**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | **1:20-cv-00234-RAH-CWB** |
| **v.** | ) | |
| | ) | |
| **ARMY SUSTAINMENT, LLC,** | ) | |
| **f/k/a L-3 ARMY SUSTAINMENT, LLC,** | ) | |
| **f/k/a ARMY FLEET SUPPORT, LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

**PLAINTIFF UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION**

**CARL M. CHANG**
Trial Attorney
(205) 382-3859
carl.chang@eeoc.gov

**GEORGE HAYEK**
Trial Attorney
(205) 651-7071
george.hayek@eeoc.gov

1130 22nd Street South, Suite 2000
Birmingham, AL 35205
Phone: (205) 651-7034
Facsimile: (205) 212-2041

ATTORNEYS FOR PLAINTIFF

**TABLE OF CONTENTS**

I.    **INTRODUCTION** ................................................................................ 1

II.   **STATEMENT OF FACTS** .............................................................. 3

   A.   AFS's Policy Prohibited Use of Certain Prescription Medications ...................... 4

      1.   AFS Viewed Prescription Medications as Similar to Illegal Drugs and Alcohol .......... 5

      2.   AFS Considered Employees Using Certain Prescription Medications to be Dangerous and Disabled ................................................................................ 6

   B.   AFS Screened Employees for Prohibited Medication Use ........................................ 6

      1.   AFS's Drug Screening for Prohibited Medications ........................................ 6

      2.   AFS Required Employees to Self-Report Prescribed Medications ................................ 9

      3.   Employees Were Sent to Company Doctors to Discuss Alternative Medications, and Company Doctors Determined Employee's Fitness Based on AFS's Policy ...................... 10

   C.   AFS Developed and Administered a Policy to Produce Consistent Outcomes .. 10

      1.   AFS Wanted and Implemented a Hard and Fast Rule .................................................. 11

      2.   AFS Drafted a Discriminatory Prescription Medication Guideline ............................ 13

   D.   The Exception that Proves the Prohibition: ADD/ADHD Medication ................. 14

   E.   AFS Mandated Safety Sensitive Letters Be Sent to Prescribing Physicians ..... 15

   F.   All Identified Employees Were Sent to Company Doctors ................................... 15

   G.   AFS Promulgated Prescription Medication Evaluation Guidelines for Company Doctors ...................................................................................... 17

   H.   Company Doctors Assessed Employees Pursuant to AFS Directives ................. 18

   I.   AFS's Policy Lacked Any Process for a Reasonable Accommodation, Although Accommodations Were Feasible ........................................................................... 22

1.   Accommodation Omitted from Procedural Guide .......................................... 22

2.   Claimants' Requests Went Unheeded ....................................................... 22

3.   Accommodation Not Possible Through Medication Review Process ......................... 25

4.   Reasonable Accommodations Were Available ............................................... 25

J.   AFS's PROCEDURES FORCED CLAIMANTS TO FORGO PRESCRIPTION MEDICATIONS ......... 26

1.   AFS Placed Non-Compliant Employees on Indefinite, Unpaid Leave......................... 26

2.   Claimants Feared for Their Jobs and Did Not Stop Taking Their Medications Voluntarily

     27

3.   Union Intervention .......................................................................... 28

K.   CONSEQUENCES OF AFS's POLICY AND ITS ADMINISTRATION ........................... 29

1.   Financial Distress............................................................................ 29

2.   Physical Pain and Suffering ................................................................ 29

3.   Mental Discomfort .......................................................................... 30

4.   Emotional Distress .......................................................................... 31

L.   AFS LACKED JUSTIFICATION FOR ITS POLICY AND PROCEDURES ....................... 32

1.   AFS's Prohibition of Prescription Medications Was Not Based on Science.............. 32

2.   AFS's Safety Standard is Vague and Arbitrary ........................................... 33

3.   No Safety Incidents Were Attributed to Use of Prescription Medications................. 35

M.   CLAIMANTS' DISABILITIES ............................................................... 35

1.   Amber Ficquette Cottrell .................................................................. 36

2.   Azeala Hutchinson .......................................................................... 36

3.    Heath McElveen...................................................................... 37

4.    Marcus Rich ............................................................................ 37

5.    Mark Blinn .............................................................................. 38

6.    Mathew Black .......................................................................... 38

7.    Winston (Mervin) Simmons ..................................................... 38

8.    Michael Sanders ...................................................................... 40

9.    Paul Nolin ............................................................................... 40

10.   Richard Johannes .................................................................... 41

11.   Rick Skinner............................................................................ 42

12.   Rickey Helms .......................................................................... 42

13.   Rickey Sego ............................................................................ 43

14.   Sabra Distasio Kelley .............................................................. 43

15.   Tammy Bright Hudson ............................................................. 43

16.   Tammie Johannes..................................................................... 44

17.   Timothy Murray....................................................................... 44

III.   SUMMARY JUDGMENT STANDARD .......................................................... 44

IV.   ARGUMENT ................................................................................................. 45

A.    INTRODUCTION ......................................................................................... 45

B.    THE EEOC CAN PROVE INTENTIONAL DISCRIMINATION BY DIRECT OR CIRCUMSTANTIAL
EVIDENCE ......................................................................................................... 45

C.    A REASONABLE JURY CAN DETERMINE AFS DISCRIMINATED AGAINST THE CLAIMANTS
BASED ON THEIR DISABILITIES UNDER § 12112(A) .................................................. 46

1.    The EEOC Can Prove the Claimants Are "Disabled" Under the ADA........................ 46

2.    The EEOC Can Prove the Claimants Were Qualified for Their Positions .................. 54

3.    The EEOC Can Prove the Claimants Suffered an Adverse Employment Action Because of Their Actual or Perceived Disabilities................................................................................ 55

4.    AFS Lacks a Legitimate Non-Discriminatory Justification for its Actions................. 63

D.    A REASONABLE JURY CAN DETERMINE THE CLAIMANTS DID NOT POSE A DIRECT THREAT 67

E.    A REASONABLE JURY CAN DETERMINE AFS'S POLICY WAS AN IMPERMISSIBLE QUALIFICATION STANDARD THAT SCREENED OUT EMPLOYEES BASED ON DISABILITY UNDER 12112(B)(3) AND (B)(6) ........................................................................................................... 70

1.    AFS's Discriminatory Qualification Standard Disparately Treated the Claimants and Had a Disparate Impact on Disabled Employees.................................................................. 71

2.    AFS's Drug Policy Screened Out Employees with Disabilities ................................... 72

3.    AFS's Reliance on Claimants' Disabilities to Screen Them Out is Direct Evidence of Discrimination Which Precludes Summary Judgment ........................................................ 73

4.    AFS Improperly Stereotyped Claimants Based on Their Disability-Related Prescriptions 74

5.    AFS's Drug Policy Had a Disparate Impact on Employees with Disabilities ............. 75

6.    AFS's Unaccommodating Application of its Drug Policy Was Not Job-Related or Consistent with Business Necessity...................................................................................... 76

F.    A REASONABLE JURY CAN DETERMINE AFS FAILED TO ACCOMMODATE THE CLAIMANTS UNDER § 12112(B)(5)(A) ........................................................................................................ 81

1.    Claimants Were Qualified Individuals with a Known Disability ................................. 81

2.    Claimants Requested Accommodation by Asking to Continue Using their Prescription Medications........................................................................................................................... 82

3.    AFS Refused to Engage in the Interactive Process.........................................83

4.    Continuing Medication Use Was a Reasonable Accommodation ...............................85

5.    Prescription Medication Use Related to Performance of Job Functions .....................87

6.    Continuing Prescription Medication Use Was Not a Matter of Preference.................88

7.    The Failure to Accommodate Is the Adverse Employment Action.............................89

G.    NONE OF THE EEOC'S CLAIMS ARE TIME-BARRED .........................................................92

1.    No Claimants Are Time-Barred Because AFS's Continuing Policy of Discrimination

was a Continuing Violation That Extended the Charge Period ...........................................92

2.    The EEOC Has Broader Authority Than a Private Litigant to Pursue Any Claim Arising

Out of a Reasonable Investigation. .......................................................................................96

3.    EEOC's Has Broad Enforcement Authority to Rectify Discrimination ......................96

4.    AFS's Timeliness Argument is Based on a Non-Controlling Outlier Case.................99

5.    Notwithstanding the Continuing Violation Doctrine, AFS Miscalculated the Relevant

Charge Period......................................................................................................................102

H.    THE CLAIMANTS ARE ENTITLED TO COMPENSATORY DAMAGES DUE TO EVIDENCE OF
INTENTIONAL DISCRIMINATION AND FORESEEABLE FURTHER INJURIES CAUSED BY AFS ...... 105

V.    CONCLUSION ................................................................................................................ 106

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam C v. Scranton Sch. Dist.*,
   No. 3:07-CV-532, 2011 U.S. Dist. LEXIS 27423 (M.D. Pa. Mar. 17, 2011) ......................105

*Adams v. Crestwood Med. Ctr.*,
   504 F. Supp. 3d 1263 (N.D. Ala. 2020)........................................................................90, 91

*Allmond v. Akal Sec., Inc.*,
   558 F.3d 1312 (11th Cir. 2009) ..................................................................................77

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)....................................................................................................44

*Arroyo-Audifred v. Verizon Wireless, Inc.*,
   431 F. Supp. 2d 215 (D.P.R. 2006)............................................................................94

*Baker v. Union Pac. R.R. Co.*,
   580 F. Supp. 3d 647 (D. Neb. 2022)..........................................................................73

*Barlow v. Walgreen Co.*,
   8:11–CV–71–T– 30EAJ, 2012 WL 868807 (M.D. Fla. Mar. 14, 2012) ................................47

*Barron v. Astrue*,
   No. 2:05-CV-2193-VEH, 2007 U.S. Dist. LEXIS 104048 (N.D. Ala. June 11,
   2007) ..............................................................................................................................49

*Beasley v. O'Reilly Auto Parts*,
   559 F. Supp. 3d 1226 (S.D. Ala. 2021)......................................................................89

*Bell v. Ohio State Univ.*,
   351 F.3d 240 (6th Cir. 2003) ......................................................................................94

*Bonci v. Army Fleet Support*,
   No. 109-CV-101-WKW WO, 2009 WL 3245612 (M.D. Ala. Oct. 5, 2009) ........................28

*Borkowski v. Valley Central School Dist.*,
   63 F.3d 131 (2nd Cir. 1995)........................................................................................86

*Brabson v. Ohio*,
   2012 U.S. Dist. LEXIS 160895 (S.D. Ohio 2012)....................................................94

*Bragdon v. Abbott*,
    524 U.S. 624 (1998) ................................................................................................65, 67

*Breaux v. Bollinger Shipyards, LLC*,
    No. 16-2331, 2018 WL 3329059 (E.D. La. July 5, 2018) ...........................................58, 69, 86

*Brewer v. Tiffin Motorhomes, Inc.*,
    No. 3:08-CV-1343-SLB, 2010 WL 11564932 (N.D. Ala. July 30, 2010)..............................51

*Butler v. Greif Bros. Serv. Corp.*,
    231 F. App'x 854 (11th Cir. 2007).....................................................................................81

*Butler v. Greif, Inc.*,
    No. 1:04-CV-3502-ODE, 2006 WL 8431947 (N.D. Ga. Mar. 29, 2006)..............................81

*Byrd v. Outokumpu Stainless USA, LLC*,
    No. CV 20-0520-WS-M, 2022 WL 2134993 (S.D. Ala. June 14, 2022) .................... *passim*

*Carico v. UPS Ground Freight, Inc.*,
    No. 2:19-CV-756-WKW, 2021 U.S. Dist. LEXIS 115024 (M.D. Ala. June 21,
    2021) ................................................................................................................................48

*Chevron USA, Inc. v. Echazabal*,
    536 U.S. 73 (2002) ...............................................................................................67, 71

*Cleary v. Fed. Exp. Corp.*,
    313 F. Supp. 2d 930 (E.D. Wis. 2004) ..............................................................................73

*Cohan v. Crafty Crab Boynton Beach Inc.*,
    No. 21-82060-CV, 2022 U.S. Dist. LEXIS 23246 (S.D. Fla. Feb. 8, 2022) .........................49

*Connelly v. WellStar Health Sys.*,
    758 F. App'x 825 (11th Cir. 2019).....................................................................................45

*Cooper v. City of Adamsville*,
    No. 2:18-cv-01539-MHH, 2021 U.S. Dist. LEXIS 53799 (N.D. Ala. Mar. 22,
    2021) ................................................................................................................................49

*Cooper v. CLP Corp.*,
    2015 WL 9311964 (N.D. Ala. Dec. 23, 2015).....................................................................50

*Cutrera v. Bd. Of Sup'rs of Louisiana State Univ.*,
    429 F.3d 108 (5th Cir. 2004) ............................................................................................83

*Davis v. Coca-Cola Bottling Co. Consol.*,
    516 F.3d 955 (11th Cir. 2008) U.S. App. LEXIS 2562 .........................................................95

*Daw v. G.A. W. & Co.*,
  No. CV 19-0525-MU, 2021 WL 6052800 (S.D. Ala. Apr. 20, 2021) ...............................53, 54

*Dinkins v. Charoen Pokphand USA, Inc.*,
  133 F. Supp. 2d 1237 (M.D. Ala. 2001) ............................................................................102

*Doers v. Lincare, Inc.*,
  No. 8:14-cv-3168-T-30AEP, 2016 U.S. Dist. LEXIS 27847 (M.D. Fla. Mar. 4,
  2016) ....................................................................................................................................48

*E.E.O.C. v. AutoZone, Inc.*,
  707 F.3d 824 (7th Cir. 2013) .............................................................................................105

*E.E.O.C. v. Browning - Ferris, Inc.*,
  262 F.Supp.2d 577 (D. Md. 2002) ........................................................................................65

*E.E.O.C. v. Exxon Corp.*,
  203 F.3d 871 (5th Cir. 2000) ................................................................................................79

*E.E.O.C. v. Joe's Stone Crab, Inc.*,
  220 F.3d 1263 (11th Cir. 2000) ....................................................................................45, 46

*Earl Patrick As Adm'r & Pers. Representative of the Estate of Patrick Clyde v.*
*City of Birmingham*,
  No. 2:09-CV-1825-VEH, 2010 U.S. Dist. LEXIS 147326 (N.D. Ala. Oct. 28,
  2010) ..................................................................................................................................106

*EEOC v. 5042 Holdings Ltd.*,
  2010 U.S. Dist. LEXIS 8242, 2010 WL 148085 (N.D. W.Va. Jan. 11, 2010) .....................100

*EEOC v. Caterpillar, Inc.*,
  409 F.3d 831 (7th Cir. 2005) ...............................................................................................97

*EEOC v. Freeman*,
  2010 U.S. Dist. LEXIS 41336 .............................................................................................99

*EEOC v. Freeman*,
  U.S. Dist. LEXIS 41336 (D. Md. 2010) ......................................................99, 100, 101, 102

*EEOC v. Hussey Copper Ltd.*,
  696 F. Supp. 2d 505 (W.D. Pa. 2010) .................................................................................69

*EEOC v. Huttig Sash & Door Co.*,
  511 F.2d 453 (5th Cir. 1975) ...............................................................................................97

*EEOC v. Kronos, Inc.*,
620 F.3d 287 (3rd Cir. 2010) ................................................................................98

*EEOC v. LA Weight Loss*,
509 F. Supp. 2d 527 (D. Md. 2007) .......................................................................99

*EEOC v. MGH Family Health Center*,
No. 1:15-cv-952, 2017 WL 410298 (W.D. Mich. Jan. 30, 2017) ..........................65

*EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*,
990 F. Supp. 1059 (C.D. Ill. 1998) ........................................................................99

*EEOC v. Outokumpu Stainless USA, LLC*,
No. CV 20-521-CG-B, 2022 WL 4004769 (S.D. Ala. Sept. 1, 2022) ....................74

*EEOC v. Scolari Warehouse Markets, Inc.*,
488 F. Supp. 2d 1117 (D. Nev. 2007) ....................................................................99

*EEOC v. Scott Med. Health Ctr., P.C.*,
217 F. Supp. 3d 834 (W.D. Pa. 2016) ..................................................................100

*EEOC v. Sears, Roebuck & Co.*,
490 F. Supp. 1245 (M.D. Ala.1980) .......................................................................94

*EEOC v. Sidley Austin LLP*,
437 F.3d 695 (7th Cir. 2006) ...............................................................................100

*EEOC v. Sterling Jewelers, Inc.*,
2010 U.S. Dist. LEXIS 649, 2010 WL 86376 (W.D.N.Y. Jan. 6, 2010) ...............99

*EEOC v. STME, LLC*,
938 F.3d 1305 (11th Cir. 2019) .............................................................................50

*EEOC v. United Health Programs of Am., Inc.*,
213 F. Supp. 3d 377 (E. D. N.Y. 2016) ................................................................100

*EEOC v. UPS*,
Case No. CV-15-01935-PHX-GMS, 2017 WL 3503676 (D. Ariz. June 19,
2017) ......................................................................................................................60

*Emmons v. C-Innovation, L.L.C.*,
No. CV 17-4674, 2018 WL 1705574 (E.D. La. Apr. 9, 2018) ...............................88

*Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*,
No. 2:17-CV-01649-MHH, 2022 WL 2959569 (N.D. Ala. July 26, 2022)...........71, 73, 76

*Equal Emp. Opportunity Comm'n v. Kaiser Found. Health Plan of Georgia, Inc.*,
   No. 1:19-CV-05484-AT-WEJ, 2021 WL 2547068 (N.D. Ga. Apr. 19, 2021) ......................85

*Equal Emp. Opportunity Comm'n v. Kaiser Found. Health Plan of Georgia, Inc.*,
   No. 1:19-CV-5484-AT, 2021 WL 3508533 (N.D. Ga. Aug. 9, 2021) ......................85, 90, 91

*Exby-Stolley v. Bd. of Cnty. Commissioners*,
   979 F.3d 784 (10th Cir. 2020) ........................................................................56, 57

*Fed. Express Corp. v. Holowecki*,
   552 U.S. 389 (2008).........................................................................................103, 104

*Forbes v. St. Thomas Univ., Inc.*,
   768 F. Supp. 2d 1222 (S.D. Fla. 2010) ...................................................................49

*Franklin v. Potter*,
   600 F. Supp. 2d 38 (D.D.C. 2009) ........................................................................60

*Fuog v. CVS Pharmacy, Inc.*,
   No. CV 20-337 WES, 2021 WL 4355402 (D.R.I. Sept. 24, 2021) ........................54

*Fuzy v. S & B Eng'rs & Constructors, Ltd.*,
   332 F.3d 301 (5th Cir. 2003) ................................................................................77

*Gen. Tel. Co. v. EEOC*,
   446 U.S. 318 (1980)........................................................................................96, 97

*Goff v. Performance Contractors, Inc.*,
   No. CV 18-0529-WS-MU, 2020 WL 1794967 (S.D. Ala. Apr. 8, 2020)........................53, 54

*Gonzales v. City of New Braunfels, Tex.*,
   176 F.3d 834 (5th Cir. 1999) ................................................................................71

*Hairston v. Gainesville Sun Pub. Co.*,
   9 F.3d 913 (11th Cir. 1993) .................................................................................62

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993)..............................................................................................56

*Haynes v. City of Montgomery*,
   2008 WL 4495711 (M.D. Ala. Oct. 6, 2008).........................................................75

*Haynes v. City of Montgomery*,
   344 Fed. Appx. 519 (11th Cir. 2009).........................................................51, 52, 53

*Haynes v. City of Montgomery, Ala.*,
 344 F. App'x 519 (11th Cir. 2009)...........................................................................75

*Haynes v. City of Montgomery, Ala.*,
 No. 2:06-CV-1093WKW, 2008 WL 695023 (M.D. Ala. Mar. 12, 2008) ...............59

*Helmuth v. Troy Univ.*,
 No. 2:19-CV-601-RAH-SMD, 2021 WL 1081118 (M.D. Ala. Mar. 19, 2021)
 (Huffaker, J.)..........................................................................................................56

*Hernandez v. Palm Beach Cty. Bd. of Cty. Comm'rs*,
 No. 20-80075-CIV, 2021 WL 4459405 (S.D. Fla. Sept. 29, 2021).........................95

*Hixon v. Tennessee Valley Auth. Bd. of Directors*,
 504 F. Supp. 3d 851 (E.D. Tenn. 2020)...................................................................69

*Holiday v. City of Chattanooga*,
 206 F.3d 637 (6th Cir. 2000) ..................................................................................65

*Holly v. Clairson Indus., L.L.C.*,
 492 F.3d 1247 (11th Cir. 2007) .........................................................................82, 89

*Howard v. Norfolk S. Corp.*,
 No. 2:17-CV-02163-RDP ...................................................................................50, 61

*Howard v. Norfolk S. Corp.*,
 No. 2:17-CV-02163-RDP, 2020 WL 5569922 (N.D. Ala. Sept. 17, 2020)................... *passim*

*Jacobs v. York Union Rescue Mission, Inc.*,
 2014 WL 6982618 (M.D. Penn 2014) ....................................................................48

*Jarvela v. Crete Carrier Corp.*,
 776 F.3d 822 (11th Cir. 2015) ................................................................................46

*Jensen v. Frank*,
 912 F.2d 517 (1st Cir. 1990)....................................................................................93

*Jeter v. Dixie*,
 No. 1:13cv197-MEF (WO), 2013 U.S. Dist. LEXIS 128185 (M.D. Ala. Aug.
 15, 2013) ................................................................................................................49

*Johnson v. Alice Ind. School Dist.*,
 No. C-12-170, 2012 WL 4068678 (S.D. Tex. Sept. 14, 2012)...............................60

*Kinsey v. City of Jacksonville*,
No. 3:01 CV 785, 2005 WL 3307211 (M.D. Fla. Dec. 6, 2005), *aff'd* 189 F.
App'x 860 (11th Cir. 2006) ......................................................................59

*Lewis v. City of Union City, Georgia*,
934 F.3d 1169 (11th Cir. 2019) ...........................................................*passim*

*Lisby v. Tarkett Ala., Inc.*,
No. 3:16-cv-01835-MHH, 2020 U.S. Dist. LEXIS 55927 (N.D. Ala. Mar. 31,
2020) ..........................................................................................................49

*Lisby v. Tarkett Alabama, Inc.*,
No. 3:16-CV-01835-MHH, 2020 WL 1536386 (N.D. Ala. Mar. 31, 2020)..........................52

*Lloyd v. Housing Auth. of the City of Montgomery, Ala.*,
857 F. Supp. 2d 1252 (M.D. Ala. 2012) .................................................48

*Loperena v. Scott*,
No. CIV. A. 2:08-CV-99, 2009 WL 1066253 (M.D. Fla. Apr. 21, 2009)........................45, 74

*Lowe v. Alabama Power Company*,
244 F.3d 1305 (11th Cir. 2001) ........................................................65, 69, 74

*Lowe v. Delta Airlines, Inc.*,
No. 1:16-CV-3717-TWT-JSA, 2017 WL 2982336 (N.D. Ga. May 31, 2017)......................85

*LRL Prop. v. Portage Metro Hous. Auth.*,
55 F.3d 1097 (6th Cir. 1995) ..........................................................93, 94

*Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).........................................................................45

*Matthews v. Pennsylvania Dept. of Corrections*,
613 Fed. Appx. 163 (3rd Cir. 2015).........................................................48

*Mazzeo v. Color Resolutions Int'l, LLC*,
746 F.3d 1264 (11th Cir. 2014) .......................................................47, 48

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973).....................................................................46, 71

*Migis v. Pearle Vision, Inc.*,
135 F.3d 1041 (5th Cir. 1998) ...........................................................106

*Mitchell v. Pilgrim's Pride Corp.*,
817 F. App'x 701,711 (11th Cir. 2020)...................................................82

*Monroe v. Fla. Dep't of Corr.*,
    793 F. App'x 924 (11th Cir. 2019)................................................................. *passim*

*Moore v. Chertoff*,
    437 F. Supp. 2d 156, 98 FEP 795 (D.D.C. 2006) ...................................................94

*Moore v. Jackson Cty. Bd. of Educ.*,
    979 F. Supp. 2d 1251 (N.D. Ala. 2013)..................................................................47

*Murphy v. Gen. Elec. Co.*,
    245 F. Supp. 2d 459, 90 FEP 1418 (N.D.N.Y. 2003) ............................................94

*Nat. Parks and Conservation Ass'n, Inc. v. Tenn. Valley Auth.*,
    502 F.3d 1316 (11th Cir. 2007) ..............................................................................93

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002).............................................................................. *passim*

*O'Connor v. City of Newark*,
    440 F.3d 125 (3rd Cir. 2006) .................................................................................94

*Owens-Benniefield v. BSI Fin. Servs.*,
    806 Fed. Appx. 853 (11th Cir. 2020) ...................................................................101

*Owusu–Ansah v. Coca–Cola Co.*,
    715 F.3d 1306 (11th Cir. 2013), *cert. denied*, 571 U.S. 1045 (2013)....................77

*Pollard v. Drummond Co., Inc.*,
    No. 2:12-CV-03948-MHH, 2015 WL 5306084 (N.D. Ala. Sept. 10, 2015) ..............65, 68, 74

*Powell v. Gentiva Health Servs., Inc.*,
    No. CIV.A. 13-0007-WS-C, 2014 WL 554155 (S.D. Ala. Feb. 12, 2014) ............50

*Provencher v. CVS Pharmacy, Div. of Melville Corp.*,
    145 F.3d 5 (1st Cir. 1998)......................................................................................93

*Quitto v. Bay Colony Golf Club, Inc.*,
    No. 206CV-286-FTM-29DNF, 2007 WL 2002537 (M.D. Fla. July 5, 2007)........49

*Raytheon Co. v. Hernandez*,
    540 U.S. 44 (2003)..................................................................................................71

*Rigby v. Springs Indus., Inc.*,
    156 F. App'x 130 (11th Cir. 2005)..........................................................................52

*Rousseau v. Alabama Cmty. Coll. Sys.*,
  No. 2:20-CV-391-RAH-SMD, 2021 WL 3476605 (M.D. Ala. Aug. 6, 2021) .......................70

*Salser v. Clarke Cty. Sch. Dist.*,
  No. 3:10-CV-17 CDL, 2011 WL 56064 (M.D. Ga. Jan. 5, 2011) ..........................................95

*Samson v. Fed. Express Corp.*,
  746 F.3d 1196 (11th Cir. 2014) ...................................................................................54

*Schultz v. Royal Caribbean Cruises, Ltd.*,
  465 F. Supp. 3d 1232 (S.D. Fla. 2020) ........................................................................45

*Schwarz v. Villages Charter Sch., Inc.*,
  No. 5:12-CV-177-OC-34PRL, 2014 WL 12623013 (M.D. Fla. May 23, 2014) ...................84

*Sharpe v. Cureton*,
  319 F.3d 259 (6th Cir. 2003) .................................................................................93, 94

*Silvia v. City of Hidalgo, Tex.*,
  575 Fed. Appx. 419 (5th Cir. 2014) ...........................................................................83

*Snead v. Fla. Agricultural & Mechanical Univ. Bd. of Trustees*,
  724 Fed. Appx. 842 (11th Cir. 2018) .........................................................................54

*Stainback v. Citadel Broad. Co. Corp.*,
  No. 2:13-CV-812-KOB, 2014 U.S. Dist. LEXIS 175381 (N.D. Ala. Dec. 19,
  2014) ........................................................................................................................49

*Steenmeyer v. Boeing Co.*,
  92 F. Supp. 3d 1024 (W.D. Wash. 2015) ....................................................................60

*Stokes v. City of Montgomery*,
  No. 2:07CV686-WHA, 2008 WL 4369247 (M.D. Ala. Sept. 25, 2008) ...............................67

*Sugg v. City of Sunrise*,
  No. 20-13884, 2022 U.S. App. LEXIS 26088 (11th Cir. Sep. 19, 2022) ..............................49

*Taylor v. Pathmark Stores, Inc.*,
  177 F.3d 180 (3d Cir. 1999) ......................................................................................65

*Tenenbaum v. Caldera*,
  45 Fed. Appx. 416 (6th Cir. 2002) .............................................................................94

*Toole v. Metal Servs. LLC*,
  17 F. Supp. 3d 1161 (S.D. Ala. 2014) ....................................................................70, 71

*Turic v. Holland Hosp., Inc.*,
  85 F.3d 1211 (6th Cir. 1996) ............................................................... 105

*U.S. EEOC v. O'Reilly Auto. Stores, Inc.*,
  U.S. Dist. LEXIS 266330 (M.D. Fla. 2020) ........................................... 98

*United States EEOC v. St. Joseph's Hosp., Inc.*,
  842 F.3d 1333 (11th Cir. 2016) ............................................................. 49

*Taul ex rel. United States v. Nagel Enters.*,
  No. 2:14-CV-0061-VEH, 2019 U.S. Dist. LEXIS 26669 (N.D. Ala. Feb. 20,
  2019) ..................................................................................................... 106

*US Airways, Inc. v. Barnett*,
  535 U.S. 391 (2002) ....................................................................... 86, 88

*White v. Potter*,
  No. 1:06-CV-1759-TWT, 2007 WL 1330378 (N.D. Ga. Apr. 30, 2007) ......... 59, 62

*Wilkerson v. Grinnell Corp.*,
  270 F.3d 1314 (11th Cir. 2001) ..................................................... 103, 104

*Williamson v. Clarke Cty. Dep't of Human Res.*,
  834 F. Supp. 2d 1310 (S.D. Ala. 2011) ................................................. 82

*Wilson v. Sec'y of Veterans Affs. Dep't of Veterans Affs.*,
  No. 20-10799, 2022 WL 1907863 (11th Cir. June 3, 2022) ............... 82, 83

*Wingfield v. S. Univ. of Fla., Inc.*,
  No. 8:09-cv-01090-T-24-TBM, 2010 WL 2465189 (M.D. Fla. June 15, 2010) ......... 59, 61, 62

*Wolfe v. Postmaster General*,
  488 Fed. Appx. 465 (11th Cir. 2012) ..................................................... 50

*Wysong v. The Dow Chemical Company*,
  503 F.3d 441 (6th Cir. 2007) ................................................................ 69

**Statutes**

42 U.S.C.A. § 12111(9)(B) ........................................................................ 87

42 U.S.C.S. § 2000e-5 .................................................................... *passim*

42 U.S.C. § 12102 ........................................................................... *passim*

42 U.S.C. § 12111 ........................................................................... *passim*

42 U.S.C. § 12112 ................................................................................... *passim*

42 U.S.C.§ 12117(a) ....................................................................................... 93

42 U.S.C. § 12188(a)(1) ................................................................................. 84

U.S. Code § 12113 .................................................................................... 77, 78

**Other Authorities**

29 C.F.R. § 1601.12(a) ......................................................................... 103, 104

29 C.F.R. §1601.13 ........................................................................................ 92

29 C.F.R. § 1630 ................................................................................. *passim*

Fed. R. Civ. P. 56(a), (c) ............................................................................... 44

## I.    INTRODUCTION

In 2014, Defendant Army Sustainment, LLC, f/k/a L-3 Army Sustainment, LLC, f/k/a Army Fleet Support, LLC ("Defendant" or "AFS"), a government contractor, began applying a policy that was an anomaly among its predecessors and its successor at Fort Rucker. The policy completely prohibited the use of certain medications for employees AFS considered to be in safety sensitive positions. No safety incident compelled AFS to adopt a prohibition and apply this policy. No aircraft accident had ever been caused by prescription medications at Fort Rucker.

AFS screened out employees using certain medications prescribed by their treating physicians and sent them to company doctors. AFS's policy required company doctors to discuss alternative medications and determine an employee's fitness for work pursuant to AFS's prohibition on prescription medications. It made no sense to determine individual employees unfit for work when they had a prescription medication that addressed their underlying condition and posed no danger. For example, an employee whose job duties were clerical was found unable to work while taking medication for Attention Deficit/Hyperactivity Disorder ("ADHD") simply because AFS's guidelines were not met. Likewise, an employee with Post-Traumatic Stress Disorder ("PTSD") could not work and take his prescribed medication, even though the medication managed his PTSD symptoms with no notable side effects. Another employee with chronic pain was simply made to suffer as she performed her job duties without the medication that had worked for her in the past.

The Plaintiff, Equal Employment Opportunity Commission ("EEOC"), brings claims on behalf of Charging Parties, Winston Simmons and Paul Nolin, and 15 other Claimants (collectively

the "Claimants")[1] asserting that AFS violated the Americans with Disabilities Act (ADA) by administering an impermissible qualification standard, discriminating against the Claimants based on their disabilities, and failing to provide reasonable accommodations. No Claimants are time-barred. No statute of limitations expressly excludes any Claimant. AFS had notice of the Claimants as potential class members during the EEOC's investigations, and AFS's policy continuously discriminated against Claimants from 2014 to 2018.

AFS does not and cannot show that any individual Claimant represented a threat to themselves or their coworkers. Many Claimants had worked at their jobs safely while taking their prescribed medications for years. Yet, those years did not matter to AFS. Whether Claimants actually experienced side effects from their medication at work also did not matter. AFS was concerned only with potential side effects and the possibility of an incident, no matter how remote or implausible with any particular individual.

Claimants complained about the policy and wanted to continue taking their prescribed medications, but "accommodation" was not in the vocabulary of the policy. AFS placed Claimants who were not in compliance with the policy on unpaid, indefinite leave. Claimants had to stop taking their prescribed medications if they wanted to resume their gainful employment with AFS. Those Claimants who agreed to stop taking their medications were subject to termination if they resumed. AFS forced those employees to work with untreated disabilities, as alternative, AFS-approved treatments proved inadequate.

---

[1] The other claimants are Amber Ficquette Cottrell, Azeala Hutchinson, Heath McElveen, Marcus Rick, Mark Blinn, Mathew Black, Michael Sanders, Richard Johannes, Rick Skinner, Rickey Sego, Sabra Distasio Kelley, Tammy Johannes, Tammy Bright Hudson, and Timothy Murray. The record typically refers to the maiden names for Amber Ficquette Cottrell, Sabra Distasio Kelley, and Tammy Bright Hudson.

The EEOC opposes AFS's Motion for Summary Judgment (Doc. 153). The callous application of the policy left many Claimants unable to pay bills, and one Claimant lost his home and was forced to file bankruptcy as a result. Claimants dealt with financial hardship, bouts of severe pain, impaired focus, loss of emotional control, stress, sleeplessness, and more, all with ripple effects on their lives, wellbeing, and family. A reasonable jury could find that AFS is liable for the harms it caused.

## II.    STATEMENT OF FACTS

From 2003 to 2018, AFS was a government contractor providing aviation maintenance support to the United States Army Aviation Center and the United States Air Force at Fort Rucker, Alabama. Fort Rucker was mostly a training ground and not a base for field combat. (Ex. 23, Murray Dep. 24:15-25:4). In 2012, AFS created an Alcohol and Drug Free Workplace Procedural Guide 2501 ("the Procedural Guide"). (Ex. 37, Procedural Guide §1.0, p.2). The Procedural Guide included a policy prohibiting the use of certain prescription medications by employees whom AFS considered to be in safety sensitive positions. AFS began applying the policy at least by 2014. (Ex. 10, Murray Decl. ¶11). Even though he had worked for nine years without issue while taking his prescribed mediation, AFS determined Timothy Murray unable to work while taking Ativan for PTSD and panic attacks. (Ex. 10, Murray Decl. ¶¶6-8, 11-19; Ex. 23, Murray Dep. 63:8-69:12). AFS placed Murray on unpaid leave for five months until he was able to wean off the prohibited medication. (Ex. 10, Murray Decl. ¶¶29; Ex. 23, Murray Dep. 37:3-10, 71:21-73:8). Murray suffered months without income, lost his home because he could not pay his mortgage, and had to declare bankruptcy. (Ex. 10, Murray Decl. ¶¶27-32; Ex. 23, Murray Dep. 37:3-10, 71:21-73:8).

Although the company servicing the government contract changed over time, generally the same employees remained in their roles at Fort Rucker. (Ex. 17, Helms Decl. ⁋50). From 1984 to 1988, Sikorsky Support Services had the maintenance contract at Fort Rucker. (Ex. 11, Nolin Decl. ⁋⁋1-5). From 1998 to 2003, DynCorp provided maintenance services under the Fort Rucker contract. (*Id.*). Neither of AFS's predecessors completely prohibited the use of prescription medications. (Ex. 11, Nolin Decl. ⁋15). These contractors allowed employees to take prescribed medication 6-8 hours before a work shift. (*Id.*) Initially, AFS's administration of its policy also allowed many of its employees to take medication 6-8 hours before a work shift. But, in 2016, AFS ended the exemption, and complaints about the policy increased dramatically. (Ex. 11, Nolin Decl. ⁋15; Ex. 28, Poole Dep. 65:20-67:7; Ex. 26, Lawson Dep. 231:5-8). In 2018, Army Sustainment lost the contract at Fort Rucker. (Ex. 11, Nolin Decl. ⁋⁋35-36). Its successor, M1 Support Systems, resumed the prescription medication policy of Army Sustainment's predecessors. (Ex. 6, Hutchinson Decl. at ¶ 33; Ex. 11, Nolin Decl. ⁋⁋35-36). Once again, employees were able to take prescribed medication with the approval of a treating physician. (*Id.*).

## A.     AFS's Policy Prohibited Use of Certain Prescription Medications

As stated in the Procedural Guide, AFS's policy prohibited the use of certain prescription medications by employees in positions AFS considered to be safety sensitive. Prescription medications such as "pain killers with narcotics, antidepressants and prescription diet medications" were deemed "inappropriate *for use at all* for employees in a safety sensitive environment." (Ex. 37, Procedural Guide §4.20.2, p.6) (emphasis added). A company doctor did not determine whether those medications were appropriate for use by employees in positions AFS considered to

be safety sensitive. Instead, AFS determined those medications inappropriate regardless of whether they were used off duty or during work hours.[2] (*Id.*).

    1.    <u>AFS Viewed Prescription Medications as Similar to Illegal Drugs and Alcohol</u>

The Procedural Guide states: "The policy of this company is that no employee will consume alcoholic beverages at work or work under the influence of *prohibited prescription medication*, illegal drugs or alcohol at any time when performing job functions." (Ex. 37, Procedural Guide §1.0, p.3) (emphasis added). The Procedural Guide defines "prohibited prescription medication" as "[p]rescription medications listed in the L3 Communications Nine Panel Screen." (Ex. 37, Procedural Guide §4.29, p.7). The substances listed in the Nine Panel Drug Screen include cocaine, marijuana, and heroin. (Ex. 37, Procedural Guide §5.6, p.11). By tying the definition of "prohibited prescription medications," which includes lawfully prescribed drugs, to the Nine Panel Drug Screen, which is meant to address the use of illegal drugs or the abuse of prescription drugs, AFS policy viewed the use of lawfully prescribed medication in the same light as illegal drug use.

---

[2] Under Section 4.20 of the Procedural Guide, the terms: "Legal Drug," "Prescription Drug," and "Medication" are medications "prescribed by a person's physician and used in accordance with the prescription." Section 4.20.2 states: "Certain prescription medications may be unsafe for use during work hours but are acceptable for use during off duty hours . . . The determination of whether a medication is appropriate for use during work hours is determined by a company authorized Occupational Medical Provider." However, "*other* prescription medications have been determined inappropriate *for use at all* for employees in a safety sensitive environment such as aviation maintenance. (Section 4.20.2) (emphasis added). These prescription medications may include but are not limited to pain killers with narcotics, antidepressants and prescription diet medications." In contrast to other employees, a company doctor did not determine whether those medications are appropriate for use by employees in positions AFS considered to be safety sensitive. That determination was not within the OMP's role because the medications were deemed prohibited.

2.     AFS Considered Employees Using Certain Prescription Medications to be Dangerous and Disabled

In the Procedural Guide, AFS described "prohibited prescription medications" as "medications that can potentially cause errors or momentary lapses in judgment." (Ex. 37, Procedural Guide §4.29, p.7). A "safety sensitive classification" is "a job or position where the employee holding that position has the responsibility for his/her own safety or other people's safety." (Ex. 37, Procedural Guide §4.36, p.8). The Procedural Guide further states that safety sensitive classifications "hold a connection between the work performed and a 'compelling interest in safety,' such that small errors or momentary lapses in judgment could have 'catastrophic consequences for crew members.'" (*Id.*). "It would be particularly dangerous if such an employee is using certain types of prescription medication." (*Id.*). AFS considered any such employee as unable to work and disabled.  "Employees determined unable to work within the parameters of the Alcohol and Drug Free Workplace Policy will be deemed disabled." (Ex. 37, Procedural Guide §5.3, p.9).

**B.     AFS Screened Employees for Prohibited Medication Use**

AFS identified employees using prohibited medications through drug screens and required self-reporting. Identified employees were sent to a company doctor for a discussion about alternative medications and advised to contact their treating physicians for alternatives. The company doctor was to then assess the employee's fitness for the position pursuant to AFS's policy of prohibition.

1.     AFS's Drug Screening for Prohibited Medications

According to AFS policy, "no employee will work under the influence of prohibited prescription medication" (Ex. 37, Procedural Guide §1.0, p.3). The Procedural Guide defined

"under the influence" as an employee "affected by a drug, whether legal or illegal," that impairs or *potentially* impairs the ability to perform the employee's job and also as "having a *detectable* amount of alcohol, controlled or illegal substances or evidence of use in the body." (Ex. 37, Procedural Guide §4.39, p.8)(emphasis added). AFS's policy considered employees to be under the influence if a prohibited medication was merely detected in their system. (Ex. 36, Yarborough Dep. 212:5-9 ("[N]o employee will be under the influence as [AFS] define[s] it of the prohibited prescription medication. … [J]ust the mere presence in their body, as AFS put[s it], is under the influence of these particular medications.").[3]

AFS subjected its employees to random drug screenings to detect a prohibited medication. (Ex. 37, Procedural Guide §5.11, p.14). In addition, the Procedural Guide required drug screens for an employee "who is reasonably suspected of using a prohibited drug" or for employees involved in an accident. (Ex. 37, Procedural Guide §§4.27, 4.30, 4.31, 5.11, 5.12, pp.7, 14-15). The drug screens were conducted by a company doctor fulfilling the role of Medical Review Officer ("MRO"). (Ex. 37, Procedural Guide §4.21, p.6). A "Negative" test result with a "Safety Sensitive Concern" meant the detection of "a prescription medication that has been *legally prescribed yet is prohibited for use* in a safety sensitive classification." (Ex. 37, Procedural Guide §5.15.7, p.16)(emphasis added). The MRO provided the lab analysis of those test results to AFS. (Ex. 37, Procedural Guide §6.6.3, pp.18-19). According to the Procedural Guide, an employee with a test result of "Negative with Safety Sensitive Concern" "[w]ill be evaluated by the OMP

---

[3] Some medications could be detectable days after being taken. (Ex.36, Yarborough Dep. 160:16-161:11). However, "[t]here's no correlation" between having "a detectable amount of a particular drug or its metabolite in the urine, hair, nail or whatever" and a person's impairment level. (Ex. 36, Yarborough Dep. 162:1-11; 307:12-23).

and advised to contact his/her primary care physician to seek an alternative" and "[m]ay be placed off the clock until a 'negative' test result is obtained …." (Ex. 37, Procedural Guide §5.15, p.15-16). This provision presumes that the only viable risk-mitigation option is an alternative medication. The Procedural Guide omitted from an OMP's role any determination of whether the employee's ability to safely perform his job duties was impaired.

When a drug screen indicated an employee was using a prohibited prescription medication and AFS sent the employee to a company doctor, AFS considered the employee unable to work and took the employee off the clock. (Ex. 37, Procedural Guide §5.15.7.2, p.17; Ex. 48, Emails Re Britt; Ex. 49, Emails Re Buehler). The employee did not earn income during that period. Even if the employee had previously been cleared by a company doctor, the employee was still subject to this procedure. (Ex. 48, Emails Re Britt; Ex. 49, Emails Re Buehler). In 2016, AFS held discussions about "grandfathering" employees who had been previously cleared. However, a grandfathering arrangement was not implemented. (Ex. 27, Hanchey Dep. 127:8-135:20; Ex. 29, Swaim Dep. 153:11-154:14). Tammie (Maddox) Hanchey, the AFS employee primarily responsible for drafting the Procedural Guide,[4] was not tolerant of individual deviations from the rules she created. (Ex. 28, Poole Dep. 140:16-141:12).

AFS policy enforced the prohibition on prescription medications through the threat of termination upon a second detection of a prohibited medication. (Ex. 37, Procedural Guide §5.15.7.4, p.17). AFS considered a negative test result with a safety sensitive concern to be an

---

[4] (Lawson Dep. 56:4-20; 61:19-62:6).

offense and directed that an employee "[w]ill be advised that a 2nd offense will result in termination." (*Id.*).

### 2.     AFS Required Employees to Self-Report Prescribed Medications

AFS's policy required employees in positions AFS considered to be safety sensitive to self-report any prescribed medication that *may* affect the ability to perform job duties. (Ex. 37, Procedural Guide §§4.20.1, 5.5, 5.13, p.6, 11, 15). AFS sent self-reporting employees to a company doctor who evaluated the prescription medication "for determination of use in safety sensitive positions." (Ex. 37, Procedural Guide §§5.5, 5.13, p.11, 15). For any medication that had been "deemed to be a risk to the employee and/or the workplace," the Procedural Guide directed the OMP to discuss alternative medications with the employee. (*Id.*). AFS deemed the use of prohibited medications by safety sensitive employees to be a workplace risk. (Ex. 37, Procedural Guide §4.20.2, p.6). The Procedural Guide omitted from an OMP's role any determination of whether the employee's ability to safely perform his job duties was impaired.

AFS required employees to receive clearance from AFS's Occupational Health Group before returning to work after several days of absence. (Ex. 3, Cottrell, Decl. ¶ 13; Ex. 29, Swaim Dep. 74:6-20). As requested in AFS's Return-to-Work form, an Occupational Health Group member would ask employees if they were in a safety sensitive position and taking prescription medications. (Ex. 29, Swaim Dep. 74:6-20; Ex. 38, Return-to-Work Form). The form specifically lists several categories of medications AFS deemed "likely to impair the employee's ability to perform the essential functions of his or her job safely." (Ex. 38, Return-to-Work Form).

3.  Employees Were Sent to Company Doctors to Discuss Alternative Medications, and Company Doctors Determined Employee's Fitness Based on AFS's Policy

The Procedural Guide defines an Occupational Medical Provider (OMP) as "[a] company approved licensed physician or other qualified medical professional selected to perform medical monitoring and *qualification examinations* in accordance with applicable Federal, State and local laws and regulations, and *AFS Directives*." (Ex. 37, Procedural Guide §4.22, p.6) (emphasis added). The Procedural Guide directs the company doctors fulfilling the OMP role to issue a Safety Sensitive Letter to prescribing physicians and discuss alternative medications with employees who are sent to them for a medication review. (Ex. 37, Procedural Guide §6.7.2, p.19).  When an employee is sent to an OMP after self-reporting a medication, the OMP "[d]etermines an employee's fitness to return-to-duty in accordance with [the Procedural Guide]." (Ex. 37, Procedural Guide §6.7.1, p.19).

**C.  AFS Developed and Administered a Policy to Produce Consistent Outcomes**

The Director of AFS's Human Resources Department was Michael Lawson since the summer of 2015, and his predecessor was Dan Dymarkowski, who had been the Director since 2009. (Ex. 26, Dep. Lawson 34:9-15, 47:10-24). The Director was responsible for AFS's Human Resources policies. (Ex. 26, Dep. Lawson 48:14-17). Tammy Maddox Hanchey was the manager of the Occupational Health Office in the Human Resources Department.[5] (Ex. 39, Org Chart; Ex. 27, Hanchey Dep. 26:22-27:5). The Occupational Health Office handled communications with the company doctors. Laura Swaim handled many of the day-to-day tasks for administering the

---

[5] Tammy Maddox Hanchey is referred to by her maiden name "Maddox" in the record.

prescription medication program. (Ex. 29, Swaim Dep. 31:6-16). Penny Poole was the Labor Relations Manager. (Ex. 39, Org Chart). Among her other duties, Poole oversaw the grievance process including the grievances filed by employees who complained about the AFS's prescription medication policy. (Ex. 28, Poole Dep. 50:18-51:5). Poole became involved with the revisions of the Procedural Guide after complaints about the policy prohibiting prescription medications were made through the Union. (Ex. 28, Poole Dep. 18:5-17, 75:1-76:23). Even though employees for a government contractor like AFS were generally hired by the succeeding government contractor, none of the aforementioned AFS employees were hired by M1 Support Systems when it took over operations at Fort Rucker.[6] (Ex. 27, Hanchey Dep. 224:19-225:7; Ex. 28, Poole Dep. 21:17-22:3; Ex. 29, Swaim Dep. 222:24-223:8; Ex. 26, Lawson Dep. 26:3-14).

    1. <u>AFS Wanted and Implemented a Hard and Fast Rule</u>

In January 2012, AFS created the Procedural Guide as a standalone document. (Ex. 37, Procedural Guide p.2). The procedures in the Procedural Guide had previously been a part of AFS's Human Resource Manual. (*Id.*). The goal in applying the Procedural Guide was to ensure consistent administration of AFS's policy. (*Id.*). Hanchey authored the original version of the Procedural Guide in 2012 and all the subsequent revisions. (*Id.*). Despite the Procedural Guide's focus on prescription medications, medical procedures, and doctor determinations, Hanchey had never graduated college; her highest level of education was barber school; and she lacked any credentials in toxicology. (Ex. 27, Hanchey Dep. 23:20-25:5, 27:7-12).

---

[6] Laura Swaim was hired by M1 Support Systems a few months later. (Ex. 29, Swaim Dep. 222:24-223:8).

In June 2012, a concern arose about different company doctors making different determinations on the same medication for different employees. (Ex. 50, Emails Re Consistency). A representative from a company doctor's office communicated that the doctors assessed each employee individually and would continue to do so unless AFS provided guidance on which medications it would or would not accept.[7] (*Id.*). The last word on the discussion was from Patricia Donahue, AFS's Director of Procurement. (*Id.*). Donahue stated there was a need for clarification because "in the policy we leave decisions to the medical professional to determine suitability for duty." (*Id.*). "And I can see how that might vary from patient to patient etc. If we have a *hard and fast rule* of what we will not accept—I suggest we publish it." (*Id.*)(emphasis added). Donahue was apparently suggesting that AFS use a list of prohibited medications. (Ex. 29, Swaim Dep. 126:9-127:3). All the members of AFS's Occupational Health Office agreed they "needed" the outcomes of the doctor evaluations to be consistent. (Ex. 29, Swaim Dep. 130:18-131:2). Following the discussion on consistent outcomes, the Procedural Guide was completely rewritten, and a revision was issued in April 2013. (Ex. 37, Procedural Guide p.2).

In October 2013, AFS clarified the jobs it considered to be safety sensitive by adding a list of "Safety Sensitive Classifications" to the Procedural Guide. (Ex. 37, Procedural Guide p.2). In 2014, AFS modified the drug screen panel from 10 substances to 9 substances. (*Id.*) The change, however, was not substantial. The Nine Panel Drug Screen removed Quaaludes, a substance that was no longer used. (Ex. 27, Hanchey Dep. 65:12-66:25). There have not been any significant

---

[7] When asked about AFS's Procedural Guide, one of AFS's company doctors, Dr. Mathew Krista, testified that an evaluation of risk of a prescription medication for a safety sensitive worker could vary between individual doctors, and AFS may have raised that consistency concern with him. (Ex. 30, Krista Dep. 107:2-108:5).

substantive changes to the Procedural Guide since 2013. (Ex. 37, Procedural Guide p.2). The Procedural Guide produced in 2013 embodies the same policy and defines essentially the same procedures that were present throughout the events in this case.

2.    AFS Drafted a Discriminatory Prescription Medication Guideline

Tammie Maddox Hanchey had always felt that AFS's policy regarding prescription medications should be more restrictive and defined and that AFS needed tighter oversight. (Ex. 28, Poole Dep. 139:9-140:7). Around February 2015, Hanchey, the author of the Procedural Guide, wrote a "Prescription Medication Guideline Procedural Guide 2506" ("the Prescription Medication Guideline") as a statement of procedure and policy separated from the Procedural Guide. (Ex. 40, Prescr. Med. Gde.). As with the Procedural Guide, the goal of the Prescription Medication Guideline was "[t]o ensure the consistent administration of procedures regarding prescription medication deemed to be unsafe for employees working on the AFS contract." (*Id.* at 3). The purpose of the Prescription Medication Guideline was to maintain a workplace "free from the influence of prescription medication that *may* negatively impact work performed in a safety sensitive environment." (*Id.*)(emphasis added). As in the Procedural Guide, the Prescription Medication Guideline required employees to self-report prescription medications. (*Id.*). Under the Prescription Medication Guideline, a company doctor evaluates *the prescription medication* and discusses alternative medication.

Although marked a draft, the Prescription Medication Guideline reiterates and unmistakably clarifies that the company doctor's role is to evaluate the medication for risk to the workplace and not the employee's actual experience in taking the medication. The Prescription Medication Guideline also provided eligibility for short term disability benefits or the equivalent

from the company if the benefits are denied. (Ex. 40, Prescr. Med. Gde. p.3). However, "[t]his program shall be limited to employees who require temporary short-term use of a prohibited prescription medication, have been determined unable to work, and are seeking an alternative medication that falls within the parameters of [the Procedural Guide]." (*Id.*). The guidelines thus excluded employees who required long-term use of a prohibited prescription medication from disability benefits or the equivalent. The Prescription Medication Guideline makes explicit and further reinforces AFS intent to treat employees with permanent disabilities differently from employees with temporary impairments.

## D.    The Exception that Proves the Prohibition: ADD/ADHD Medication

In November 2015, AFS recognized a "Policy Exception" to the prohibition of prescribed medications on the Nine Panel Screen. (Ex. 51, Emails Re ADD). In emails with the subject line "Policy Exception," Hanchey related how she had discussed medications for ADD/ADHD with a representative from the company doctor's office. (*Id.*). Hanchey "explained [AFS's] *concern* regarding this being an ADA qualifying disability and the potential for reasonable accommodation." (*Id.*). The representative "was in agreement that we should consider an exception in these specific situations." (*Id.*). The following guidance was approved for forwarding to the company doctors:

> Although regularly prescribed medications for the diagnosis of ADHD/ADD fall into a category included in the L-3 nine-panel, consideration will be given on, a case by case basis, to determine reasonable accommodation when a thorough review of medical records and history of the case reveals a true diagnosis of ADHD/ADD and a history of stability on the prescribed Rx. This will be applicable for both incumbent employees as well as potential employment candidates.

(*Id.*). Accordingly, AFS provided an exception to its blanket prohibition of prescription medications in this limited circumstance. However, as stated in the guidance, an exception was

possible only when the specified criteria are met. The guidance omitted factors from consideration such as whether the individual experiences any side effects or the effect of the medication on an individual's work performance.

**E.     AFS Mandated Safety Sensitive Letters Be Sent to Prescribing Physicians**

In February 2016, AFS extended the requirements for OMPs to formalize communications with prescribing physicians. (Ex. 37, Procedural Guide §6.7.2, p.19). The Procedural Guide was further amended to direct an OMP to issue a "Safety Sensitive Letter to Prescribing Physician" whenever prohibited medications are identified for an employee. (*Id.*). The letter informed the employee's prescribing physician that the employee was taking medication prohibited by AFS and the medication likely posed a safety risk making the employee medically unqualified for the employee's safety sensitive position. (Ex. 41, Safety Sensitive Letter). The letter first asked the prescribing physician to change the employee's prescription to a non-prohibited alternative medication if an alternative could achieve comparable results and to indicate that on the form. (*Id.*). Another checkbox was available for the prescribing physician to indicate if no non-prohibited medication would be efficacious. (*Id.*). No other options or procedures were described. The letter did not ask the prescribing physician for input on whether the employee could perform safety sensitive duties while taking the currently prescribed medication or if the employee could safely work while taking the medication under certain conditions such as 6-8 hours before a work shift.

**F.     All Identified Employees Were Sent to Company Doctors**

Before 2016, the Occupational Health Office decided whether to send an employee identified as taking a prohibited medication to a company doctor to discuss alternative medications and determine the employee's fitness for duty. (Ex. 29, Swaim Dep. 84:9-17). A member of the

Occupational Health Group would oftentimes make the decision not to send an employee to a company doctor if the employee stated he or she was only taking the prohibited medication at least six-to-eight hours before a work shift. (Ex. 29, Swaim Dep. 74:4-77:14). Many employees believed that AFS's policy on prescription medications was that they could take their prescription medications as long as they took the medication at home 6-to-8 hours before work. (*E.g.,* Ex. 2, Blinn Decl. ¶¶14-15; Ex. 5, Hudson Decl. ¶16). The Occupational Health Office would send an employee to a company doctor if they did not know the effects of their medication. (Ex. 29, Swaim Dep. 83:17-84:17).

Sometime in 2016, the Human Resources Director, Michael Lawson, decided a more stringent approach was needed despite the existing drug screen protocols. (Ex. 26, Lawson Dep. 39:1-25; 67:13-20). Lawson abolished the administrative decision-making regarding whether to send an employee to a company doctor for medication review. (Ex. 29, Swaim Dep. 95:8-97:2). As a result, all employees in safety sensitive classifications who were identified as taking a prohibited prescription medication were sent to company doctors as directed in the Procedural Guide. (Ex. 29, Swaim Dep. 87:23-88:19, 95:8-97:2). The company doctors then conducted examinations of employees pursuant to AFS directives. (Ex. 37, Procedural Guide §4.22, p.6).

When AFS began to send employees to company doctors for medication reviews regularly, the Occupational Health Office informed employees of AFS's policy regarding prescription medications as described in the Procedural Guide. (*E.g.,* Ex. 3, Cottrell Decl. ¶¶15-27; Ex. 17, Helms Decl. ¶¶23-39). The employees learned that their prescription medications were on a list of banned substances, that they would be sent to a company doctor, and that a finding of unfitness by

16

a company doctor meant they could no longer work in their positions and would only be able to work in positions that were not classified as safety sensitive. (*Id.*).

After the administrative changes in 2016, AFS's policy on prescription medications impacted many more employees. (Ex. 28, Poole Dep. 65:25-67:12). The employees and the Union were unhappy with the policy and complained. (*Id.*). Penny Poole dealt with grievances on the issue and saw that the company doctors were assessing employees pursuant to AFS's policy of prohibiting certain prescription medications. (Ex. 28, Poole Dep. 83:16-84:6 ("Prime Care's position was this is what your policy seems to indicate, therefore, I'm going to defer to your policy")). Claimants disagreed with the policy and expressed their desire to continue with their prescription medications. (Ex. 1, Black Decl. at ¶¶10-23; Ex. 2, Blinn Decl. at ₱₱ 23-25; Ex. 18, Blinn Dep. 76:1-77:21; Ex. 53, Email re Blinn; Ex. 3, Cottrell Decl. ₱₱15-27; Ex. 4, Distasio Decl. ₱₱10-16; Ex. 5, Hudson Decl. ₱₱16-26; Ex. 19, Hudson Dep. 47:11-54:16; Ex. 6, Hutchinson Decl. at ¶¶10-18; Ex. 9, McElveen Decl. ₱₱12-21; Ex. 22, McElveen Dep. 12:8-17:23, 45:6-61:8, 85:1-95:20; Ex. 53 Email re Blinn, Emails and Notes re McElveen; Ex. 10, Murray Decl. ₱₱9-20; Ex. 11, Nolin Decl. ₱₱16-26; Ex. 24, Nolin Dep. 108:3-110:3; 128:10-132:16; Ex. 12, Rich Decl. ₱₱23-28; Ex. 13, Sanders Decl. ₱₱7-14; Ex. 14, Simmons Decl. ₱₱14-21; Ex. 25, Simmons Dep. 37:7-38:15; Ex. 15, Skinner Decl. ₱₱11-19; Ex. 54, Email re Skinner; Ex. 17, Helms Decl. ₱₱23-39).

## G.    AFS Promulgated Prescription Medication Evaluation Guidelines for Company Doctors

An AFS document entitled "Prescription Medication Evaluation Guidelines" ("the guidelines") contained detailed instructions for OMPs in their evaluation of so-called safety-sensitive employees and their use of prohibited medications. (Ex. 42, Prescr. Med. Eval. Gde. p.2). The guidelines recognized that the ADA requires accommodations. (*Id.*). However, ADD/ADHD

were the only conditions allowed for accommodation consideration. (*Id.* at 1-2). The guidelines restricted the role of an OMP to determine whether the medication was prohibited or not and, if prohibited, to make change recommendations to treating physicians with the Safety Sensitive Letter. (*Id.* at 2). If the use of a prohibited medication could not be stopped or changed, the guidelines did not allow an OMP to determine that an employee could continue in their position. (*Id.*). An OMP was required to recommend that the employee be moved into a non-safety-sensitive position. (*Id.*).

## H.    Company Doctors Assessed Employees Pursuant to AFS Directives

AFS primarily sent employees to a medical provider called PrimeCare to fulfill the roles of MRO and OMP as defined in the Procedural Guide. (Ex. 27, Hanchey Dep. 99:17-22; Ex. 26, Lawson Dep. 98:23-99:21). AFS began working with PrimeCare at least as early as 2003. (Ex. 27, Hanchey Dep. 101:17-22). In addition to medication reviews, PrimeCare provided a variety of occupational health services such as drug screenings and medical examinations. (Ex. 27, Hanchey Dep. 100:12-101:16). At some point in 2016 or 2017, AFS began to send employees to another medical provider called New Horizons for medication reviews. (Ex. 28, Poole Dep. 84:16-24). Sending employees to New Horizons resulted in the same outcomes as employees received when sent to PrimeCare. (Ex. 55, Email Cotter re New Horizons; Ex. 56, Email Griggs re New Horizons; Ex. 27, Hanchey Dep. 177:4-17).

AFS had statement-of-work contractual agreements with its medical providers for occupational health services. (Ex. 43, SOW 1; Ex. 44, SOW 2; Ex. 45, SOW 3). The contracts specifically called for the medical provider to conduct medication evaluations in accordance with

AFS's medication management guidelines. (*Id.*). PrimeCare operated under a contractual relationship with AFS. (Ex. 30, Krista 50:12-51:22; Ex. 31, M. Williams 32:25-33-7).

For almost all the Claimants, Drs. Mathew Krista, Michael Williams, and Yusef Williams were the company doctors who performed their medication reviews. Dr. Michael Williams was not aware of any other business clients who requested medication reviews. (Ex. 31, M. Williams Dep. 31:21-32:21). None of the doctors had received specialized education in the field of occupational health, and they relied only on their experience in conducting occupational health examinations. (Ex. 30, Krista Dep. 19:16-18; Ex. 31, M. Williams Dep. 21:6-11; Ex. 32, Y. Williams Dep. 17:2-4).

Dr. Yusef Williams testified, "My understanding is that [AFS] drafted a policy that would – that would prohibit certain medications based on safety-sensitive jobs at their facility." (Ex. 32, Y. Williams Dep. 25:25-26:6). Dr. Yusef Williams understood the taking of a prohibited medication violated AFS's policy on drugs and alcohol. (Ex. 32, Y. Williams Dep. 54:17-55:3). Dr. Michael Williams agreed that "safety-sensitive classification employees should not take any of the medicines that are listed on [the Nine-Panel Screen]" according to the Procedural Guide. (Ex. 31, M. Williams Dep. 65:5-67:3). A violation of AFS's policy regarding prescription medications meant that the employee *could possibly* be impaired because the medication *can* sometimes cause an effect. (Ex. 32, Y. Williams Dep. 115:24-118:4).

The company doctors discussed with Claimants AFS's policy regarding prescription medications, the potential of their prescription medication to impair their ability to perform job duties safely, and that the use of the medication violates AFS's policy. (Ex. 30, Krista Dep. 81:19-83:12, 140:11-141:10). AFS policy directed company doctors to discuss alternative medications

with employees who were sent to them for medication reviews. (Ex. 37, Procedural Guide §§4.22, 5.5, 5.13, 5.15, p.6, 11, 15-16). As part of the medication reviews, the company doctors discussed Claimants' underlying conditions. (Ex. 60, 62, 64, 66, 69, 72, 74, 76, 79, 81, 83, 85). The term "clearance needed" on an employee's medical record only meant that the company doctor needed more information from the prescribing physician. (Ex. 32, Y. Williams Dep. 61:16-24). A Safety Sensitive Letter, also called a medication change request form, was sent to an employee's prescribing physician for the purpose of seeing if a safety sensitive alternative medication could be found. (Ex. 32, Y. Williams Dep. 66:25-67:8). There was no communication with the prescribing physician besides the letter. (Ex. 32, Y. Williams Dep. 119:1-17).

The company doctors did not conduct any mental or cognitive tests on Claimants. (Ex. 17, Helms Decl. ¶32; Ex. 60, 62, 64, 66, 69, 72, 74, 76, 79, 81, 83, 85). The protocol of Drs. Krista and Michael Williams was to discuss the *potential* side effects of a medication with an employee. (Ex. 30, Krista Dep. 81:13-18, 84:12-17, 86:2-87:12, 133:12-134:13, 146:7-147:23; Ex. 31, M. Williams Dep. 87:2-17). The company doctors would have included a note in an employee's patient records if there were any significant experiencing of side effects or if the prescribed medication affected the employee's work performance. (Ex. 30, Krista Dep. 135:9-136:24, 147:24-148:2; Ex. 31, M. Williams Dep. 142:24-145:8; Ex. 32, Y. Williams Dep. 46:7-47:12, 64:1-65:8, 66:5-24). Claimants' patient notes do not indicate that company doctors asked Claimants whether they actually experienced side effects from their prescribed medications. (Ex. 26, Lawson 150:8-169:23). None of the medical records from company doctors showed that Claimants experienced any side effects from their prescribed medications while working. (Ex. 30, Krista Dep. 94:18-22; Ex. 60, 62, 64, 66, 69, 72, 74, 76, 79, 81, 83, 85).

AFS's policies were a factor in the company doctors' assessment of employees, particularly AFS's safety sensitive designations. (Ex. 30, Krista Dep. 68:16-69:2, 116:10-24; Ex. 31, M. Williams Dep. 84:25-85:5). The company doctors thought that AFS's designation of an employee's position as safety sensitive meant that anything that could affect the employee's job performance was imperative to the safety of the employee and others. (Ex. 31, M. Williams Dep. 86:7-20). The company doctors did not decide which positions were safety sensitive and relied on AFS to inform them which positions it considered to be safety sensitive. (Ex. 30, Krista Dep. 67:1-68:21; Ex. 31, M. Williams Dep. 86:18-20; Ex. 32, Y. Williams Dep. 71:12-20; 71:21-23).

For employees found unfit, the company doctors' patient notes explicitly state the determination was made in accordance with AFS's policy on prescription medications. (Ex. 60, 62, 64, 66, 69, 72, 74, 76, 79, 81, 83, 85). The only way to avoid a finding of unfitness for work was to stop taking the prohibited medications. (*Id.*). The company doctors' determinations regarding ADD/ADHD medication also followed AFS guidance. Azeala Hutchinson's visit with a company doctor occurred before AFS recognized an exception for ADD/ADHD medication in November 2015. (Ex. 6, Hutchinson Decl. ¶¶12-18). Accordingly, the company doctor found Ms. Hutchinson fit for duty only when she agreed not to take Vyvanse after being told that she could not work while taking her prescribed medication. (*Id.*). In compliance with guidance from AFS, the company doctors eventually did not determine Mathew Black, Heath McElveen, Paul Nolin unfit based on their medication for ADD/ADHD. (Ex. 60, 76, 78). Both Mathew Black and Heath McElveen, however, were still placed off the clock, initially not found fit to work, and experienced other problems as a result of the process. (Ex. 1, Black Decl. ¶¶9-32; Ex. 9, McElveen Decl. 15-49). In compliance with AFS guidance, the company doctors found Amber Ficquette Cottrell,

Richard Johannes, Sabra Distasio Kelley, and Tammie Johannes unfit through their use of Vyvanse or Adderall. (Ex. 64, 66, 72, 74). For Tammie Johannes, the medication was used to treat conditions other than or in addition to ADD/ADHD. (Ex. 8, Johannes T. Decl. ¶¶4, 6; Ex. 74).

## I.  AFS's Policy Lacked Any Process for a Reasonable Accommodation, Although Accommodations Were Feasible

AFS's policy and administration of its policy did not provide employees an opportunity to keep using their medications without consequences for their employment.

### 1.  Accommodation Omitted from Procedural Guide

The term "accommodate" does not appear anywhere in the Procedural Guide. (Ex. 37, Procedural Guide). AFS's policy did not provide for any options or process other than for an employee to seek an alternative medication. Employees were sent to company doctors only to discuss alternative medications and be assessed pursuant to AFS's policy. (Ex. 37, Procedural Guide §§4.22, 5.5, 5.13, 5.15, p.6, 11, 15-16). The Safety Sensitive Letter provided prescribing physicians with only two options: 1) prescribe an alternative medication or 2) maintain the current prescription with the clear warning that the employee's job was at stake. (Ex. 41, Safety Sensitive Letter). The letter did not call for any other communication between the company doctor and the prescribing physician. (*Id.*). No resolution particular to the individual was possible under the process defined in the Procedural Guide.

### 2.  Claimants' Requests Went Unheeded

Claimants expressed their desire to continue taking their prescription medications through discussions with the Occupation Health Office and the company doctors. Black told the company doctor that he did not want to change his ADHD medication because he had taken it for 15 years and it helped manage his ADHD and anxiety medical conditions. (Ex. 1, Black Decl. ¶¶10-23).

AFS told Blinn that he could not work at all while taking Vicoprofen which he had taken for 10 years and told him to take an alternative medication that did not work for him. (Ex. 2, Blinn Decl. ¶¶ 23-25; Ex. 18, Blinn Dep. 76:1-77:21; Ex. 53, Email re Blinn).

A company doctor told Cottrell she could not take Vyvanse, and she protested and asked Human Resources if she could bring a note from her doctor but AFS told her she would be demoted to a janitor position unless she stopped taking Vyvanse. (Ex. 3, Cottrell Dec. ¶¶ 15-27). A company doctor told Distasio that she could not continue taking Vyvanse without asking her anything about her work performance. (Ex. 4, Distasio Decl. ¶¶ 10-12). Human Resources insisted she take alternative medications even after Distasio presented a letter from her doctor stating it was the only medication that worked for her. (Ex. 4, Distasio Decl. ¶¶ 13-17, 23-24). Human Resources also told Distasio that she could not take Hydrocodone after neck surgery and be at work. (Ex. 4, Distasio Decl. ¶¶18-22). A company doctor told Hudson she could no longer take medications that helped her manage her shingles symptoms, tachycardia breakthrough, anxiety and chronic pain and then pressured her to sign a written promise that she would stop these medications under threat of termination. (Ex. 5, Hudson Decl. ¶¶ 16-26; Ex. 19, Hudson Dep. 47:11-54:16).

Although AFS's Office of Occupational Health previously cleared Hutchinson to work while taking Vyvanse, a company doctor instructed her to get an alternative medication from her doctor despite her telling the doctor she had a desk job where she did not turn wrenches or work on the mechanical aspects of aircraft. (Ex. 6, Hutchinson Decl. ¶¶ 10-18). AFS's Human Resources and a company doctor told McElveen he could not take Adzenys XR-ODT, Lorazepam or Percocet and needed to get alternative medications if he wanted to return to work. (Ex. 9, McElveen Decl.

¶¶ 12-21; Ex. 22, McElveen Dep. 12:8-17:23, 45:6-61:8, 85:1-95:20; Ex. 53 Email re Blinn, Emails and Notes re McElveen).

A company doctor and AFS Human Resources refused to let Murray continue taking Ativan even just at night and work for AFS. (Ex. 10, Murray Decl. ¶¶ 9-20). A company doctor informed Nolin that he should just drink beer instead because it was against AFS's new policy to take Oxycodone even though he had been able to perform his job for 35 years while taking narcotic pain medication 6-8 hours before a work shift. (Ex. 11, Nolin Decl. ¶¶ 14-26; Ex. 24, Nolin Dep. 108:3-110:3; 128:10-132:16).

AFS told Rich he could not take Hydrocodone and Tramadol which effectively managed his pain post-shoulder surgery and continue at his job. (Ex. 12, Rich Decl. ¶¶ 23-28). A PrimeCare doctor told Sanders it violated AFS policy for him to continue taking Phentermine and required him to change to a medication that did not work well for him. (Ex. 13, Sanders Decl. ¶¶ 7-14). When Simmons returned from post-surgical medical leave, AFS told him he could not work while taking Lortab even off-duty. (Ex. 14, Simmons Decl. ¶¶ 14-19). When he told Lauren Swaim in the Office of Occupational Health he needed to take the medication, she told him, "If you are in that bad of a condition, then you don't need to work here," and reiterated AFS had a zero tolerance policy under which he faced termination. (Ex. 14, Simmons Decl. ¶¶ 14, 16-21; Ex. 25, Simmons Dep. 37:7-38:15).

Rick Skinner (deceased) told his wife that a company doctor told him he could not keep his job if he took Lortab even though AFS was aware he had taken it only at night to manage pain for years. (Ex. 15, Skinner Decl. ¶¶ 1, 4-5, 8-21; Ex. 54, Email re Skinner). A company doctor required Sego to discontinue several medications including a heart medication and told him to rely

on herbal medicines instead because his medication violated AFS's policy (Ex. 16, Sego Decl. ¶¶ 9, 12-16).  AFS would not permit Sego to return to work until he saw a particular heart specialist out of town who switched his diuretic pill. (Ex. 16, Sego Decl. ¶¶ 17-20).

A company doctor told Helms he could not keep his job and continue taking Klonopin even though he took a very low dose only at bedtime. (Ex. 17, Helms Decl. ¶¶ 23-27, 31-32). He protested because the mediation effectively treated his back pain and lack of sleep and he felt no effects from it at work. (Ex. 17, Helms Decl. ¶¶ 2-33). HR required him to sign a written promise to stop taking the medication or go on administrative leave or be demoted. (Ex. 17, Helms Decl. at ¶¶ 29-33).

3.    Accommodation Not Possible Through Medication Review Process

According to AFS's Director of Human Resources, a company doctor was supposed to handle any accommodations for an employee in deciding whether the employee was either fit or not fit for work. (Ex. 26, Lawson Dep. 204:10-205:1). However, the company doctors all testified that they were not authorized to provide an accommodation to an employee for the use of their prescribed medication, they only provided assessments, and they did not make decisions on accommodations. (Ex. 30, Krista Dep. 120:2-17; Ex. 31, M. Williams Dep. 71-72; Ex. 32, Y Williams Dep. 36, 53). AFS never told its employees that AFS would work to accommodate them if the prescribing doctor decided that they needed to be on a prohibited prescription medication. (Ex. 26, Lawson Dep. 224:23-225:3).

4.    Reasonable Accommodations Were Available

AFS's was apparently concerned with possible drug side effects causing cognitive deficits from the use of certain prescription medications. Had AFS been interested in engaging in

interactive discussions with employees, many types of resolutions would have been simple to implement in addressing time management, memory, concentration, organization, and other issues. For example, the Job Accommodation Network (JAN) provided many possible solutions for AFS's concerns. (Ex. 35, Yarborough Report at 6). Decreased concentration could be addressed through simple methods like allowing breaks for mental fatigue, providing a noise-canceling headset, or restructuring tasks so the most difficult tasks are tackled when the employee has the most energy. (*Id.* at 19-22). One indisputably easy accommodation to implement was to simply allow employees who did not represent a threat to themselves or others in the workplace to continue using their prescribed medications. Employees had previously been allowed to take their medications 6-8 hours before work, and there were no demonstrated safety issues attributed to the use of prescription medications. (E.g., Ex. 17, Helms Decl. ¶¶9, 23). This accommodation fit employees' medical needs without unnecessary job consequences.

**J.    AFS's Procedures Forced Claimants to Forgo Prescription Medications**

Without a process to seek an accommodation, Claimants and their prescribing physicians were left with the choice of either switching from a medication that had addressed Claimants' conditions to an alternative medication or refusing to switch medications and face negative job consequences. AFS's administration of its policy forced Claimants to stop taking their prescribed medications.

1.    AFS Placed Non-Compliant Employees on Indefinite, Unpaid Leave

AFS placed employees on unpaid leave indefinitely if they did not stop taking their prescription medication and were found unfit to work by a company doctor. AFS did not allow Timothy Murray to return to work as he weaned off his prohibited medication and transitioned to

an alternative one. (Ex. 10, Murray Decl. ¶¶17-31). It did not matter that this process took five months. (*Id.*). Despite his pleas, Murray was out of work and received no income for several months. (*Id.*). Even though he had an existing FMLA arrangement with AFS regarding the use of his prescription medication, Mark Blinn was still placed on unpaid leave for nearly two months. (Ex. 2, Blinn Decl. ¶¶12-28). Only through the actions of the Union did AFS address Blinn's situation. (*Id.* at ¶38). Heath McElveen was also placed on extended, indefinite leave until he agreed to forgo his prescribed medications. (Ex. 9, McElveen Decl. ¶¶14-33). The unpaid, indefinite leave was unnecessary and unreasonable. All three employees had worked while taking their prescribed medications and had not exhibited any safety issues with taking their medications. (Ex. 10, Murray Decl. ¶8; Ex. 2, Blinn Decl. ¶¶12-16; Ex. 9, McElveen Decl. ¶9).

2.    <u>Claimants Feared for Their Jobs and Did Not Stop Taking Their Medications Voluntarily</u>

Claimants were understandably fearful that they could lose their jobs. (Ex. 1, Black Decl. ¶ 31, 32; Ex. 2, Blinn Decl. ¶ 29; Ex. 3, Cottrell, Decl. ¶ 26-27; Ex. 5, Hudson Decl. ¶ 34; Ex. 8, Johannes T. Decl. ¶ 23; Ex. 9, McElveen Decl. ¶¶ 21, 32; Ex. 11, Distasio, Decl. ¶ 25-26; Ex. 13, Sanders Decl. ¶ 13; Ex. 14, Simmons Decl. ¶ 21, 29-30; Ex. 16, Sego Decl. ¶ 20, 22; Ex.15, Skinner Decl. at ¶ 17; Ex. 20, Johannes R. Dep. 22:1-3; Ex. 22, McElveen Dep. 107:13-128:15; Ex. 24, Nolin Dep. 226:1-23, 220:13-221:8; Ex. 25, Simmons Dep. 30:7-12, 31:6-13, 35:1-8). If Claimants were reclassified into non-safety sensitive positions, the only jobs that would have been available were positions like janitor, clerk, administrative specialist, messenger, or personnel specialist. (Ex. 37, Procedural Guide §5.4.3, p.10; Ex. 88, Job Descriptions). Other jobs with comparable pay and benefits were not available in the area. (Ex. 17, Helms Decl. ¶49).

Claimants' pleas with AFS personnel and company doctors did not matter. (§II.I.2, *supra*). Claimants faced an indefinite, unpaid leave or the loss of their position. No other option was available except to stop taking the prohibited medication. For an employee to be found conditionally fit to work, the employee had to sign a statement that they would not take their prescribed medication. (Ex. 26, Lawson Dep. 205:2-9). Many Claimants signed a Results of Rx form stating they would no longer take their prescribed medication. (*See* Ex. 93, Results of Rx Form McElveen; Ex. 94, Results of Rx Form Simmons; Ex. 95, Results of Rx Form Johannes R.; Ex. 96, Results of Rx Form Johannes T.). The Claimants who agreed to stop taking their prescribed medication were subject to disciplinary action including termination if they again began taking the medications. (*See id.*).

### 3.  Union Intervention

A few Claimants turned to the Union for help.[8] Initially, Amber Ficquette Cottrell agreed to stop taking her prescribed medication. Later, through the Union, Cottrell reached an agreement where AFS allowed her to use her prescribed medication while the safety sensitive designation of her position was under review. (Ex. 3, Cottrell Decl. ¶30; Doc. 153 at 48-49). A final decision was never conveyed to Cottrell, and she lived in fear that her job would be terminated at any time. (Ex. 3, Cottrell Decl. ¶¶36-37).  Mark Blinn was left on leave indefinitely until he contacted the Union and it intervened on his behalf. (Ex. 2, Blinn Decl. ¶38). Eventually, AFS allowed Blinn to

---

[8] It was within the Union's discretion to assist an employee regarding their prescription medications and job. *See Bonci v. Army Fleet Support*, No. 109-CV-101-WKW WO, 2009 WL 3245612, at *2 (M.D. Ala. Oct. 5, 2009) ("[Plaintiff] was informed by her Union on 6 April 2006, that they would no longer be pursing her grievance contesting the second Letter of Reprimand."). The Union did not agree to help with all Claimants' requests. (Ex. 17, Helms Decl. ¶¶35-36; Ex. 19, Hudson Dep. 162:3-163:9).

continue working under the same FMLA arrangement he had before he had been placed on unpaid, indefinite leave for nearly two months. (*Id.*). All other Claimants were forced to forego the medications they needed that AFS had prohibited.

## K.    Consequences of AFS's Policy and Its Administration

As a result of AFS's policy on prescription medications, Claimants suffered agonizing pain, considerable financial consequences, emotional distress, and mental anguish.

### 1.    Financial Distress

The deprivation of income from being placed on unpaid leave had financial consequences that AFS's later partial reimbursement did not resolve. Timothy Murray lost his home and was forced to declare bankruptcy. (Ex. 10, Murray Decl. at ¶ 32). Mark Blinn could not pay his bills, which damaged his credit. (Ex. 2, Blinn Decl. at ¶¶ 30-36); (Ex. 18, Blinn Dep. at 147:11-148:13, 156:12-157:2; 187:19-188:9). The same held true for Heath McElveen and Marcus Rich. (Ex. 9, McElveen Decl. at ¶¶ 34-39); (Ex. 12, Rich Decl. at ¶ at 41). Other claimants were forced to borrow money to keep their households afloat.[9]

### 2.    Physical Pain and Suffering

After being forced off their medications, some Claimants experienced physical pain and suffering. For example, without the benefit of her medications, Tammy Bright Hudson experienced pain so debilitating that she opted to undergo thoracic surgery in the hopes that it could relieve the pain—a surgery she would not have elected to undertake had she been allowed to continue taking her prescribed medications.  (Ex. 5, Hudson Decl. at ¶¶ 27-29). But the surgery proved ineffective

---

[9] The claimants who borrowed money include: Tammie Bright Hudson (Ex. 5, Hudson Decl. at ¶¶ 32-33), Tammie Johannes (Ex. 8, Johannes T. Decl. at ¶ 31), and Matthew Black (Ex. 1, Black Decl. at ¶¶ 20-22).

and, in some respects, even worsened her pain. (Ex. 5, Hudson Decl. at ¶¶ 34-37). The chronic, unmedicated pain she experienced also caused her to have high blood pressure and more frequent tachycardia episodes, culminating in her needing to have a metal valve placed in her aortic valve, as well as open heart surgery and a heart ablation. (Ex. 5, Hudson Decl. at ¶¶ 38-42).

And Mrs. Hudson is not alone. Other claimants also experienced physical pain and suffering as a result of AFS's policy, including: (1) Winston Simmons, whose unmanaged pain also caused him to experience significant heart issues culminating in the need for a heart ablation;[10] (2) Paul Nolin;[11] (3) Rickey Sego;[12] (4) Richard Johannes;[13] and (5) Rick Skinner.[14]

3.    Mental Discomfort

Without the medications that addressed their ADHD or PTSD, Claimants suffering from those disabilities struggled to keep up with their work and domestic responsibilities. For example, without Vyvanse to manage her ADHD and sleep disorder, Amber Cottrell could not function well, struggled in her college classes, and could not sleep. She struggled to stay organized, take care of her son, clean the house, cook, and shop for groceries, and was left feeling overwhelmed and anxious. (Ex. 3, Cottrell Decl. ¶¶ 28-29). Richard Johannes, who suffers from ADHD, found it challenging to concentrate while performing his job duties without the use of his prescribed Vyvanse—especially where no alternative medication or treatment was equally effective. (Ex. 7, Johannes R. Decl. ¶¶ 25-28). Other claimants who similarly suffered include Tammie Johannes,

---

[10] (Ex. 14, Simmons Decl. ¶ 30-33) (Ex. 25, Simmons Dep. 9:4-12-:2).
[11] (Ex. 11, Nolin Decl. ¶¶ 28-33); (Ex. 24 299:18-300:14).
[12] (Ex. 16, Sego Decl. ¶¶ 23-25).
[13] (Ex. 7, Johannes R. Decl. ¶¶ 33-34).
[14] (Ex.15, Skinner Decl. ¶ 25-33).

who suffers from narcolepsy (Ex. 8, Johannes T. Decl. ¶¶ 26-27); Azeala Hutchinson, who suffers

from ADHD (Ex. 6, Hutchinson Decl. ¶¶ 19, 27);  and Timothy Murray, who suffers from PTSD

and severe anxiety (Ex. 10, Murray Decl. ¶¶ 6, 16, 21, 25-28, 34).

    4.    <u>Emotional Distress</u>

Every Claimant reported experiencing emotional distress, embarrassment, and a fear of

losing their job.[15] Some had marital and family strain, experienced anxiety and depression, and

put on substantial weight. For example, without his medications to manage both his ADHD and

PTSD, Heath McElveen describes beginning to "spiral out of control mentally," such that his wife

even filed for divorce. (Ex. 9, McElveen Decl. ¶¶ 43-44). He became suicidal again, having

attempted suicide once already. (*Id.* at ¶ 45). And his children stopped wanting to spend time with

him and became scared of him due to his uncontrolled emotions. (*Id.* at ¶ 47). He also gained 50

pounds from stress eating. (*Id.* at ¶ 48).  Marcus Rich's depression worsened to the point where he

began to isolate himself to cope, which caused him to lose friendships and ultimately his marriage.

(Ex. 12, Rich Decl. ¶¶ 47-49). He also began drinking. (*Id.* at ¶ 49). Tammy Hudson's anxiety

worsened to the point where she began experiencing insomnia, panic attacks, and episodes of

uncontrollable crying. (Ex. 5, Hudson Decl. ¶¶ 38-39).

---

[15] *See* (Ex. 1, Black Decl. ¶¶ 27-32) (felt like a criminal, embarrassed, marriage strained); (Ex. 2, Blinn Decl. ¶ 41) (suffered emotional distress); (Ex. 3, Cottrell Decl. at ¶¶ 27, 37); (Ex. 4, Distasio Decl. ¶¶ 26-27); (Ex. 5, Hudson Decl. ¶¶ 26, 35, 39) (feared losing job, developed panic attacks and uncontrollable crying); (Ex. 6, Hutchinson Decl. ¶ 29-32); (Ex. 7, Johannes R. Decl. ¶ 30-32) (Ex. 8, Johannes T. Decl. ¶¶ 35-41) (lost enjoyment of life, feared being prescribed medicine that could cause her to lose job, gained significant weight); (Ex. 9, McElveen Decl. ¶¶ 40-49) (gained 50 pounds, lost hair, marital and family strain); (Ex. 10, Murray Decl. ¶ 20, 34); (Ex. 11, Nolin Decl. at ¶¶ 32-34); (Ex. 12, Rich Decl. ¶¶ 47-49) (lost friends and experienced marital strain, divorced); (Ex. 13, Sanders Decl. at ¶¶ 16-19) (marital strain); (Ex. 14, Simmons Decl. ¶¶ 28-32); (Ex. 15, Skinner Decl. ¶¶ 25-31); (Ex. 16, Sego Decl. ¶¶ 21-24); (Ex. 17, Helms Decl. ¶¶ 38, 46-48).

**L.    AFS Lacked Justification for Its Policy and Procedures**

Despite the pain and suffering it caused, AFS lacked any valid justification for its policy and procedures concerning certain prescription medications.

1.    <u>AFS's Prohibition of Prescription Medications Was Not Based on Science</u>

AFS has not produced any scientific studies, reports, or data that justify a blanket ban on the use of prescription medications on the Nine Panel Drug Screen. The scientific evidence does not support AFS's rigid, rule-based procedures that do not allow for individualized assessments of risk for employees. AFS's policy was based on stereotypical views of the prescription medications. For example, AFS prohibited opioid medication because of the belief that a person would have possible cognitive deficits and should not be allowed to work in a safety sensitive position. (Ex. 35, Yarborough Report at 6 ¶3.) However, studies show that the cognitive deficits are more likely related to pain rather than the opioids, and opioid therapy did not negatively impact cognitive performance for people who chronically take opioid medication for pain. (Ex. 35, Yarborough Report at 8 ¶6.) Accordingly, AFS's prohibition likely had the opposite intended effect of worsening cognitive defects. (*Id.*).

Obviously, it does not make sense to disallow someone with ADHD from treatment while performing a clerical job. (Ex. 29, Swaim Dep. 292:10-293:11). For example, taking Vyvanse improved Amber Cottrell's ability to perform her job duties. (Ex. 3, Cottrell, Declar. ¶ 13). However, due to AFS policy, Dr. Michael Williams found Amber Cottrell unfit for duty despite the facts that her position involved clerical duties and her treating physician stated she experienced no side effects. (Ex. 31, M. Williams Dep. 86:23-89:21; Ex. 66, Kelley PrimeCare Rec.). In the same vein, AFS has provided no scientific evidence to show the work value of depriving a person

suffering from PTSD from their treatment without an individualized assessment of risk. The need for a prohibition on the prescription medications is further undercut by the fact that one of AFS's company doctors prescribed Norco, an opiate medication that had been prohibited under AFS's policy, to a former AFS employee who was still performing the same aircraft mechanic job for the company that succeeded AFS at Fort Rucker. (Ex. 17, Helms Decl. ¶¶43-44; Ex. 30, Krista Dep. 153:10-156:6; Ex. 67, Helms Med. Rec.).

Scientific evidence is also contrary to AFS's policy tenet that a detectable amount of a prohibited medication means that an employee is under the influence. Detection of a substance does not correlate with impairment. (Ex. 35, Yarborough Report at 8 n3; Ex. 36, Yarborough Dep. 160:13-15). Even one of AFS's company doctors admitted that the experience of side effects can vary between individuals. (Ex. 30, Krista Dep. 99:12-21). In addition, a person can develop tolerance to side effects over time. (Ex. 36, Yarborough Dep. 160:4-15). An individual assessment is likely not even necessary unless there is some indication of a performance issue. (*See* Ex. 36, Yarborough Dep. 163:4 - 164:4). At the least, years of work experience while taking a medication should factor into an assessment of an employee. (Ex. 29, Swaim Dep. 284:24-285:8; Ex. 26, Lawson Dep. 84).

2.    AFS's Safety Standard is Vague and Arbitrary

The designation of an employee's position as safety sensitive was a cornerstone of the company doctors' medication review. Unfortunately, the standard for designating a position as safety sensitive was vague and arbitrary. The Procedural Guide stated: "These classifications hold a connection between the work performed and a 'compelling interest in safety,' such that small errors or momentary lapses in judgment could have 'catastrophic consequences for crew

members.'" (Ex. 37, Procedural Guide §4.36, p.8). Section 5.4.3 of the Procedural Guide lists the positions at issue in this case. AFS determined that these positions "involve[] national security, health and safety, or functions that require a high degree of trust and confidence." (Ex. 37, Procedural Guide §5.4.3, p.10). A wide variety of positions is listed from aircraft mechanic to aircraft scheduler to records clerk. This provision designates as safety sensitive even entirely clerical positions with no physical contact with the aircraft, such as "Records Clerk" and "Materiel Inspector." (Ex. 88, Job Descriptions). One of the company doctors admitted that if a position involved just clerical work, it should not be considered safety sensitive. (Ex. 32, Y. Williams Dep. 32:17-21). Section 5.4.3 also designates as safety sensitive "[a]ll personnel with security clearances," regardless of the nature of their job duties. (Ex. 37, Procedural Guide §5.4.3, p.10).

In 2016, AFS personnel engaged in discussions regarding the safety sensitive classifications. (Ex. 28, Poole Dep. 69:7-15). AFS personnel sought to reduce the number of positions designated as safety sensitive because of the number of complaints about the prescription medication program. (Ex. 26, Lawson Depo. 239:9-22). AFS personnel formulated a list with less safety sensitive positions, subject to approval from a Government Flight Representative. (Ex. 89, Emails re Safety Sensitive 2016). However, the positions in a later version of the Procedural Guide did not reflect the new list and contained the same positions in the safety sensitive classification as did previous versions. (Ex. 37, Procedural Guide §5.4.3, p.10; Ex. 90, Procedural Guide Rev. 10 §5.4.3, p.10). The purported change in safety sensitive classifications did not reduce the number of complaints about the prescription medication program. (Ex. 26, Lawson Depo 234:8-235:18), but it does show that AFS's safety standard was variable and easily subject to change.

3.    No Safety Incidents Were Attributed to Use of Prescription Medications

Human Resources Director Michael Lawson and Laura Swaim both testified they could not recall any workplace accidents caused by prescription medications, and AFS's own data supports their recollections. (Ex. 26, Lawson Dep. 84:19-85:18, 98:5-22; Ex. 29, Swaim Dep. 42:7-45:5, 156:21-24, 211:19-24, 229:16-231:9; Ex. 91, Rx Statistics 2014-2015; Ex. 92, Occupational Health Statistics 2016-2017). There has been no aircraft accident attributed to a maintenance or repair worker's use of prescription medication during the entire time of the past few contractors at Fort Rucker. (Ex. 17, Helms Decl. ¶9). The contractor before AFS and the contractor after AFS at Fort Rucker allowed Claimants to take their prescribed medications without any accidents attributed to prescription medication use by a maintenance or repair employee. (Ex. 6, Hutchinson Decl. at ¶ 33; Ex. 11, Nolin Decl. ¶¶15, 35-36). Even Defendant's expert, Dr. Parmet, testified he would have heard of any accidents caused by prescription medications and he did not know of any such accidents at Fort Rucker involving aircraft or otherwise where the use of medication was found to be the cause. (Ex. 34, Parmet Dep. 67:20-68:14; 108:12-109:14, 113:12-114:20). AFS investigated all safety incidents, and prescription medications have not been found to be the cause of any incident involving a Claimant. (Ex. 26, Lawson Dep. 84:19-85:18.) In the Rule 30(b)(6) deposition of its corporate representative, AFS admitted it could not say that prescription medications caused any safety incidents, performance issues, or disciplinary issues involving any Claimants. (Ex. 33, Nance 30b6 Dep. 242:7-258:9).

**M.    Claimants' Disabilities**

The following are descriptions of Claimants' underlying conditions that were addressed by their prescribed medications.

1.    Amber Ficquette Cottrell

Amber Ficquette Cottrell suffers from ADHD and a sleep disorder. (Ex. 3, Cottrell, Decl. ⁋ 9-12, 28; Ex. 63, Cottrell Med. Rec.). Her treating physician prescribed Vyvanse to treat these conditions. (Ex. 3, Cottrell, Decl. ⁋ 12, 28; Ex. 63, Cottrell Med. Rec.). Taking Vyvanse helped Cottrell perform her job duties. (Ex. 3, Cottrell, Declar. ⁋ 13). Vyvanse also improved her attention span, increased her ability to complete a task, improved her ability to be organized, and decreased her forgetfulness. (Ex. 63, Cottrell Med. Rec.).

When she was forced to stop taking Vyavanse, Cottrell was unable to sleep well, struggled in her college classes, had high blood pressure, and had problems staying organized, taking care of her child, cleaning the house, cooking, and shopping for groceries. (Ex. 3, Cottrell Decl. ⁋ 29, ⁋ 35, ⁋37). She felt overwhelmed, anxious, and like she could not get anything done. (Ex. 3, Cottrell Decl. ⁋ 29).

2.    Azeala Hutchinson

Azeala Hutchinson suffers from ADHD. (Ex. 6, Hutchinson Decl. at ¶ 3; Ex. 70, Hutchinson Med. Rec.). She was prescribed Adderrall in 1999 and was taking it when she began working for AFS. (Ex. 6, Hutchinson Decl. at ¶ 3). Around 2011, she began taking Vyvanse for her ADHD. (Ex. 6, Hutchinson Decl. at ¶ 9). From approximately 2011 to 2015, Hutchinson was able to perform her job duties without any issues at work while taking Vyvanse and had taken Adderall before that. (Ex. 6, Hutchinson Decl. at ¶¶ 3-4, 9). Hutchinson must take Vyvanse to concentrate. (Ex. 70, Hutchinson Med. Rec.).

3.    Heath McElveen

Heath McElveen suffers from PTSD, Anxiety, and ADHD. (Ex. 9, McElveen Decl. ₱ 5, 6,7; Ex. 75, McElveen Med. Rec.). He was diagnosed with ADHD as a child and with PTSD in 2010. *Id.* His doctor prescribed Adzenys XR-ODT, Lorazepam, and Percocet to manage his conditions. (Ex. 9, McElveen Decl. ₱ 8, 28; Ex. 75, McElveen Med. Rec.).

From 2008 to 2016, McElveen was able to perform his job duties while taking Adzenys XR-ODT, Lorazepam, and Percocet without issue. (Ex. 9, McElveen Decl. ₱ 9). In November 2016, McElveen's current medications included Ativan, Adzenys-Xr-odt, Norco/Percocet, and Zoloft. (Ex. 22, McElveen depo. 14:16-15:15; Ex. 75, McElveen Med. Rec.). After he was forced to stop taking his medications, he developed severe insomnia, was tired all the time, and also spiraled out of control mentally. (Ex. 9, McElveen Decl. ₱ 9, 43).

4.    Marcus Rich[16]

Marcus Rich suffers from depression and chronic pain. (Ex. 12, Rich Decl. ¶ 6, 8, 27; Ex. 80, Rich Med. Rec.). The prescription medications for addressing his conditions included Abilify and Hydrocodone. (Ex. 12, Rich Decl. ¶¶8, 13, 15, 17, 23-25, 27). Rich experienced pain in his knees, shoulder, and back. (Ex. 80, Rich Med. Rec.). In 2004, the pain was too great for him to travel to work. (*Id.*). Around July or August 2016, he had shoulder surgery. (Ex. 12, Rich Decl. at ¶ 23). After each incident, Rich was cleared to return to work only if he stopped taking Hydrocodone. (Ex. 12, Rich Decl. at ¶ 25-26, 28-32, 35; Ex. 81, Rich PrimeCare Rec.).

---

[16] Defendant asserts that Rich's statement that he resigned is untrue. Documentary evidence from Marcus Rich's personnel file shows that he was Voluntarily Separated/transferred from AFS on 1/30/2017. (EEOC-PD-0000174). Although Rich's remembrance of the month may be mistaken, he experienced a change in employment status in 2017.

5.    Mark Blinn

Mark Blinn suffers from degenerative joint disease in both his ankles and his knee. (Ex. 2, Blinn Decl. ⁋ 7-9; Ex. 18, Blinn Depo. 33:23-35:3, 168:3-13). His condition causes chronic pain and swelling in his ankles. (Ex. 2, Blinn Decl. ⁋ 3; Ex. 18, Blinn Depo. 35:4-8, 168:14-170:14; Ex. 61, Blinn Med. Rec.). He was prescribed Vicoprofen to treat the pain. (Ex. 2, Blinn Decl. ⁋ 11; Ex. 18, Blinn Depo. 35:4-37:10; Ex. 61, Blinn Med. Rec.). His condition impairs his ability to walk, run, climb, and work. (Ex. 18, Blinn Depo. 35:4-8, 168:14-170:14).

It is undisputed that, since February 2010, Mark Blinn had an arrangement with AFS to take intermittent FMLA when the chronic pain in his ankles and knee was too much and he needed to take time off. (Doc. 153 at 39-40; Defendant Ex. 78 (Sealed)).

6.    Mathew Black

Matthew Black suffers from ADHD and anxiety and took Adderall, Xanax, and Valium for his conditions. (Ex. 1, Black Decl. ⁋⁋ 4-6; Ex. 59, Black Med. Rec.). He was able to perform his job duties without any issues while taking his medication, and he did not receive disciplinary actions against him at work while he was taking his medications because he could concentrate. (Ex. 1, Black Decl. ⁋ 7).

7.    Winston (Mervin) Simmons

Winston (Mervin) Simmons suffers from chronic pain in his back and shoulder. (Ex. 14, Simmons Decl. ¶¶ 10-12, 17, 20, 23-27, 30-33; Ex. 86, Simmons Med. Rec.). Since 1992, he has had degenerative disease of his cervical spine and other problems with his back such as a lumbar fracture, spondylolisthesis, and stenosis. (Ex. 14, Simmons Decl. ¶¶ 9-12; Ex. 86, Simmons Med. Rec.). He has osteoarthritis and has had musculoskeletal injuries requiring surgeries, including

torn rotator cuffs (Ex. 14, Simmons Decl. p. 2, ¶ 8; Ex. 25, Simmons Dep. 77:12-15; Ex. 86, Simmons Med. Rec.). In 2012, he lost portions of his pancreas, colon, and entire spleen because of pancreatic cancer. (Ex. 14, Simmons Decl. ¶ 12; Ex. 86, Simmons Med. Rec.).

From 2000 to 2016, he took Lortab intermittently to address the chronic pain. (Ex. 14, Simmons Decl. p. 3, ¶¶ 12, 15-16, 19-20). He took Lortab from time to time before March 2016 for pain resulting from pancreatic cancer, three major surgeries, loss of portions of organs, and other surgeries. (Ex. 25 Simmons 58-59:15-6). In August 2016, Simmons had Lortab pills from his previous prescriptions to address his pain. (Ex. 14, Simmons Decl. ¶¶ 10, 19-22; Ex. 25, Dep. Simmons 39-40:8-16; 44-45:19-16).

From 2000 to 2016, Simmons was able to perform his job duties while taking Lortab without any issues. (Ex. 14, Simmons Decl. ¶ 12). After he was forced to stop taking his medication in August 2016, Simmons had to endure a great amount of pain because he could only take Lortab when he had enough time off or when he took extra time off.  (Ex. 25, Dep. Simmons 65:8-21). The pain disrupted his sleep, limited his mobility, affected his ability to do yard work or travel, and contributed to heart problems. (Ex. 14, Simmons Decl. ¶ 31-33; Ex. 25, Simmons 9:4-10, 9-10:12-2, 10:13-19; 77:3-21). Simmons's cardiologist told him that his increased stress level from the pain was conducive to the development of his heart condition. (Ex. 25 Simmons 136:11-19).

Before August 2016, Simmons could take his pain medication the night before work and some of the pain relief would carry over to the next day, plus he could sleep so he didn't have mental impairment.  (Ex. 25, Simmons Dep. 185-186:13-1). After he stopped taking Lortab for a period after August 2016, Simmons suffered chronic pain more on weekdays than the weekends. (Ex. 25, Simmons Dep. 184-185:15-12). In February 2017, Simmons could not even stand for long

periods of time because of the pain. (Ex. 86, Simmons Med. Rec.). At times, the pain woke him from his sleep. (Ex. 86, Simmons Med. Rec.). Even though he had signed a statement saying he would not take Lortab, not being able to take Lortab caused him extreme pain, so he took days off periodically when the pain was bad enough in order to be able to take Lortab without being detected at work. (Ex. 14, Simmons Decl. ¶ 30; Ex. 25, Simmons Dep. 51-52:11-21, 53:6-12, 128:1-18, 130-131:21-9). He ended up taking off work around 20 to 30 days total in order to take Lortab. (Ex. 25, Simmons Dep. 130-131:21-9).

8.    Michael Sanders

Michael Sanders suffers from ADHD and obesity, and he took Phentermine to treat his obesity. (Ex. 13, Sanders Decl. ¶¶ 4-6). AFS through its company doctor perceived Sanders as unable to work because he took Phentermine. (Ex. 13, Sanders Decl. ¶¶ 8-14; Ex. 82, Sanders PC Rec.).

9.    Paul Nolin

Paul Nolin suffers from osteoarthritis and chronic pain and has had 16 major surgeries for his joints because of the osteoarthritis. (Ex. 11, Nolin Decl. at ℙ 6; Ex. 24, Nolin Dep. 134:9-135:1, 305:6-306:11, 310:6-311:21; Ex. 78, Nolin Med. Rec.). Nolin also has Attention Deficit Disorder ("ADD"). (Ex. 11, Nolin Decl. ℙ 11; Ex. 78, Nolin Med. Rec.). Nolin's treating physician diagnosed him with osteoarthritis in the 1990's and prescribed him Lortab. (Ex. 11, Nolin Decl. ℙ 7). Nolin has also been prescribed with other pain medication such as Percocet and Oxycodone. (Ex. 11, Nolin Decl. ℙ 9; Ex. 78, Nolin Med. Rec.). In 2016, Nolin had a prescription for Oxycodone to address his chronic pain. (Ex. 11, Nolin Decl. ℙ 10; Ex. 78, Nolin Med. Rec.). By 2016, Nolin had taken his pain medications as prescribed for 20 years or so and performed his job

duties without any accidents or property damage. (Ex. 11, Nolin Decl. ¶ 14; Ex. 24, Nolin Dep. 136:2-137:1). Without adequate pain medication, Nolin has trouble sleeping and climbing. (Ex. 24, Nolin Dep. 308:5-309:22).

  10. <u>Richard Johannes</u>

  Richard Johannes suffers from sleep apnea and ADHD. (Ex. 7, Johannes R. Decl. ¶¶ 5-7; Ex. 71, Johannes R. Med. Rec.). Because of his ADHD, he had problems with concentration, and it affected him through stress and anxiety. (Ex. 7, Johannes R. Decl. ¶¶ 33, 35-36). ADHD affected his ability to do his job effectively, and he had to work extra hard.  (Ex. 20, Johannes R. Dep. 212:7-22). Vyvanse helped tremendously to understand and cope with his deficiencies. (*Id.*). Without Vyvanse at work it was frustrating trying to keep up with everyone else, reading everything multiple times to remember and less awareness.  (Ex. 20, Johannes R. Dep.  215:1-8).

  In July 2016, Mr. Johannes and Tammie Johannes underwent reasonable suspicion drug screens because of unfounded accusations. (Defendant's Ex. 87 (Sealed)). At his August 4, 2016, medical appointment with Dr. Pilcher, Mr. Johannes, who was fearful of losing his job, asked about alternatives to Vyvanse. (Ex. 20, Johannes R. Dep. 141:10-18). Dr. Pilcher expressed concerns about changing Mr. Johannes's ADHD medication, but finally agreed to try when Mr. Johannes explained that he could get into trouble at work for taking Vyvanse, and that he wanted to save his job. (Ex. 7, Johannes R. Decl. ¶ 24; Ex. 20, Johannes R. Dep. 142:4-18). When eventually confronted by AFS about Vyvanse on August 10, 2016, Mr. Johannes reported he had already stopped taking Vyvanse. (Ex. 20, Johannes R. Dep. 102-103:18-7, 138:17-19). AFS's company doctor required Mr. Johannes obtain a letter from Dr. Pichler stating Mr. Johannes could perform his job without Vyvanse.  (Ex. 7, Johannes R. Decl. ¶ 12).  Dr. Pichler signed the letter

indicating Mr. Johannes didn't need Vyvanse to perform his job duties, despite the doctor's concerns, because Mr. Johannes begged him to do so to save his job. (Ex. 7, Johannes R. Decl. ¶ 13). Mr. Johannes had a difficult time at work without Vyvanse. (Ex. 20, Johannes R. Dep. 131:3-17; 215:1-8).

11. Rick Skinner

Rick Skinner took Norco to treat the chronic pain in his knee and back. (Ex. 15, Skinner Decl. ¶¶4-5; Ex 84, Skinner Med. Rec.). His chronic pain affected his mobility. (Ex 84, Skinner Med. Rec.). After he agreed to stop taking Norco due to AFS's policy, the alternative medication did not relieve the pain as well. (Ex. 15, Skinner Decl. ¶20). Skinner became "very physically inactive due to his chronic leg pain." (Ex 84, Skinner Med. Rec.).

12. Rickey Helms

Rickey Helms suffered from chronic back pain that caused a sleep disorder. (Ex. 17, Helms Decl. ¶17; Ex. 67, Helms Med. Rec.). His back pain caused him to lose a lot of sleep. (Ex. 17, Helms Decl. ¶11, 14; Ex. 67, Helms Med. Rec.). Helms took Klonopin to address his back pain, which allowed him to have a good night of sleep. (Ex. 17, Helms Decl. ¶¶19-21). While taking Klonopin, Helms was able to be more alert, had better concentration, and could work better. (*Id.* at ¶22). After AFS forced Helms to stop taking his medication, his back and sleep problems returned and caused problems for him while working. (*Id.* at ¶¶24-34, 38-42, 45, 47). He had to deal with pain while working, take breaks to stretch, and had a harder time performing his tasks. (*Id.* at 47).

13.   Rickey Sego

Rickey Sego suffers from coronary artery disease, ischemic cardiomyopathy, and ventricular tachycardia. (Ex. 16, Sego Decl. ₧4-7; Ex. 83, Sego Med. Rec.). Sego took Furosemide and Plavix to prevent future heart attacks. (Ex. 16, Sego Decl. ₧9). He had to stop taking the medications according to AFS's policy. (Ex. 16, Sego Decl. ₧15-19). He had a stroke in 2018 and was not able to have gainful employment afterwards. (Ex. 16, Sego Decl. ₧25; Ex. 83, Sego Med. Rec.).

14.   Sabra Distasio Kelley

Sabra Distasio Kelley suffers from ADHD. (Ex. 4, Kelley Decl. ₧4; Ex. 65, Kelley Med. Rec.). Kelley was prescribed Vyvanse for ADHD and binge eating disorder in 2015. (Ex. 4, Kelley Decl. ₧6; Ex. 65, Kelley Med. Rec.). She had previously taken Adderall. (Ex. 4, Kelley Decl. ₧5; Ex. 65, Kelley Med. Rec.). Vyvanse helped Kelley with her focus, concentration, and work performance. (Ex. 4, Kelley Decl. ₧8; Ex. 65, Kelley Med. Rec.).

15.   Tammy Bright Hudson

Tammy Bright Hudson suffers from chronic shingles, chronic back pain, supraventricular tachycardia, and anxiety. (Ex. 5, Hudson Decl. ₧9-11; Ex. 68, Hudson Med. Rec.; Ex. 69, Hudson PC Rec.). From 2014 to 2016, AFS allowed her to take intermittent FMLA leave for her shingles and back pain.  (Ex. 5, Hudson Decl. ₧12). Hudson took Lyrica, Tramadol, and Clonazepam for her conditions.  (Ex. 5, Hudson Decl. ₧13-15; Ex. 68, Hudson Med. Rec.). Taking Clonazepam (Klonopin) helped her with her tachycardia palpitations. (Ex. 68, Hudson Med. Rec.). After she stopped taking her medications, she suffered considerable pain, worsening her other conditions including her heart condition. (Ex. 5, Hudson Decl. ₧26-27; Ex. 68, Hudson Med. Rec.).

16.    <u>Tammie Johannes</u>

Tammie Johannes was diagnosed with narcolepsy and idiopathic hypersomnia. (Ex. 8, Johannes T. Decl. ¶¶4-6; Ex. 21, Johannes T. Dep. 37:16-38:20, 44:18-23, 228:3-18; Ex. 73, Johannes T. Med. Rec.). Her condition causes her to be excessively sleepy during the day--even after a good or prolonged sleep, to have difficulty waking up, and to be tired a lot of the time.  (Ex. 8, Johannes T. Decl. ¶6; Ex. 21, Johannes T. Dep. 38:4-11; Ex. 73, Johannes T. Med. Rec.). With her condition, Ms. Johannes had problems staying awake during her work shift and problems with concentration and memory. (Ex. 21, Johannes T. Dep. 196:2- 200:21).

17.    <u>Timothy Murray</u>

Timothy Murray suffered from combat Post-Traumatic Stress Disorder ("PTSD"), severe anxiety, panic disorder, and depression. (Ex. 10, Murray Decl. at ¶ 6; Ex. 23, Murray Depo. 63:8-65:12; Ex. 77, Murray Med. Rec.). He was prescribed Ativan for his severe panic attacks and PTSD. (Ex. 10, Murray Decl. at ¶ 7; Ex. 23, Murray Depo. 63:8-65:12). His panic attacks and PTSD caused night terrors and sweats, difficulties with social settings, and difficulties from trying to concentrate on many things at once. (Ex. 10, Murray Decl. at ¶ 6; Ex. 23, Murray Depo. 63:8-65:12).

### III.    SUMMARY JUDGMENT STANDARD

A district court should only grant summary judgment if "materials in the record" demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A court must view all justifiable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986). The evidence presented to the court is always construed in favor of the party

opposing the motion. *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## IV.   ARGUMENT

### A.   Introduction

As set forth in the EEOC's Complaint (Doc. 1), AFS violated the ADA in three ways. AFS

(1) discriminated against the Claimants based on their actual or perceived disability;[17] (2) failed

to reasonably accommodate their known physical or mental limitations;[18] and (3) used

impermissible qualification standards that screened out or tended to screen out individuals with a

disability.[19]

### B.   The EEOC Can Prove Intentional Discrimination by Direct or Circumstantial Evidence

Intentional discrimination may be proved with direct evidence or circumstantial evidence.

*See Connelly v. WellStar Health Sys.*, 758 F. App'x 825, 828 (11th Cir. 2019). "Direct evidence is

evidence that establishes the existence of discriminatory intent behind the employment decision

without any inference or presumption." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1283

(11th Cir. 2000). "In a direct evidence case, an unlawful motive has been deemed a determinative

factor in an employment decision, and the burden is then on the defendant to prove by a

preponderance of the evidence that the same decision would have been reached even absent the

discriminatory motive." *Schultz v. Royal Caribbean Cruises, Ltd.*, 465 F. Supp. 3d 1232, 1263

(S.D. Fla. 2020). "[A] finding that direct evidence of discrimination exists, standing alone, is

---

[17] 42 U.S.C. § 12112(a).
[18] 42 U.S.C. § 12112(b)(5)(A).
[19] 42 U.S.C. §12112(b)(6) and § 12112(b)(3).

normally sufficient to defeat a motion for summary judgment." *Loperena v. Scott*, No. CIV. A. 2:08-CV-99, 2009 WL 1066253, at *10 (M.D. Fla. Apr. 21, 2009) (citing *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir.1998)).

A plaintiff may also prove intentional discrimination through circumstantial evidence where shifting burdens would apply as established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In that framework, once a prima facie case is established, the defendant must produce a legitimate, non-discriminatory reason for the employment action. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). The plaintiff can then prove the proffered reason was pretext for unlawful discrimination. *Id.*

**C.    A Reasonable Jury Can Determine AFS Discriminated Against the Claimants Based on Their Disabilities Under § 12112(a)**

Under 42 U.S.C. § 12112(a), "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to … terms, conditions, and privileges of employment." A plaintiff establishes a claim for discrimination under the ADA by showing (1) he has a disability; (2) he is a qualified individual; and (3) he was discriminated against because of his disability. *Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 828 (11th Cir. 2015).

1.    The EEOC Can Prove the Claimants Are "Disabled" Under the ADA

a.    *Claimants Have Actual Disabilities*

An individual has an actual disability under the ADA when his or her impairment "substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). A physical or mental impairment includes "[a]ny physiological disorder or condition … affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory, cardiovascular, reproductive, digestive, genitourinary, immune, circulatory hemic, lymphatic,

skin, and endocrine;" or "[a]ny mental or psychological disorder, such as … organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(1) and (2). The 2008 amendments to the ADA broadened the scope of impairments that constitute a disability. *See Moore v. Jackson Cty. Bd. of Educ.*, 979 F. Supp. 2d 1251, 1259, 1261 (N.D. Ala. 2013).[20] The question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis. *See* 29 C.F.R. 1630.2(j)(1)(iii).

"[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). It can also include the operation of a major bodily function, such as "digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions." *See* 29 C.F.R. § 1630.2(i)(1)(ii). If an impairment impacts just one major life activity, it is sufficient to constitute a disability. *See* 42 U.S.C. § 12102(4)(C).

"'[An] impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1269 (11th Cir. 2014) (quoting 29 C.F.R. §

---

[20] "[T]he phrase 'substantially limits' is to be 'construed broadly in terms of extensive coverage' and is 'not meant to be a demanding standard.'" *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1269 (11th Cir. 2014) (quoting 29 C.F.R. § 1630.2(j)(1)(i)) (adopting the EEOC's interpretation of the phrase "substantially limits"). *See Barlow v. Walgreen Co.*, 8:11–CV–71–T–30EAJ, 2012 WL 868807, *4 (M.D. Fla. Mar. 14, 2012) ("The new regulations [under the ADAAA] go on to explain that the term 'substantially limits' is to be broadly construed 'in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.'") (citing 29 C.F.R. § 1630.2(j)(1)(i)).

1630.2(j)(1)(i)) (adopting the EEOC's interpretation of the phrase "substantially limits"). A court will consider the condition, manner and time it takes an individual to perform a major life activity. *See* 29 C.F.R. § 1630.2(j)(4)(i). Specifically, courts may consider the pain and difficulty of performing such activities. *See* 29 C.F.R. 1630.2(j)(4)(ii); *see also Matthews v. Pennsylvania Dept. of Corrections*, 613 Fed. Appx. 163, 168-9 (3rd Cir. 2015); *Jacobs v. York Union Rescue Mission, Inc.*, 2014 WL 6982618 at 10-11 (M.D. Penn 2014) (holding a person suffering from extensive pain, which requires medical attention, is substantially limited from a major life activity). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—medication." 42 U.S.C. § 12102(4)(E)(i)(I). *See Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1269 (11th Cir. 2014) (quoting 42 U.S.C. § 1630.2(j)(1)(ii), (iv), (vi)-(vii)). "In effect, these provisions require courts to look at a plaintiff's impairment in a hypothetical state where it remains untreated." *Lloyd v. Housing Auth. of the City of Montgomery, Ala.*, 857 F. Supp. 2d 1252, 1263 (M.D. Ala. 2012).

All but one of the Claimants had actual disabilities because they had physical or mental impairments that substantially limited one or more major life activities such as chronic pain from muscular-skeletal injuries, anxiety, sleep disorders, PTSD, and ADHD, or major bodily functions.[21] (§II.M, *supra*). *See* 29 C.F.R. § 1630.2(j)(3)(iii)("it should easily be concluded that … post-traumatic stress disorder …  substantially limit[s] brain function"); *Monroe v. Fla. Dep't of Corr.*, 793 F. App'x 924 (11th Cir. 2019) (PTSD); *Carico v. UPS Ground Freight, Inc.*, No.

---

[21] The EEOC agrees that the evidence does not support a finding of obesity as an actual disability for Michael Sanders. As discussed below, the EEOC contends that AFS perceived Sanders to be disabled.

2:19-CV-756-WKW, 2021 U.S. Dist. LEXIS 115024, *73 (M.D. Ala. June 21, 2021) (PTSD); *Doers v. Lincare, Inc.*, No. 8:14-cv-3168-T-30AEP, 2016 U.S. Dist. LEXIS 27847, at *14-15 (M.D. Fla. Mar. 4, 2016) (finding issue of material fact that plaintiff's anxiety and panic attacks was an actual disability); *United States EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1344 (11th Cir. 2016) (back pain); *Cooper v. City of Adamsville*, No. 2:18-cv-01539-MHH, 2021 U.S. Dist. LEXIS 53799, at *16-17 (N.D. Ala. Mar. 22, 2021) (chronic back pain); *Barron v. Astrue*, No. 2:05-CV-2193-VEH, 2007 U.S. Dist. LEXIS 104048, at *11 (N.D. Ala. June 11, 2007) (arthritis); *Lisby v. Tarkett Ala., Inc.*, No. 3:16-cv-01835-MHH, 2020 U.S. Dist. LEXIS 55927, at *12-13 (N.D. Ala. Mar. 31, 2020) (ADHD, anxiety, and chronic back pain); *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1230 (S.D. Fla. 2010) (PTSD); *Jeter v. Dixie*, No. 1:13cv197-MEF (WO), 2013 U.S. Dist. LEXIS 128185 (M.D. Ala. Aug. 15, 2013) (brain injury, arthritis and back injury); *Cohan v. Crafty Crab Boynton Beach Inc.*, No. 21-82060-CV, 2022 U.S. Dist. LEXIS 23246 (S.D. Fla. Feb. 8, 2022) (spinal stenosis and various injuries to joints); *Stainback v. Citadel Broad. Co. Corp.*, No. 2:13-CV-812-KOB, 2014 U.S. Dist. LEXIS 175381 (N.D. Ala. Dec. 19, 2014) (heart problems); *Sugg v. City of Sunrise*, No. 20-13884, 2022 U.S. App. LEXIS 26088 (11th Cir. Sep. 19, 2022) (post-heart attack limitations); and *Quitto v. Bay Colony Golf Club, Inc.*, No. 206CV-286-FTM-29DNF, 2007 WL 2002537, at *9 (M.D. Fla. July 5, 2007) (osteoarthritis).

Whether Claimants' impairments qualify as an actual or perceived disability are material facts in dispute. A reasonable jury could conclude that 16 of the Claimants have an actual disability. (§II.M, *supra*).

       *b.*    *Alternatively, AFS Perceived All of the Claimants as Disabled*

Another definition of "disability" under the ADA is where an employer regards an employee as having an impairment that substantially limits one or more of the employee's major life activities. 42 U.S.C. § 12102(1)(C). For example, as with Claimant Michael Sanders, "an employer may *perceive* an employee's overweight status to constitute a physical impairment." *Powell v. Gentiva Health Servs., Inc.*, No. CIV.A. 13-0007-WS-C, 2014 WL 554155, at *8 (S.D. Ala. Feb. 12, 2014). This definition applies "*whether or not the impairment limits or is perceived to limit a major life activity.*" 42 U.S.C. § 12102(3)(A); *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, cccc, at *13 (N.D. Ala. Sept. 17, 2020) ("[P]erception of an impairment is all that is necessary, 'whether or not the impairment limits or is perceived to limit a major life activity.'") (quoting *Cooper v. CLP Corp.*, 2015 WL 9311964, *4-5 (N.D. Ala. Dec. 23, 2015), quoting in turn 42 U.S.C. § 12102(3)(A)). "Indeed, '[t]he relevant inquiry ... is not the plaintiff's actual condition, but how the Defendant "perceived [his] condition, including the reactions and perceptions of the persons interacting with or working with him."'" *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *13 (N.D. Ala. Sept. 17, 2020) (quoting *E.E.O.C. v. American Tool & Mold, Inc.*, 21 F. Supp. 3d 1268, 1275 (M.D. Fla. Apr. 16, 2014)). *See Cooper v. CLP Corp.*, No. 2:13-CV-02152-JEO, 2015 WL 9311964, at *4 (N.D. Ala. Dec. 23, 2015), aff'd, 679 F. App'x 851 (11th Cir. 2017) (quoting *Powell v. Gentiva Health Services, Inc.*, 2014 WL 554155, *7 n.14 (S.D. Ala. Feb. 12, 2014)); 42 U.S.C. § 12102(3)(A)-(B); 29 C.F.R. § 1630.2(g)(1)(iii); *Wolfe v. Postmaster General*, 488 Fed. Appx. 465, 468 (11th Cir. 2012) ("[A] plaintiff need demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity."); *EEOC v. STME, LLC*, 938 F.3d 1305, 1316 (11th Cir. 2019) (in "regarded as" cases, a plaintiff

must show that the employer knew that the employee had an actual impairment or perceived the employee to have such an impairment).

In *Haynes v. City of Montgomery*, 344 Fed. Appx. 519 (11th Cir. 2009), the Eleventh Circuit found a perceived disability when defendant hired a doctor who did not clear plaintiff to work in any safety sensitive position because of his prescription medication. *See also Byrd v. Outokumpu Stainless USA, LLC*, No. CV 20-0520-WS-M, 2022 WL 2134993, at *8 (S.D. Ala. June 14, 2022) (same); *Brewer v. Tiffin Motorhomes, Inc.*, No. 3:08-CV-1343-SLB, 2010 WL 11564932, at *11 (N.D. Ala. July 30, 2010) (finding that "[a] jury could reasonably conclude that Tiffin effectively barred Brewer from employment in any position, within a broad range of jobs, and that Tiffin regarded Brewer as substantially limited in the major life activity of working."). The doctor thus perceived the plaintiff to have been substantially limited in the major life activity of working. *Id.* By relying on the doctor's evaluation, the defendant shared the doctor's perception in its decision not to return the plaintiff back to work. *Id.*

In this case, AFS company doctors determined that Claimants' prescription medications cognitively impaired them to the point where they should not be allowed to continue working in positions classified as safety sensitive, encompassing a broad range of jobs with different skill sets. (*See* §II.H, *supra*). As in *Haynes*, the company doctors perceived Claimants as substantially impaired in the major life activity of working. In this case, however, AFS did more than rely on the company doctors' determinations. AFS perceived Claimants as disabled through its policy on prescription medications that regarded employees taking certain medications to be impaired in the

performance of safety sensitive duties.[22] This perceived impairment meets the "regarded as" definition of disability. *See Rigby v. Springs Indus., Inc.*, 156 F. App'x 130, 132 (11th Cir. 2005) (holding defendant regarded plaintiff as disabled because of its position that employee was "unable to perform any manufacturing job because of the potential side effects of his use of Lortab to treat the pain that results from his diabetes or its complications."); *Byrd v. Outokumpu Stainless USA, LLC*, No. CV 20-0520-WS-M, 2022 WL 2134993, at \*8 (S.D. Ala. June 14, 2022) (adopting reasoning in *Haynes*); *Lisby v. Tarkett Alabama, Inc.*, No. 3:16-CV-01835-MHH, 2020 WL 1536386, at \*5 (N.D. Ala. Mar. 31, 2020) (reasonable jury could find that plaintiff's impairment from methadone use was a perceived disability based on company doctor's perception of the impairment).

Moreover, Claimants informed AFS personnel and AFS company doctors about their conditions necessitating the use of their medications. (*See* §II.I.2 and II.M, *supra*). Thus, AFS and its company doctors had knowledge of the Claimants' conditions and medications while forcing them to change their treatment to alternative medications. In addition, AFS's Procedural Guide provided that employees placed on leave by the policy were deemed disabled and eligible for short term disability. A reasonable jury could determine from this evidence that AFS perceived the Claimants to have disabling conditions. *See Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at \*14 (N.D. Ala. Sept. 17, 2020) (finding Defendant perceived

---

[22] As noted by Defendant (Doc. 153 at 84), AFS provided a sole exception for treatment of ADD or ADHD. The exceptions, however, were not based on individual assessment of direct threats but rather on certain guidelines provided by AFS. The company perceived employees who had ADD or ADHD but did not meet AFS's guidelines as impaired in the performance of safety sensitive duties just like other employees who were taking prohibited medications.

employee to have disability when it had knowledge of his condition and a letter served as temporary proof of the employee's disability).

In contending that it did not perceive Claimants as disabled, AFS relies on *Goff v. Performance Contractors, Inc.*, No. CV 18-0529-WS-MU, 2020 WL 1794967 (S.D. Ala. Apr. 8, 2020), and *Daw v. G.A. W. & Co.*, No. CV 19-0525-MU, 2021 WL 6052800 (S.D. Ala. Apr. 20, 2021). In *Goff*, the Alabama Southern District Court acknowledged "the common sense principle that an employer that takes an adverse action because it fears the consequences of an employee's medical condition has regarded that employee as disabled." WL 1794967, at *7. *See Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1182 (11th Cir. 2019) (same). The defendant in *Goff* based its decision not to hire the plaintiff "on information from third-party medical evaluators imposing work restrictions on Goff that could not be reconciled with the essential functions of the pipefitter position for which he was being considered." *Id.* at *7. The restrictions were based on the plaintiff's history of taking certain medication. *Id.* The court in *Daw* adopted the same reasoning in *Goff* in also finding that Defendant's decision not to hire the plaintiff was not based on a perceived disability. However, the doctors' determinations in *Goff* and *Daw* were not challenged, and, as a result, the court did not find that the defendants' reliance on those determinations was misplaced. After *Goff* and *Daw* were decided, the Alabama Southern District Court has since distinguished those cases from a case where, unlike in *Goff* and *Daw*, a doctor did not properly determine that a plaintiff represented a direct threat to himself or to others. *Byrd v. Outokumpu Stainless USA*, LLC, No. CV 20-0520-WS-M, 2022 WL 2134993, at *5 n.17 (S.D. Ala. June 14, 2022). In *Byrd*, the Alabama Southern District Court discussed *Haynes* in holding that defendant, in reliance on a third-party medical evaluator, perceived that plaintiff to be substantially impaired

in the major life activity of working because of his long-term prescription of hydrocodone for pain. Like *Byrd*, this case involves the issue of whether a company doctor properly established a "direct threat." The evidence shows that company doctors did not find Claimants to be direct threats (*see* §II.H, *supra*), and AFS has waived the issue of direct threat. (Doc. 153 at 85). Accordingly, this court should consider the company doctors' determinations to lack any findings that Claimants were direct threats to themselves or others. Therefore, *Goff* and *Daw* are not applicable as to whether AFS perceived Claimants as disabled.[23] As discussed, AFS perceived Claimants as impaired in their ability to work, a major life function.

2.    The EEOC Can Prove the Claimants Were Qualified for Their Positions

A "qualified individual" is someone who, with or without a reasonable accommodation, can perform the essential functions of the job. 42 U.S.C. § 12111(8). *See Snead v. Fla. Agricultural & Mechanical Univ. Bd. of Trustees*, 724 Fed. Appx. 842, 844 (11th Cir. 2018). "Essential functions" are "the fundamental job duties of the employment position," but do "not include the marginal functions of the position." *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1200-01 (11th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(1)). There is nothing about the act of taking or not taking a prescribed medication that can be considered an essential function of any position at AFS. *See* 29 C.F.R. § 1630.2(m), 29 C.F.R. § 1630.2(n). The performance of job duties is related to only the

---

[23] In its argument against a finding of perceived disability, Defendant appears to concede that a person prescribed opioid medication is likely disabled: "some number, but not all or perhaps even most of those with opioid prescriptions are disabled within the meaning of the ADA." (Doc. 153 at 84 (quoting *Fuog v. CVS Pharmacy, Inc.*, No. CV 20-337 WES, 2021 WL 4355402, at *5 (D.R.I. Sept. 24, 2021)). *Fuog* involved a policy where pharmacists would not fill prescriptions for opioid medication without additional requirements like submitting other prescriptions for non-opioid medications or the purchase of other products. *Fuog* is inapposite to this case where AFS prohibited use of prescription medications because of a perceived impairment due to possible side effects from those medications.

possible side effects on employees from taking prescription medications. Safety in performing essential functions is the only purported connection to AFS's prohibition of prescription medications. However, the use of prescription medications actually aided Claimants in performing their essential functions and there is no evidence any of the Claimants experienced any side effects from those medications that caused them to be a direct threat to themselves or others. (*See* II.M, *supra*). Collectively, Claimants had taken their medications for many years without a safety incident attributed to prescription medication use. Claimants did not suddenly become unqualified to perform their jobs because of AFS's application of its policy on prescription medications or a shift in the administration of the policy. Accordingly, AFS does not assert that any of the Claimants were not qualified individuals. Nor could AFS reasonably do so. There is no evidence the Claimants' use of prescription medications affected the safe performance of the essential functions of their positions.

> 3.    The EEOC Can Prove the Claimants Suffered an Adverse Employment Action Because of Their Actual or Perceived Disabilities

Defendant contends the "EEOC cannot meet its burden to identify any adverse employment action taken towards any of the claimants." (Doc. 153 at 89). Defendant's contention is false— there is ample evidence in the record from which a jury could conclude Defendant subjected each of the Claimants to an adverse employment action. Namely, Defendant conditioned each claimant's ongoing employment with Defendant on their agreement to stop using their lawfully prescribed medications. Defendant also placed many of the claimants on unpaid involuntary leave.

Defendant correctly cites the Eleventh Circuit's definition of an adverse employment action, but Defendant overemphasizes the need to show an "ultimate employment decision." Rather, "the Eleventh Circuit's standard for discrimination claims require[s] an employee to

establish an 'ultimate employment decision' <u>or make some other showing of substantiality in the</u> <u>employment context in order to establish an adverse employment action</u>." *Helmuth v. Troy Univ.*, No. 2:19-CV-601-RAH-SMD, 2021 WL 1081118, at *7 (M.D. Ala. Mar. 19, 2021) (Huffaker, J.) (alteration in original) (emphasis added) (internal quotation marks omitted) (citing *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)). The key is that the adverse employment action "alters the employee's compensation, <u>terms, conditions, or privileges of employment</u>, deprives him or her of employment opportunities, <u>or adversely affects his or her status as an employee</u>." *Id.* (emphasis added) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)).

Thus, an employee need not necessarily show a termination or demotion to establish an adverse employment action. The Supreme Court has "repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition 'is not limited to "economic" or "tangible" discrimination,' and that it covers more than 'terms' and 'conditions' in the narrow contractual sense." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002) (first alteration in original) (internal citations omitted). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment . . . .'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57 (1986)). The "terms, conditions, or privileges of employment" phrase also appears in the ADA, and courts have applied the Supreme Court's interpretation of the phrase in the Title VII context to the ADA context. *See* 42 U.S.C. § 12112(a); *Exby-Stolley v. Bd. of Cnty. Commissioners*, 979 F.3d 784, 817 (10th Cir. 2020) ("*Burlington* and *Meritor Savings Bank* thus provide us with a broad conception of the scope of the language 'terms, conditions, [and] privileges of employment.' Specifically, such language in a

statutory provision ordinarily signals that the provision covers a wide range of employment-related conduct. And, though *Burlington* and *Meritor Savings Bank* commented on the 'terms, conditions, [and] privileges of employment' language contained in Title VII, we discern nothing in the text of those decisions or otherwise that suggests their reasoning does not readily apply to nearly identical language in the ADA.").

As stated above, Defendant conditioned each claimant's ongoing employment with Defendant on their agreement to stop using their lawfully prescribed medications. (*See* §II.J, *supra*). Those who refused were put on unpaid leave until they either agreed to Defendant's conditions or successfully grieved Defendant's actions with the union. (*Id.*). Defendant only allowed those who agreed to stop taking their medicines to return to work. (*Id.*). But even then, the claimants who signed an agreement were warned that if Defendant caught them using their medications again, they would be subject to termination. (*Id.*).

In fact, Defendant required many of the claimants to sign *literal* terms and conditions agreeing, in writing, to not take their medications:

> Based on review by the Employer approved medical provider, I have been advised that the use of the medication (s) listed below has (have) been determined inappropriate for use in a safety sensitive work environment.
>
> _____    _____
>
> _____    _____
>
> _____    _____
>
> ==I further understand that should future substance screens result in disclosure of the use of this medication I may be subject to disciplinary action up to and including discharge.==
>
> _____
> EMPLOYEE SIGNATURE/DATE

(*See* Ex. 93-96).

As this form shows, the claimants who signed agreed not only that they would stop taking their medicine but also that they would be subject to discharge if caught taking them in the future. The meaning of Defendant's condition was clear to each of the claimants—stop taking your medication or risk indefinite leave and termination.

Prohibiting an existing employee from continuing to work unless they agree to stop taking their disability-related medications is an adverse employment action that constitutes a substantial and material change in the employee's terms and conditions of employment—in this case, even in the "narrow contractual sense" referenced by the Supreme Court as evidenced by the documents some claimants were made to sign. *Morgan*, 536 U.S. at 116. In a factually similar case, *Breaux v. Bollinger Shipyards*, the court found sufficient evidence of an adverse employment action when a defendant employer refused to allow an employee to return to work in a safety-sensitive position unless he agreed to stop taking his disability-related medication. No. CV 16-2331, 2018 WL 3329059, at *13–14 (E.D. La. July 5, 2018). Accordingly, the court denied the defendant's summary judgment motion. *Id.* at *14. Here, Defendant subjected each of the claimants to the same alteration of conditions as the employee in *Breaux*—stop taking your medication or you cannot return to work. Unsurprisingly, many Claimants complied and agreed to stop taking their medications in order to return to work. They then had to perform their job duties while suffering from pain, mental issues, or other consequences from discontinuing their prescribed medication.

Furthermore, Defendant subjected some claimants to yet another adverse employment action: placing them on involuntary, unpaid leave even though they were ready, willing, and able to work but for Defendant's discriminatory employment condition. Defendant attempts to

minimize this fact by arguing that courts around the country have held that unpaid leave is merely a reasonable accommodation, exclusively citing cases from courts outside the Eleventh Circuit as support. (Doc. 153 at 88-89).

Defendant's inability to cite a favorable case within the Eleventh Circuit is unsurprising because district courts in this circuit have regularly held that being placed on unpaid, involuntary leave is an adverse employment action. *See, e.g.*, *Wingfield v. S. Univ. of Fla., Inc.*, No. 8:09-cv-01090-T-24-TBM, 2010 WL 2465189, at *13 (M.D. Fla. June 15, 2010) (holding that forcing an employee to take sick leave without pay alters the employee's compensation and the terms, conditions, and privileges of the employee's employment); *White v. Potter*, No. 1:06-CV-1759-TWT, 2007 WL 1330378, at *11 (N.D. Ga. Apr. 30, 2007) (concluding that the defendant's requirement that the plaintiff take leave without pay constituted a materially adverse action under the circumstances); *Kinsey v. City of Jacksonville*, No. 3:01 CV 785, 2005 WL 3307211, at *8 (M.D. Fla. Dec. 6, 2005) ("Requiring an employee to take leave without pay could be considered an adverse employment action as it directly affects the employee's compensation."), *aff'd* 189 F. App'x 860 (11th Cir. 2006); *Haynes v. City of Montgomery, Ala.*, No. 2:06-CV-1093WKW, 2008 WL 695023, at *5 (M.D. Ala. Mar. 12, 2008) (finding sufficient evidence of adverse employment action to support disparate treatment claim where defendant placed plaintiff on involuntary unpaid medical leave).

Indeed, the Eleventh Circuit itself has affirmed that placing an employee on unpaid leave is an adverse employment action. In *Lewis v. City of Union City, Ga.*, 934 F.3d 1169 (11th Cir. 2019), the defendant placed the plaintiff on unpaid administrative leave until she could be cleared by her physician to return to full duty. *Id.* at 1175. At summary judgment, the district court held

that the plaintiff had produced sufficient evidence that her employer "took adverse action—*placing her on leave*—because of [her] impairment" and thus had regarded her as disabled. *Id.* at 1181 (emphasis added). In its en banc, *de novo* review, the Eleventh Circuit affirmed the district court's finding, holding that the plaintiff put forth sufficient evidence to show that her employer put her on administrative leave because it regarded her as disabled. *Id.* at 1182. Notably, the *Lewis* court reached this conclusion even though the leave was only meant to last until the plaintiff could be cleared by her physician. *Id.* at 1175.

Of course, courts in other circuits have also concluded that unpaid administrative leave is an adverse employment action. *See, e.g.*, *Franklin v. Potter*, 600 F. Supp. 2d 38, 72 (D.D.C. 2009) ("[B]eing sent home without pay, as was the case here, would satisfy a prima facie case for a materially adverse action."); *Johnson v. Alice Ind. School Dist.*, No. C-12-170, 2012 WL 4068678, at *3 (S.D. Tex. Sept. 14, 2012) ("While administrative leave, by itself, may not constitute an adverse employment action, being placed on administrative leave without pay does."); *Steenmeyer v. Boeing Co.*, 92 F. Supp. 3d 1024, 1031 (W.D. Wash. 2015) (finding placing employee on involuntarily unpaid leave was adverse employment action and denying summary judgment); *EEOC v. UPS*, Case No. CV-15-01935-PHX-GMS, 2017 WL 3503676, at *2, 5 (D. Ariz. June 19, 2017) (noting that forced indefinite unpaid leave of absence was adverse employment action).

The *Steenmeyer* court succinctly explained the key distinction between cases where leave is an accommodation and where it is an adverse employment action: "The fact that unpaid leave may, in certain circumstances and where requested, constitute a reasonable accommodation does not mean that it cannot also be an adverse action, particularly where the employee is placed on unpaid leave involuntarily." 92 F. Supp. 3d at 1031 (emphasis added). Here,

no leave was necessary. Claimants were able to work safely while taking their prescription medications, and Defendant cannot establish that they were unable to work. The unpaid leave was decidedly involuntary and therefore adverse.

Defendant also attempts to minimize its adverse employment actions by focusing on the length of the involuntary unpaid leave, citing *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *16 (N.D. Ala. Sept. 17, 2020) for the proposition that involuntary, unpaid leave is only an adverse employment action when it is excessive, such as the 5-year leave in that case. (Doc. 153 at 88). But *Howard* did not hold that the length of the unpaid leave is what made it adverse. Instead, all the *Howard* court states about this issue is that "[i]t is clear that Plaintiff suffered an adverse employment action: he was placed on a medical hold and his salary was suspended." 2020 WL 5569922, at *16. Thus, the *Howard* court simply concluded that being placed on a medical hold and having one's salary suspended is an adverse employment action; it did not discuss or assign any import to the length of the leave.[24]

Contrary to Defendant's intimation, no rule requires involuntary, unpaid leave be excessively long in order to be an adverse employment action. Indeed, courts have regularly found short periods of unpaid leave suffice to establish an adverse employment action. For example, the unpaid leave that the Eleventh Circuit held was adverse in *Lewis* was only about 3 weeks long. 934 F.3d at 1175-76 (en banc); *see also, e.g.*, *Wingfield*, 2010 WL 2465189, at *13 (one month of

---

[24] *Howard* is also instructive because it features a very similar set of facts—the defendant put the plaintiff on leave because of his need to take disability-related medications, Oxycodone and Methadone. 2020 WL 5569922, at *6-7 Notably, *Howard* was also never terminated, much like the claimants in this case. *Id.* at *7 ("Although Plaintiff was prohibited from working as a conductor, his employment with Defendant was never terminated.").

unpaid leave was adverse employment action); *White*, 2007 WL 1330378, at *3 (one day of unpaid leave was adverse employment action).

Defendant also appears to insinuate that the unpaid, involuntary leave the claimants experienced was not adverse because some (but not all) claimants were retroactively paid 70% of their salary through short term disability. But the court in *Wingfield* rejected that exact argument. There, the defendant employer placed the plaintiff employee on unpaid, involuntary medical leave for 31 days, but then retroactively paid her *full* salary once her leave ended (thus, even more than the 70% some claimants in the present case received). *Wingfield*, 2010 WL 2465189, at *3, 13. The defendant argued that it did not take an adverse action against the plaintiff because it "retroactively deposited her missed salary into her bank account." *Id.* at *13. The court rejected that argument, holding that "[a]lthough [the defendant] retroactively tried to pay [the plaintiff], it did not do so for a month. By that time, [the plaintiff] had lived without her salary for 31 days." *Id.* "The fact that [the defendant] attempted to undo its action does not change the adverse nature of the action at the time it occurred." *Id.* The court concluded that "[t]he retroactive deposit does not 'erase all injury associated with it, specifically the lost value and use of the funds during the time she was not receiving them.'" *Id.* (quoting *Crawford v. Carroll*, 529 F.3d 961, 972 (11th Cir. 2008)). *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993) ("In August of 1990, plaintiff was the subject of an adverse employment action; he was suspended with pay for thirty days.").

In sum, there is sufficient evidence for a jury to conclude that Defendant subjected each of the claimants to an adverse employment action by forcing them to forego their medications and deal with the physical and mental consequences while working (and living) (see §II.M, *supra*),

and by forcing those who did not agree to stop taking their medications to go on involuntary, unpaid leave.

    4.    <u>AFS Lacks a Legitimate Non-Discriminatory Justification for its Actions</u>

AFS offers three reasons it asserts are legitimate and nondiscriminatory for its actions in sending Claimants to company doctors, placing some Claimants on leave, and forcing Claimants to switch to alternative medications. Regarding AFS's first proffered reason, that it needed to send Claimants to the company doctors for safety concerns, Dr. Yarborough provided contrary testimony. It was not necessary to send Charging Parties, Nolin or Simmons, to company doctors solely on the basis of medication use because there was no indication of a performance or conduct issue. (*See* Ex. 36, Yarborough Dep. 163:4-164:4). Claimants had taken their medications as prescribed and had not had any performance issues at work. AFS cannot establish that it sent Claimants to company doctors for an individualized assessment of risks based on the employee's actual experience of taking a prescription medication. (*See* §IV.D, *infra*). The evidence shows that Claimants were sent to AFS's company doctors to discuss alternative medications, contact prescribing physicians for alternative medications, and to assess the employee's fitness based on AFS's policy of certain prohibited medications. As discussed, these actions were not justified. (*See* §IV.E.6, *infra*). Therefore, AFS's proffered reason for sending Claimants to company doctors is pretextual.

AFS's attempt to justify placing Claimants on leave has no merit. AFS disqualified Claimants, placed them on unpaid indefinite leave, and did not act on its own to resolve the situation. Placing Claimants on leave cannot be considered a reasonable accommodation as AFS claims. (*See* §IV.F, *infra*).  Claimants were able to work. They were not recovering from injuries

at the time AFS took them out of work for the medication at issue. AFS's Procedural Guide provided that employees placed on leave due to the policy were eligible to apply for short-term disability. AFS's own assertion that it was willing to compensate employees in lieu of disability payments from its insurance carrier undercuts its own argument. AFS cannot reasonably claim that it did not consider employees disabled when it made disability payments to Claimants placed on leave. Moreover, there was no justification for placing Claimants who demonstrated no inability to work on leave. (*See* §IV.E.6, *infra*).

AFS claims it was reasonable to have placed Mark Blinn on unpaid leave without any reimbursement for around two months.[25] Since 2010, Blinn had an arrangement with AFS to take FMLA leave whenever he needed to take time off because of the chronic pain in his ankles. (Ex. 2, Blinn Decl. ¶¶12-13; Doc. 153 at 39-40; Defendant Ex. 78 (Sealed)). AFS had known of Blinn's condition for more than six years when he was placed on unpaid leave. No one from AFS contacted him during this period. It cannot be seriously contested that AFS regarded Blinn as unable to work when it placed him on leave. AFS knew Blinn's medication and his condition, regarded him as disabled and unable to work, and enforced the policy prohibiting his medication anyway. AFS placed Blinn on leave because AFS believed he was disabled and unable to work. The inescapable conclusion is that AFS discriminated against Blinn because of his disability.

---

[25]Compliance with ADA does not necessarily mean financial loss for a company. Moreover, the evidence contradicts AFS's assertion that it had to pay someone else to perform Blinn's job duties at an overtime rate. When an aircraft mechanic was placed on leave, there were no temporary workers to take the employee's place. AFS could not have known beforehand that his disability claim would be denied. The threat of placing someone on unpaid, indefinite leave, however, was a deterrent for other employees to continue taking their prescribed medications, and the threat was a reality for Blinn. AFS could have avoided all its asserted expenses by simply allowing Blinn to continue using his medications without having to put him out of work, which was completely unnecessary.

Finally, AFS asserts it relied on company doctors for the issue of Claimants switching to alternative medications or discontinuing their medications. An employer cannot rely on a company doctor to escape liability when the company doctor has not performed a direct threat assessment. *See Pollard v. Drummond Co., Inc.*, No. 2:12-CV-03948-MHH, 2015 WL 5306084, at *7 (N.D. Ala. Sept. 10, 2015) ("An employer may not rely upon the recommendation of a physician who ... conducts a cursory examination and bases his opinion at least in part on a general assumption that all patients with the same disability have the same limitations."); *Lowe*, 244 F.3d at 1309 (denying summary judgment where doctor's restrictions not based on actual capabilities but rather assumptions that all double amputees have the same limitations).[26] Likewise, AFS also cannot rely on a "good faith" defense.[27] *See Byrd v. Outokumpu Stainless USA, LLC*, No. CV 20-0520-WS-M, 2022 WL 2134993, at *10 (S.D. Ala. June 14, 2022) (discussing Eleventh Circuit's rejection of a subjective good faith standard to rely on a third-party medical provider's recommendation). The evidence shows that AFS provided its Procedural Guide and other guidance to the company doctors. The documentary evidence plainly shows that company doctors followed AFS's guidance,

---

[26] *See also Holiday v. City of Chattanooga*, 206 F.3d 637, 644-45 (6th Cir. 2000) (stating, among other things, that "[c]ourts need not defer to an individual doctor's opinion that is neither based on the individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence") (emphasis added). *E.E.O.C. v. Browning - Ferris, Inc.*, 262 F.Supp.2d 577 (D. Md. 2002) (reasonable jury could find employer violated ADA by relying exclusively on company doctor's opinion which was not based on most current medical knowledge or best available objective evidence); *EEOC v. MGH Family Health Center*, No. 1:15-cv-952, 2017 WL 410298 at *14-17 (W.D. Mich. Jan. 30, 2017) (when direct evidence shows that the employer rejected an applicant because of an actual or perceived disability without first performing an individualized inquiry, the employer is statutorily estopped from arguing that the person was not "otherwise qualified."); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 193 (3d Cir. 1999) (no reasonable mistake defense).

[27] An employer misjudges the objective evidence at its own peril. *See Bragdon*, 524 U.S. at 649-50 (1998) (employer's "belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability . . . courts should assess the objective reasonableness of the [employer's] views"); *Lowe v. Alabama Power Company*, 244 F.3d 1305, 1309 (11th Cir. 2001) (in denying summary judgment, stating that "Alabama Power's decision that Lowe was not able to perform the mechanic position safely was not based, therefore, on particularized facts using the best available objective evidence as required by the regulations).

and AFS's directive was for company doctors to discuss alternative medications or to find Claimants unfit if they continued to use specific prohibited prescription medication. The company doctors were part of the process to force Claimants to cease using prohibited medications. In these circumstances, a reasonable jury could conclude that AFS's attempt to rely on company doctors is and was a pretext for discrimination.

AFS knew its policy affected employees with disabilities through discussions with Claimants, discussions with its company doctors, discussions with the Union, internal discussions, its guidance and draft guidance to company doctors. AFS continued administering its policy regardless of that knowlwdge. AFS even drafted a prescription medication guideline that withheld income reimbursement for employees placed on leave and who required long-term use of a prohibited medication for their condition. (*See* II.C.2). AFS's reasons are pretextual because AFS cannot dispute that Claimants were able to work safely and there was no indication of any safety issues that needed to be resolved. Furthermore, AFS's policy regarded Claimants as disabled and unable to work, and AFS and its company doctors administered its policy accordingly. "'The evidence tending to prove the "regarded as" definition of disabled ... often is duplicative of the evidence relevant to' whether the defendant's employment decision was based on the plaintiff's perceived disability." *Byrd v. Outokumpu Stainless USA, LLC*, No. CV 20-0520-WS-M, 2022 WL 2134993, at *9 (S.D. Ala. June 14, 2022) (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1184 (11th Cir. 2019)). The same evidence showing that AFS perceived Claimants as disabled also shows that the proffered reasons for its actions were pretextual. The perception that Claimants were disabled prompted AFS's actions. Because the actions were not justified by any individualized assessments of direct risk, the evidence shows that AFS's reasons were pretextual.

*See Byrd v. Outokumpu Stainless USA, LLC*, No. CV 20-0520-WS-M, 2022 WL 2134993, at \*9 (S.D. Ala. June 14, 2022) (finding evidence showing defendant perceived plaintiff to be disabled was evidence of pretext) (citing *Haynes v. City of Montgomery, Ala.*, 344 F. App'x 519, 520 (11th Cir. 2009)).

### D.    A Reasonable Jury Can Determine the Claimants Did Not Pose a Direct Threat

AFS failed to determine then, and fails to argue now, that the Claimants constituted direct threats to themselves or to others in the workplace. A "direct threat" is "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."[28] 42 U.S.C. § 12111(3). A direct threat must pose a "significant risk, i.e., high probability, of substantial harm; a speculative or remote risk is insufficient." 42 29 C.F.R. § 1630.2(r) App. (emphasis added). *See Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) ("Because few, if any, activities in life are risk free, *Arline* and the ADA do not ask whether a risk exists, but whether it is significant."). A direct threat assessment "must also be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)). "Employers … cannot subject an employee with a disability to an adverse employment action without first ensuring that the employee cannot conduct the essential

---

[28] A defense may be raised in an ADA case "on the basis that an employee is not qualified for the position because that employee poses a 'direct threat.'" *Stokes v. City of Montgomery*, No. 2:07CV686-WHA, 2008 WL 4369247, at \*7 (M.D. Ala. Sept. 25, 2008) (citing 42 U.S.C. § 12111(3)).

functions of his job." *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *15 (N.D. Ala. Sept. 17, 2020).

"[A]n employer's determination that an employee's use of medication violated certain guidelines, without more, does not amount to the "individualized inquiry into [the employee's] present ability to perform his job functions" required to determine that an employee constitutes a direct threat." *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *15 (N.D. Ala. Sept. 17, 2020) (internal citations omitted) ("Specifically, [Defendant's doctor] determined Plaintiff's use of [Oxycodone and morphine] violated Defendant's medical guidelines against "employees in safety-sensitive and/or non-sedentary positions" taking "short-acting medications that may cause sedation, weakness, fatigue, confusion, dizziness[,] and similar side effects ... while at work or within 6 hours ... of reporting to work."). "'[A]n assessment based on the known possible side effects of a medication, as opposed to an individualized inquiry into a patient's present ability to perform his job functions, is insufficient.'" *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *14 (N.D. Ala. Sept. 17, 2020) (quoting *Pollard*, 2015 WL 5306084, at *7, citing in turn *Haynes v. City of Montgomery*, 2008 WL 4495711, at *4-5 (M.D. Ala. Oct. 6, 2008)). *See Pollard v. Drummond Co.*, No. 2:12-cv-03948-MHH, 2015 WL 5306084, at *6 (N.D. Ala. Sept. 10, 2015) (holding company doctor's opinion based on "his experience with other methadone patients, his knowledge of methadone's potential side effects, and his general belief that any mine employee taking methadone should be placed on restriction" is insufficient). "To prevent the very reliance on stereotype and related perceptions of an individual's limitations that the ADA prohibits, an employer must point to particularized facts

about the specific person's condition to support its decision." *Lowe v. Alabama Power Company*, 244 F.3d 1305, 1308 (11th Cir. 2001).

As the case law demonstrates, direct threat is a paramount issue in this case. Like the plaintiffs in the cases cited above, Claimants were subjected to a process where most of them were sent to company doctors. The evidence shows that the company doctors did not engage in an individualized assessment to determine whether the employee constituted a direct threat. The company doctors determined the employee's fitness based on possible side effects of prescribed medications rather than an individualized inquiry into an employee's actual ability to perform job functions.[29] (*See* §II.H, *supra*). The actions of AFS and the company doctors punished employees using certain prescription medications by forcing those employees to forego their medications without any direct threat assessment. Defendant states that it need not address the issue of direct threat because it believes that placing employees on indefinite unpaid leave and forcing them to choose between their jobs and their prescribed medications did not constitute an adverse

---

[29] In addition to the cases already cited, cases in other circuits have similarly held that assumptions or general beliefs regarding potential drug side effects are insufficient to demonstrate a direct threat. *Hixon v. Tennessee Valley Auth. Bd. of Directors*, 504 F. Supp. 3d 851, 864 (E.D. Tenn. 2020) (denying summary judgment where employer relied upon conclusion employee "might have bad side effects, but there was no evidence as to whether any of these side effects occurred" because no one "inquired if Plaintiff had suffered from any side effects."); *Breaux v. Bollinger Shipyards, LLC*, No. 16-2331, 2018 WL 3329059 at *13 (E.D. La. July 5, 2018) (denying summary judgment because, while the plaintiff took a potentially dangerous drug, there was no evidence as to whether plaintiff actually experienced debilitating side effects); *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 517–18 (W.D. Pa. 2010) (holding an individualized inquiry was necessary even though employee admitted to using methadone); *Wysong v. The Dow Chemical Company*, 503 F.3d 441 (6th Cir. 2007) (jury could conclude employer perceived employee as disabled by refusing to release her to return to work due to concerns about safety risks in taking narcotic drugs while working on machine and forklift).

employment action. (Doc. 153 at 85). However, AFS's failure to provide individualized assessments of direct threat is separate from the issue of whether AFS took an adverse employment action. Defendant did not address the issue of direct threat, thus waiving that issue. *Rousseau v. Alabama Cmty. Coll. Sys.*, No. 2:20-CV-391-RAH-SMD, 2021 WL 3476605, at *3 n.2 (M.D. Ala. Aug. 6, 2021) (holding that party waived an issue by failing to address it in his brief).

**E.    A Reasonable Jury Can Determine AFS's Policy Was an Impermissible Qualification Standard That Screened Out Employees Based on Disability Under 12112(b)(3) and (b)(6)**

AFS's policy and administration of its policy regarding prescription medications discriminated against Claimants through an impermissible standard under the ADA.[30] Qualification standards[31] include "the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet

---

[30] Qualification standards should not be confused with essential functions, which are basic job duties. *See Toole v. Metal Servs. LLC*, 17 F. Supp. 3d 1161, 1171 (S.D. Ala. 2014) (citing 29 C.F.R. § 1630.2(n)(1) and (q)). It is not disputed that Claimants could perform the essential functions of their positions. Defendant has waived any argument that Claimants did not meet the "qualified individual" element for a claim of discrimination based on disability. An employee can be "a qualified individual" under the ADA without having met each of an employer's established "qualification standards." "[I]ndeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly cannot meet because of his disability and that forms the very basis of his discrimination challenge." *Toole v. Metal Servs. LLC*, 17 F. Supp. 3d 1161, 1171 (S.D. Ala. 2014) (internal citations omitted). Because Claimants were otherwise qualified for their positions except for AFS's policy on prescription medications, AFS's policy on prescription medications must be considered a qualification standard.

[31]  "[T]he term "discriminate against a qualified individual on the basis of disability" includes--

"(3) utilizing standards, criteria, or methods of administration--(A) that have the effect of discrimination on the basis of disability;

…

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b).

in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). According to AFS's policy, employees were not qualified to work in positions it considered to be safety sensitive while taking prohibited prescription medications. "The statutory definition of 'discriminat[ion]' covers a number of things an employer might do to block a disabled person from advancing in the workplace, such as 'using qualification standards ... that screen out or tend to screen out an individual with a disability.'" *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002) (citing 42 U.S.C. § 12112(b)(6)).

1. <u>AFS's Discriminatory Qualification Standard Disparately Treated the Claimants and Had a Disparate Impact on Disabled Employees</u>

The ADA allows the EEOC to pursue a claim of an impermissible qualification standard pursuant to § 12112(b)(6) as a disparate treatment claim. "Neither the Supreme Court nor the Eleventh Circuit Court of Appeals has held explicitly that a plaintiff may pursue only a disparate impact claim under § 12112(b)(6)." *Dolgencorp*, WL 2959569, at *5. Other courts have allowed disparate treatment claims under § 12112(b)(6). *See*, *e.g.*, *Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834, 839 (5th Cir. 1999) (examining medical screening claim by individual plaintiff as a disparate treatment claim and noting that plaintiff did not plead a disparate impact claim under § 12112(b)(6)); *Toole v. Metal Services, LLC*, 17 F. Supp. 3d 1161 (S.D. Ala. 2014) (applying the *McDonnell Douglas* framework, though noting the plaintiff alleged that the physical examination had a "disparate impact" on the plaintiff).

The United States Supreme Court has recognized that "[b]oth disparate-treatment and disparate-impact claims are cognizable under the ADA" in reference to § 12112(b)(3) and (6). *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). The Supreme Court did not expressly distinguish claims pursuant to § 12112(b)(3) and (6) as either disparate treatment or disparate

impact claims or whether both could be asserted pursuant to the statutory provisions. The EEOC, however, plead its impermissible qualification standard claim under both § 12112(b)(3) and (6). (Doc. 1). Therefore, the EEOC has also asserted a disparate treatment claim regardless of which statutory provision, or both, allows such a claim.

> 2.    AFS's Drug Policy Screened Out Employees with Disabilities

AFS's policy prohibited the use of certain medications by employees in positions it considered to be safety sensitive. This qualification standard screened out employees in so-called safety sensitive positions who were using a prohibited medication. As described in Section IV.C.1, AFS regarded all employees taking prohibited medications as disabled and not qualified to work. In addition, employees were sent to company doctors who discussed alternative medications with them. As a result, the company doctors learned of the employees' conditions for which they were taking medication, and most of Claimants' conditions were actual disabilities.[32] Therefore, pursuant to its policy, AFS's eligibility criteria screened out or tended to screen out employees with disabilities.

The ADA refers to "standards" or "criteria" as screening out or tending to screen out individuals with disabilities. 42 U.S.C. § 12112(b)(3) and (6). The standards or criteria do not in themselves perform an employment action, which requires company personnel. AFS thus does not appear to contest that its policy on prescription medications contained qualification criteria that screened or tended to screen out employees with disabilities. (Doc. 153 at 102-103).

---

[32] The EEOC does not claim that Sander's obesity condition was an actual disability.

Defendant correctly contends that to establish a "screen out" claim under Section 1211(b)(6), the EEOC must establish an adverse employment action. (Doc. 153 at 102). But Defendant incorrectly contends that there is an "undisputed absence of an adverse employment action." (Doc. 153 at 103). As explained above, the EEOC has put forth enough summary judgment evidence to show that each of the claimants was subjected to an adverse employment action. Defendant argument therefore fails.[33]

3.     AFS's Reliance on Claimants' Disabilities to Screen Them Out is Direct Evidence of Discrimination Which Precludes Summary Judgment

Direct evidence of discrimination includes an employer's reliance or partial reliance on a disability to screen out an individual. *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, No. 2:17-CV-01649-MHH, 2022 WL 2959569, at *7 (N.D. Ala. July 26, 2022) (holding "policies that expressly and intentionally screen out individuals with disabilities … constitutes direct evidence of discriminatory intent") (citing *Monette v. Electronic Data Systems, Corp.*, 90 F.3d 1173 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)). Qualification standards operate as patently discriminatory standards if based on (mistaken) perceptions of the individual's ability to perform the job. *See Byrd v. Outokumpu Stainless USA, LLC*, No. CV 20-0520-WS-M, 2022 WL 2134993, at *5 (S.D. Ala. June 14, 2022)

---

[33] Defendant also appears to insinuate that rather than showing *any* adverse employment action, a "screen out" claim further requires a *certain kind* of adverse employment action—a failure-to-hire, rescission of a conditional job offer, or a situation where someone is "screened out of his or her job," the latter apparently implying termination. (Doc. 153 at 102). Though these do represent the most common screen-out fact patterns, they are by no means the *only* cases that constitute a screen out. For example, in *Baker v. Union Pac. R.R. Co.*, 580 F. Supp. 3d 647 (D. Neb. 2022), the court denied summary judgment against a screen out claim where an employer regarded an employee as disabled and placed him on involuntary unpaid medical leave but never terminated him. *See also Cleary v. Fed. Exp. Corp.*, 313 F. Supp. 2d 930, 934 (E.D. Wis. 2004) (denying summary judgment against screen out claim where employer failed to accommodate existing employee but did not terminate him).

(defendant's exclusion from safety sensitive work based only on potential side effect of hydrocodone); *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *15 (N.D. Ala. Sept. 17, 2020) (excluding plaintiff from safety sensitive positions because use of Oxycodone and morphine violated defendant's medical guidelines); *Pollard v. Drummond Co., Inc.*, No. 2:12-CV-03948-MHH, 2015 WL 5306084, at *6 (N.D. Ala. Sept. 10, 2015) (plaintiff suspended from work by defendant for use of methadone for chronic back pain). AFS regarded Claimants as disabled because of their use of prohibited prescription medications. Through the administration of its policy on prescription medications, AFS forced Claimants to work without their prescription medications or face other job consequences such as unpaid, indefinite leave. Therefore, summary judgment is inappropriate without undisputed proof of an affirmative defense. *See Loperena v. Scott*, No. CIV. A. 2:08-CV-99, 2009 WL 1066253, at *10 (M.D. Fla. Apr. 21, 2009) ("[A] finding that direct evidence of discrimination exists, standing alone, is normally sufficient to defeat a motion for summary judgment.").

4. <u>AFS Improperly Stereotyped Claimants Based on Their Disability-Related Prescriptions</u>

AFS and its company doctors acted on the stereotypical notions of Claimants' prescription medications and possible side effects. Courts in the Eleventh Circuit agree that employer decisions based on stereotypical qualifications standards about medications are discriminatory. *See Lowe v. Alabama Power Company*, 244 F.3d 1305, 1308 (11th Cir. 2001) ("To prevent the very reliance on stereotype and related perceptions of an individual's limitations that the ADA prohibits, an employer must point to particularized facts about the specific person's condition to support its decision."); *EEOC v. Outokumpu Stainless USA, LLC*, No. CV 20-521-CG-B, 2022 WL 4004769, at *12 (S.D. Ala. Sept. 1, 2022) (applying *Lowe* in medication context); *Pollard v. Drummond Co.*,

No. 2:12-cv-03948-MHH, 2015 WL 5306084, at *6 (N.D. Ala. Sept. 10, 2015) (company doctor's opinion based on "his experience with other methadone patients, his knowledge of methadone's potential side effects, and his general belief that any mine employee taking methadone should be placed on restriction" is insufficient).

There is sufficient evidence for a finder of fact to determine that the Claimants' disabilities were motivating factors behind AFS's actions against them. *See Haynes v. City of Montgomery*, No. 2:06CV1093WKW, 2008 WL 4495711, at *3 (M.D. Ala. Oct. 6, 2008), aff'd sub nom. *Haynes v. City of Montgomery, Ala.,* 344 F. App'x 519 (11th Cir. 2009) ("[T]he City's admission that its decisions were based on possible side effects of medications, coupled with the evidence that the City failed to make an individualized assessment of Mr. Haynes's present ability to perform his job and of whether Mr. Haynes was a direct threat, constitutes a sufficient evidentiary basis from which a reasonable jury could conclude that his disability was a motivating factor prompting the City's decisions.").

5.      AFS's Drug Policy Had a Disparate Impact on Employees with Disabilities

Defendant argues that the EEOC's qualification standard claim lacks supporting evidence, citing *Smith v. Miami-Dade Cnty.*, 621 F. App'x 955 (11th Cir. 2015). (Doc. 153 at 103-105). In that case, the plaintiff appealed the dismissal of her disparate impact claim. *Id.* at 957. The Eleventh Circuit stated, "[D]isparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. For a disparate-impact claim to succeed, a plaintiff must show that a facially neutral employment practice had a significant discriminatory effect on a single group of people." *Id.* at 961 (internal quotations omitted). "Further, to establish a prima

facie case of disparate impact, a plaintiff must provide comparative evidence showing that a policy has a disparate impact on the disabled." *Id.* at 961-62. Statistical evidence is not the only kind of evidence that can be used to prove a qualification standard claim. *See Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, No. 2:17-CV-01649-MHH, 2022 WL 2959569, at *8 (N.D. Ala. July 26, 2022).

The evidence supports differential impact on persons with disabilities under AFS's policy on prescription medications to the extent that the policy is facially neutral. According to Defendant, only 72 employees underwent medical evaluations pertaining to their prescription medications. (Doc. 153 at 28). Whether that number of employees is a large percentage of the workforce is irrelevant in determining whether employees with disabilities were disproportionately impacted. Moreover, it is entirely speculative to assume that the only people who were disabled are the people who were included as Claimants in this case. Defendant apparently would only be satisfied by an in-depth analysis of each impacted person's impairment. This is unnecessary because, pursuant to the policy, AFS regarded all employees who took prohibited prescription medications as disabled regardless of actual disability. AFS did not similarly consider employees without such prescriptions as disabled. Accordingly, the administration of the policy disproportionately impacted employees with disabilities. Indisputably, AFS applied its policy to each Claimant. Therefore, there is no question as to causation.

6.  AFS's Unaccommodating Application of its Drug Policy Was Not Job-Related or Consistent with Business Necessity

The ADA provides an affirmative defense to a qualification standard claim: "It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job

76

or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter." 42 U.S. Code § 12113(a). *See* 29 C.F.R. § 1630.10(a), 1630.15(b), and 1630.15(c). The employer's burden of showing that challenged qualification standards are both job-related and consistent with business necessity is "generally quite high." *Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1317 (11th Cir. 2009). "'[J]ob-relatedness is used in analyzing the questions or the subject matter contained in a test or criteria used by an employer' as a basis for an employment decision, while 'business necessity, in context, is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria' for such decision." *Owusu–Ansah v. Coca–Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013), *cert. denied*, 571 U.S. 1045 (2013) (citations omitted). In evaluating the risks addressed by a safety-based qualification standard, the focus of the inquiry is whether the risks are real or simply the product of stereotypical assumptions. *See Fuzy v. S & B Eng'rs & Constructors, Ltd.*, 332 F.3d 301, 303 (5th Cir. 2003). AFS's policy prohibiting Claimants' prescription medications lacks the justification required for a business necessity defense.

Here, the qualification standard is a categorical prohibition of certain prescribed medications for employees in positions deemed safety sensitive. AFS cannot support its claim that its safety standard was flexible based on the examinations of its company doctors. (Doc. 153 at 107-108). The evidence shows that AFS sent employees to its company doctors to discuss alternative medications and receive an assessment pursuant to AFS's policy of prohibited medications. Claimants were deemed unfit to work in a safety sensitive position while taking

certain specified prescription medications based on AFS's blanket policy.[34] Moreover, AFS has failed to establish that its company doctors acted independently in providing individualized assessments of Claimants' safety risks to the workplace because it has waived any direct threat defense.[35] (Doc. 153 at 85). As a result, AFS cannot show that Claimants' use of prescription medications posed a significant risk to themselves or to others. Defendant must justify its policy in the absence of any consideration of individual characteristics of the Claimants, the individual use of the medications, or the effects of the medication on any individual Claimant. Defendant can only assert that the potential risks of certain prohibited medication somehow outweigh the need to individually assess whether an employee actually posed a risk. Defendant cannot remotely establish an absence of an issue of material fact that the prohibition of the mere use of the prescribed medications was job related and a business necessity.

AFS's business necessity defense to an impermissible qualification standard claim must involve the assessment of a direct threat. *See* 29 C.F.R. pt. 1630, App. § 1630.15(b) & (c). AFS has waived a direct threat argument, so its business necessity argument also fails. The only rationale for AFS's policy is safety, and it cannot prove that the use of each Claimant's prescribed medication was unsafe.

---

[34] The exception is if the Claimant was taking medication for ADD/ADHD and met predefined guidelines. The fact that an exception was made is proof that the company doctors did not provide individualized assessments but instead followed AFS policy in its determinations.

[35] "The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S. Code § 12113(b). "The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 USC § 12111(3).

Regardless, "the strength of the defense again turns on whether the employer can justify the safety standard as a general rule." *E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 874 (5th Cir. 2000). AFS does not identify its standard other than by a nebulous reference to safety. The taking of a prescription medication was not directly related to job functions at AFS, and AFS connected prescription medications to the jobs only through the concept of safety. None of the descriptions for the jobs held by Claimants, however, mention the term "safety." AFS classified positions as safety sensitive arbitrarily. AFS classified jobs held by some Claimants such as records specialist as safety sensitive even though they involved only clerical duties. Some positions like aircraft monitor could not involve or cause a catastrophic accident, and AFS personnel did not consider it to be safety sensitive. (Ex. 28, Poole Dep. 197:1-8). AFS shifted its rationale behind the classifications, and the list of positions that were included changed over time. AFS has not had a constant criterion for evaluating the safety nature of its positions.

AFS lacks any tangible evidence of risk. Its pronouncements are similar to the speculations from its expert. There has been no aircraft accident attributed to a maintenance or repair worker's use of prescription medication at Fort Rucker. (§II.L, *supra*). AFS investigated all safety incidents, and prescription medications have not been found to be the cause of any incident involving a Claimant. (Ex. 26, Lawson Dep. 84:19-85:18.) Even if AFS could somehow prove a business necessity as to a certain medication, which it cannot, a reasonable accommodation was available in allowing Claimants to take their medication 6-8 hours before a work shift. No safety incidents attributed to the use of prescription medications occurred during the time Claimants used their prescription medications in that manner.

AFS has not produced any scientific studies, reports, or analysis of data showing that the use of the prescription medications used by Claimants posed a safety risk in the performance of their jobs. AFS's prohibition on specific prescription medication is based only on stereotypical notions that are not universal for every individual and can be incorrect. According to Dr. Yarborough, AFS's position that an employee taking an opioid medication on a chronic basis always suffers cognitive deficits and should not be allowed to work while taking the medication lacks a solid scientific basis. (Ex. 35, Yarborough Report at 8 ¶6.) In support, Dr. Yarborough cites an article describing a systematic review of cognitive performance among people who chronically take opioids for pain.[36] (*Id.*) Overall, opioid therapy did not worsen cognitive performance and improved it for some. (*Id.*) Deficits in attention and memory are more likely related to pain than the use of opioids. (*Id.*) Therefore, AFS's policy on prohibiting opioid medication for chronic pain, overall, worsened cognitive performance. In addition, AFS's procedures enacting the policy's prohibitions also lack adequate justification. (§II.L.1, *supra*).

AFS's policy prohibited prescription medications regardless of the lack of particularized findings of any effects on individuals and considered Claimants to be disabled and unable to work in their positions. "If a test or other selection criteria excludes an individual with a disability because of the disability and does not relate to the essential functions of the job, it is not consistent with business necessity." EEOC Technical Assistance Manual on Title I of ADA, Chapter IV, Section 4.3 (2). As discussed, AFS's standard on prescription medications did not relate to the

---

[36] Ackhurst J., Lovell M., Peacock A., Raimondo B. *A Systematic Review and Meta-Analysis of Cognitive Performance among People with Chronic Use of Opioids for Chronic Non-Cancer Pain*. Pain Medicine. 22(4), 2021, 979–993.

essential functions of Claimants' positions. Because AFS regarded Claimants as disabled and screened them out because of their disability, its policy on prescription medications was not consistent with business necessity.

**F.    A Reasonable Jury Can Determine AFS Failed to Accommodate the Claimants Under § 12112(b)(5)(A)**

>    1.    Claimants Were Qualified Individuals with a Known Disability

The ADA provides that unlawful discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship."[37] 42 U.S.C. § 12112(b)(5)(A). Actual or constructive knowledge of the disability is required for this element. *Butler v. Greif, Inc.*, No. 1:04-CV-3502-ODE, 2006 WL 8431947, at *7 (N.D. Ga. Mar. 29, 2006), aff'd sub nom. *Butler v. Greif Bros. Serv. Corp.*, 231 F. App'x 854 (11th Cir. 2007) (quoting *Morisky v. Broward County*, 80 F.3d 445, 447-49 (11th Cir. 1996)).

AFS claims it did not know of Claimants' disabilities. This is plainly untrue with at least some Claimants such as Mark Blinn, Azeala Hutchinson, and Tammy Bright Hudson who had arrangements for intermittent FMLA leave for their conditions. Moreover, the company doctors undoubtedly knew of Claimants' conditions and limitations. AFS sent Claimants to company doctors to discuss alternative medications. In order to discuss alternative medications, the company doctors had to discuss with Claimants their underlying conditions and the conditions that

---

[37] AFS does not argue that any reasonable accommodation would be an undue hardship and has therefore waived this argument.

Claimants' prescribed medications addressed. The company doctors communicated their determinations to AFS, and AFS used those determinations to decide whether to allow Claimants to return to work or to place them on leave. Therefore, AFS had knowledge of the Claimants' limitations.

2. Claimants Requested Accommodation by Asking to Continue Using their Prescription Medications

An employee need only make an adequate request putting an employer on notice in order to trigger the interactive process for a reasonable accommodation. *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *15 (N.D. Ala. Sept. 17, 2020). No "magic words or talismanic language are needed." *Williamson v. Clarke Cty. Dep't of Human Res.*, 834 F. Supp. 2d 1310, 1320 n.14 (S.D. Ala. 2011) (internal citations omitted). *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1261 n.14 (11th Cir. 2007) (noting that the Eleventh Circuit has not specified a precise form that a request must take). A request is sufficient if the employee asks for a change or adjustment in the workplace that is linked to a disability. *Id.* A request need not follow formalistic procedures to be adequate. *Wilson v. Sec'y of Veterans Affs. Dep't of Veterans Affs.*, No. 20-10799, 2022 WL 1907863, at *6 (11th Cir. June 3, 2022). "An employee has made a request for accommodation when the employer has 'enough information to know of both the disability and desire for an accommodation.'" *Mitchell v. Pilgrim's Pride Corp.*, 817 F. App'x 701, 711 (11th Cir. 2020) (quoting *Hunt v. Aimco Props.*, L.P., 814 F.3d 1213, 1226 (11th Cir. 2016)).

AFS admits that Claimants requested to continue taking their prescribed medications but, in AFS's view, the requests were not in the form it acknowledged. (Ex. 33, Nance Rule 30b6 Dep. 119:7-122:11) ("People asked to be able to take certain medications, but it was not in order to perform the essential functions of their duty."). Claimants expressed to AFS and the company

doctors that they desired to continue using their prescribed medications to treat their underlying conditions. (§II.I.2, *supra*). AFS knew of Claimants' disabilities. Therefore, Claimants made adequate requests for reasonable accommodations.

### 3. AFS Refused to Engage in the Interactive Process

"When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Silvia v. City of Hidalgo, Tex.*, 575 Fed. Appx. 419, 424 (5th Cir. 2014).[38] "The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." *Cutrera v. Bd. Of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 112 (5th Cir. 2004).

Typically, an employee's request triggers an employer's duty to provide a reasonable accommodation through an interactive process. *See Wilson v. Sec'y of Veterans Affs. Dep't of Veterans Affs.*, No. 20-10799, 2022 WL 1907863, at *4 (11th Cir. June 3, 2022); *Cutrera v. Bd. Of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 112 (5th Cir. 2004). This is not a typical case. Claimants' requests to continue using their prescription medications went unheeded. AFS's policy regarding prescription medications did not provide for a process to provide a reasonable accommodation. AFS claims it thought that the company doctors handled requests for accommodations. The company doctors thought only AFS handled requests for accommodations. AFS's policy provided only for employees to stop their prescription medications and to switch to alternative medications. The term "accommodate" is not in the Procedural Guide.

---

[38] The EEOC does not assert the claim that AFS failed to provide a reasonable accommodation on behalf of Michael Sanders whose disability was only perceived. The EEOC asserts this claim on behalf of all other Claimants.

The ADA provides that a person with a disability need not engage in a "futile gesture:" "Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188(a)(1). "A plaintiff may have 'actual notice' by either having "encountered discrimination or [having] learned of the alleged violations through expert findings or personal observation." *Schwarz v. Villages Charter Sch., Inc.*, No. 5:12-CV-177-OC-34PRL, 2014 WL 12623013, at *5 (M.D. Fla. May 23, 2014) (quoting *Resnick v. Magical Cruise Co., Ltd.*, 148 F.Supp.2d 1298, 1302 (M.D. Fla. 2001), quoting in turn *Parr v. L& L Drive-Inn Rest*, 96 F.Supp.2d 1065, 1081 (D. Haw. 2000)).

Claimants knew they were able to work while taking their prescribed medication, but AFS or its company doctors informed Claimants that AFS perceived them unable to work in a safety sensitive position while taking prohibited prescription medication. (§II.H, *supra*). AFS sent Claimants to company doctors to talk about alternative medications. The company doctors informed Claimants that they could not take their medication because it was prohibited. A letter referred to as a "medication change request" form or "safety sensitive letter" was sent to Claimants' prescribing physicians. The letter informed prescribing physicians that their patients' jobs were in jeopardy if they continued to take the prescribed medication. Claimants feared for their jobs. Claimants were not presented with options and encountered only inflexibility from the company doctors and AFS. The discrimination against Claimants was apparent to them and palpable as some Claimants engaged in emotional discussions with AFS personnel or company doctors. In addition, employees talked to each other about their experiences, and AFS's discriminatory policy became well known. (*See* Ex. 17, Helms Decl. ¶24). Any requests made by

Claimants through the process defined by AFS's policy were futile gestures at obtaining reasonable accommodations. As the policy became well-known, the law no longer required further futile gestures. The breakdowns in the interactive process for a reasonable accommodation can only be attributed to AFS.

AFS argues that, somehow, placing Claimants on unpaid, indefinite leave was a reasonable accommodation. (Doc. 153 at 87-88). However, no Claimant requested to be placed on leave. Therefore, a specific request by a Claimant was not needed for AFS to know that it was in an interactive process. AFS rigidly offered only two options: be placed on leave or cease taking prescribed medication. Claimants were all capable of performing their job functions safety, and AFS cannot establish that any Claimant represented a direct threat. Therefore, indefinite, unpaid leave was not reasonable. The failure to find a reasonable accommodation falls squarely on AFS.[39] "[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Lowe v. Delta Airlines, Inc.*, No. 1:16-CV-3717-TWT-JSA, 2017 WL 2982336, at *9 (N.D. Ga. May 31, 2017), *aff'd sub nom. Lowe v. Delta Air Lines Inc.*, 730 F. App'x 724 (11th Cir. 2018)) (other citation omitted).

4.    Continuing Medication Use Was a Reasonable Accommodation

A "reasonable accommodation" can be either of the following:

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

---

[39] A delay in implementing an accommodation can be unreasonable. *See Equal Emp. Opportunity Comm'n v. Kaiser Found. Health Plan of Georgia, Inc.*, No. 1:19-CV-05484-AT-WEJ, 2021 WL 2547068, at *16 (N.D. Ga. Apr. 19, 2021), report and recommendation adopted, No. 1:19-CV-5484-AT, 2021 WL 3508533 (N.D. Ga. Aug. 9, 2021).

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1).

To defeat a motion for summary judgment, a plaintiff "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002) (citing *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (plaintiff meets burden on reasonableness by showing that, "at least on the face of things," the accommodation will be feasible for the employer); *Borkowski v. Valley Central School Dist.*, 63 F.3d 131, 138 (2nd Cir. 1995) (plaintiff satisfies "burden of production" by showing "plausible accommodation"). Before AFS applied its policy to Claimants, it allowed Claimants to take their prescription medications at least 6-8 hours before work. As an accommodation, this arrangement was an obvious and reasonable option. Most Claimants had worked for years under that arrangement, and no safety incidents occurred. AFS cannot prove that any Claimant had a safety issue with their use of prescription medication that constituted a direct threat. The evidence supports a finding that allowing Claimants to take their medications 6-8 hours before work was a reasonable accommodation under either definition pursuant to 29 C.F.R. § 1630.2(o)(1). *See Breaux v. Bollinger Shipyards, LLC*, No. CV 16-2331, 2018 WL 3329059, at *15 (E.D. La. July 5, 2018) (finding genuine issue of fact whether plaintiff's requested accommodation of being able to continue using Suboxone was reasonable or some other accommodation could have been made for his disability).

5.     <u>Prescription Medication Use Related to Performance of Job Functions</u>

The proposed reasonable accommodation is job related and would have enabled Claimants to perform their job functions. The term "enable" means "to provide with the means or opportunity" and also "to make possible, practical, or easy." *Enable*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/account. Claimants dealt with pain or mental issues while performing their job duties without their prescribed medications. Claimants like Winston Simmons, Paul Nolin, and Tammy Hudson experienced physical pain as a result of the company's forcing them to abandon their prescribed medications and the lack of effective alternative treatment. Claimants such as Winston Simmons had to take days off work to deal with the pain he experienced. Other Claimants had mental issues. Azeala Hutchinson suffered disciplinary actions after events with policy. The proposed accommodation would have made the Claimants' performance of their job functions more practical and easier. The accommodation is undoubtedly job related.

AFS cannot reasonably argue that the use of prescription medication was not job related or connected to the performance of job functions because that would have made their actions in applying the policy to Claimants completely unnecessary and an admission of discrimination. Defendant's untenable position is that an employee must fail in the performance of their job duties while suffering physical pain or mental issues in order to demonstrate a need for a reasonable accommodation. That cannot be the standard. As defined in the ADA, reasonable accommodations include an "appropriate adjustment or modification of … policies." 42 U.S.C.A. § 12111(9)(B). The ADA requires that employers "modify or remove (within reason) policies and practices that

burden a disabled person 'because of [his] disability.'" *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

6.    Continuing Prescription Medication Use Was Not a Matter of Preference

Treatment of pain and mental issues should not be viewed as a matter of mere preference. Treating physicians who examined Claimants and knew their needs the best had prescribed the medications to Claimants that AFS prohibited. The prescribed medication best addressed Claimants' conditions. Any changes to the prescriptions were made under duress under the threat of a suspension or job loss and not voluntarily. (§II.J, *supra*). Claimants experienced serious problems without their prescription medications. Taking their prescribed medications was not simply whimsical desire.

AFS's reference to *Emmons v. C-Innovation, L.L.C.*, No. CV 17-4674, 2018 WL 1705574, at *1 (E.D. La. Apr. 9, 2018) does not support its argument. The *Emmons* court stated: "Although Plaintiff apparently would have preferred to continue using Adderall for his ADHD, it is beyond peradventure that the ADA ensures only a reasonable accommodation of disability where such an accommodation is possible." *Emmons*, WL 1705574, at *1. The plaintiff in *Emmons* requested using a medication that was banned by federal regulations. *Id.* The *Emmons* court held the requested accommodation was not available, not that it was only a matter of preference. *Emmons* is inapposite to this case. AFS has not argued that any federal regulations govern this case and has therefore waived any such argument. In addition, because AFS cannot show that any individual Claimant was a direct threat, there was no substantive reason not to allow Claimants to continue using their prescribed medications.

7.    The Failure to Accommodate *Is* the Adverse Employment Action

Defendant argues that the Commission must show an adverse employment action to support its failure-to-accommodate claim and relies on *Beasley v. O'Reilly Auto Parts*, 559 F. Supp. 3d 1226 (S.D. Ala. 2021)—a non-binding decision. (Doc. 153 at 99). The *Beasley* court's holding hinged on its analysis of a footnote in *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247 (11th Cir. 2007). But the *Beasley* court did not give weight to, or even consider, the Eleventh Circuit's more-recent footnote in its *en banc* holding in *Lewis v. City of Union City, Ga.*, 934 F.3d 1169 (11th Cir. 2019) (*en banc*). There, the Eleventh Circuit explained:

> In cases where the employee meets either the first or second definitions of "disabled" (that is, the employee shows that he or she is or has a history of being actually disabled) on the first prima facie element, that employee may meet his or her prima facie burden on this third element by showing that the employer does not make reasonable accommodations for the disability. *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) ("An employer unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer."); *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (framing issue on appeal as "whether Defendant discriminated against Plaintiff by failing to provide a reasonable accommodation that would have enabled her to perform either her CSO duties or the essential duties"); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) ("[A]n employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."); *see also* 42 U.S.C. § 12112(b)(5)(A). In other words, an employer's failure to provide a reasonable accommodation may be evidence that that employer has discriminated against her "because of" her disability.

*Lewis*, 934 F.3d at 1183 n. 11 (*en banc*).

Applying the Eleventh Circuit's analysis here, the evidence shows that the Defendant failed to accommodate Claimants who needed their medications to perform the essential functions of their position, and thus Defendant's failure to accommodate these Claimants is competent

summary judgment evidence that Defendant discriminated against them because of their disability. But even if the Court finds that an adverse employment action is required to establish a failure to accommodate claim, the Commission has nevertheless put forth sufficient evidence of adverse employment actions as to each of the Claimants, as explained above. (*See* Section IV.C.3 above).

Defendant further contends that it was under no obligation to allow the claimants to continue using their medications as the claimants did not strictly "need" their medications to perform the essential functions of their positions (Doc. 153 at 90-91). However, "[e]mployers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job because qualified handicapped employees who can perform all job functions may require reasonable accommodation to allow them to ... enjoy the privileges and benefits of employment equal to those enjoyed by non-handicapped employees." *Equal Emp. Opportunity Comm'n v. Kaiser Found. Health Plan of Georgia, Inc.*, No. 1:19-CV-5484-AT, 2021 WL 3508533, at *3 (N.D. Ga. Aug. 9, 2021) (quotations omitted). AFS's argument oversimplifies the Eleventh Circuit precedent on this issue. In *Adams v. Crestwood Med. Ctr.*, 504 F. Supp. 3d 1263 (N.D. Ala. 2020), the court provided a nuanced explanation of the Eleventh Circuit's precedent regarding this issue:

> [T]he Eleventh Circuit's decision in *Holly* illuminates a distinction between reasonable accommodations that are strictly "necessary" for (and thereby enable) the performance of essential functions, and reasonable accommodations that are not "necessary" as such, but nevertheless pertain to (and nevertheless enable) the performance of essential functions in a broader, more general sense. That is, whereas an accommodation may manifest reasonably because it enables the employee to perform an essential job function he or she could not perform without the alteration, another accommodation may manifest reasonably all the same because it effectively facilitates the employee's execution of the job – even if the employee can perform the job's essential functions without such accommodation. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257, 1261–62 (11th Cir. 2007). Further, insofar as a reasonable accommodation may properly entail the

elimination or modification of marginal functions, such an elimination or modification may constitute a reasonable accommodation that both enables the employee to (1) perform the job's essential functions, and (2) enjoy equal benefits and privileges of employment. *See* 29 C.F.R. § 1630.2(o)(1); U.S. E.E.O.C., Questions & Answers About Persons With Intellectual Disabilities in the Workplace and the Americans With Disabilities Act (Oct. 20, 2004), *available at*, 2004 WL 2368526. Thus, applying these principles to the instant case, a reasonable jury may conclude relief from the meal tray delivery duty constitutes a reasonable accommodation because (1) it would have enabled Adams's performance of the Porter/Dishwasher position's essential functions (even if he did not require an accommodation for the same); and (2) it would have enabled Adams to enjoy the same benefits and privileges of employment that employees without disabilities enjoy at Crestwood (i.e., performing the Porter/Dishwasher job without the unique obstacles Adams experienced vis-à-vis the meal tray delivery duty).

*Adams*, 504 F. Supp. 3d at 1305 n. 38. *See Equal Emp. Opportunity Comm'n v. Kaiser Found. Health Plan of Georgia, Inc.*, No. 1:19-CV-5484-AT, 2021 WL 3508533, at *3 (N.D. Ga. Aug. 9, 2021) ("As a matter of 'logical necessity,' the reasonableness of an employer's request for accommodation thus does not always turn upon his performance of the essential functions of his position.") (citations omitted).

Just as in *Adams*, the accommodations the claimants sought here—permission to continue taking their medications as prescribed—were necessary to allow the claimants to perform the essential functions of their job in a manner that enabled them "to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii). The medications allowed the claimants to work in a manner unimpaired (or substantially less impaired) by their disabilities.

For example, for those with ADHD, being allowed to take their medication would let them do their jobs without (or with less of) the impaired focus, energy, and executive function that often plague those suffering from the condition, thereby putting them on more even footing with their non-disabled coworkers in the performance of their job duties. For those with chronic pain, the

prescribed medications would have allowed them to work without (or with less) pain, also putting them on more even footing with their non-disabled coworkers. Thus, by failing to accommodate the claimants' need to remain on their prescribed medications and forcing them to work unmedicated, Defendant subjected the claimants to discrimination that robbed them of the "equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities," because the claimants needed those medications to work in the same manner as non-disabled employees. 29 C.F.R. § 1630.2(o)(1)(iii).

**G.    None of the EEOC's Claims Are Time-Barred**

1.    No Claimants Are Time-Barred Because AFS's Continuing Policy of Discrimination was a Continuing Violation That Extended the Charge Period

AFS suggests that 8 of the 17 Claimants' claims are time-barred because they accrued outside 180 days of when Nolin filed his charge on December 12, 2016. (Doc. 153, p. 77). This is inaccurate. Under Section 706 of Title VII (or ADA), an **individual** asserting employment discrimination must ordinarily file a charge with the EEOC within 180 days of when the unlawful employment practice occurred. *See* 42 U.S.C. § 2000e—5(e); 29 C.F.R. §1601.13. Even if a statutory time limit did apply to Claimants, the Supreme Court has held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a time-bar, is subject to waiver, estoppel, and equitable tolling." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (quoting *Zipes v. Trans World Airlines,*

*Inc.*, 455 U.S. 385, 393 (1982)).[40]   The "continuing violation doctrine" constitutes one such exception to the timely charge-filing requirement. *See id.* at 114.

The EEOC's claims are timely because they allege that AFS had an ongoing policy of discrimination that extended well prior to 180-days before both Nolin and Simmons' charges of discrimination. The EEOC can recover relief for claimants subjected to AFS's discriminatory policy and application of it throughout the policy existence under a continuing violation theory.

Under the continuing violation doctrine, the time limitation is tolled for a claim that otherwise would be time-barred "where the violation giving rise to the claim continues to occur within the limitations period." *Nat. Parks and Conservation Ass'n, Inc. v. Tenn. Valley Auth.,* 502 F.3d 1316, 1322 (11th Cir. 2007). For the continuing violation doctrine to apply, a plaintiff must show a "systemic violation," that is, "a longstanding and demonstrable policy of discrimination." *LRL Prop. v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1106 (6th Cir. 1995).[41]   "Unrelated incidents of discrimination will not suffice to invoke this exception; rather

---

[40] *Morgan* analyzed the timeliness requirements of Title VII of the Civil Rights Act of 1964. The ADA incorporates the procedures of Title VII, including its charge filing requirements. 42 U.S.C.§ 12117(a). In *Morgan,* the Supreme Court held that a private litigant may not recover for discrete acts of discrimination outside Title VII's 180-day statutory time to file a charge. *Morgan* explicitly stated that its holding did not extend to pattern-or-practice cases. Courts have also held that *Morgan*'s discrete acts holding does not extend to longstanding policies of discrimination by a defendant.

[41] Courts historically recognized two categories of continuing violations: "serial" and "systemic." *Sharpe v. Cureton,* 319 F.3d 259, 266 (6th Cir. 2003); *Jensen v. Frank,* 912 F.2d 517, 522 (1st Cir. 1990). A "serial" violation was shown by "a chain of similar discriminatory acts." *Provencher v. CVS Pharmacy, Div. of Melville Corp.,* 145 F.3d 5, 14 (1st Cir. 1998). However, in *Nat'l R.R. Passenger Corporation v. Morgan,* 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), the Supreme Court held that serial acts do not constitute a continuing

there must be a continuing 'over-arching policy of discrimination.'" *LRL Prop.*, 55 F.3d at 1106.[42] To establish a systemic violation in an employment case, for example, a plaintiff "must demonstrate something more than the existence of discriminatory treatment;" instead, a plaintiff "must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure." *Sharpe v. Cureton*, 319 F.3d 259, 268-69 (6th Cir. 2003) (internal citations and quotations omitted). A discriminatory policy such as AFS's can establish a continuing violation. [43]

As discussed in Sections II and IV, the evidence shows that, since at least 2013, when AFS completed the formulation of its policy on prescription medications, AFS engaged in a systemic policy of disability discrimination. AFS's policy was to prohibit certain prescription medications for employees who worked in positions designated as safety sensitive. The employees endured

---

violation. *See O'Connor v. City of Newark,* 440 F.3d 125, 127 (3rd Cir. 2006) (holding after *Morgan* "discrete acts ... cannot be aggregated under a continuing violations theory.") *Morgan* does not implicate the continuing violation exception that involves a longstanding policy of discrimination. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003).

[42] *See also EEOC v. Sears, Roebuck & Co.*, 490 F. Supp. 1245, 1260, (M.D. Ala.1980). (Ruling that the continuing violations doctrine applies to pattern-or-practice cases, and a suit is barred only when the series of practices has ended, and the last act of discrimination occurred more than 180 days before the charge was filed).

[43] *See Moore v. Chertoff*, 437 F. Supp. 2d 156, 98 FEP 795 (D.D.C. 2006). (A plaintiff may challenge a discriminatory policy or system under a continuing violation theory even if the plaintiff was aware of the discriminatory nature of the policy before the filing period.); *Arroyo-Audifred v. Verizon Wireless, Inc.*, 431 F. Supp. 2d 215 (D.P.R. 2006). (Court in ADEA case found the series of discriminatory actions against the plaintiff was evidence of a discriminatory policy of closing doors to older people. This was sufficient to state a claim for a systemic violation that continued into the 300-day period preceding the plaintiff's charge.); *Murphy v. Gen. Elec. Co.*, 245 F. Supp. 2d 459, 90 FEP 1418 (N.D.N.Y. 2003). (Since the plaintiff presented evidence he was terminated pursuant to a policy of terminating older employees, he established a continuing violation, and allegations of ADEA violations concerning acts occurring prior to 300 days before he filed his EEOC charge that related to this policy were not untimely.); *Tenenbaum v. Caldera*, 45 Fed. Appx. 416 (6th Cir. 2002)(*Morgan* decision does not implicate continuing violations related to an employer's established policy); *Brabson v. Ohio*, 2012 U.S. Dist. LEXIS 160895 (S.D. Ohio 2012)(Court observed that "the continuing violation exception can only be utilized for discrete acts when an employee demonstrates that the employer had a longstanding policy of discrimination against the class of which the plaintiff is a member," citing *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003)).

random drug testing and mandatory self-reporting of prohibited medications. The first violation of the ADA of which the EEOC is aware occurred in May 2014 when AFS forced Timothy Murray to stop taking his prescribed medications. In 2016, the number of employees sent to the company doctors and the number of ADA violations dramatically increased. The evidence shows that AFS engaged in a systemic policy of prohibiting its employees' use of prescription medications. All class members were denied the ability to take medication prescribed to them at some point. AFS's discriminatory policy continued until AFS lost its contract in 2018.

AFS claims several cases from this Circuit preclude the EEOC from using the continuing violations doctrine. These cases miss the mark. None of these cases involve a class or a systemic policy of discrimination. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 965 (11th Cir. 2008), merely states that an individual plaintiff cannot use a pattern-or-practice theory, which requires a class. The other District Court cases from within the Eleventh Circuit cited by AFS disallow an individual plaintiff from using discrete acts of discrimination to prove a continuing violation.[44] Neither case disallows the continuing violations doctrine where an overarching discriminatory policy existed. Here, 17 Claimants endured discrimination stemming from AFS's overarching policy. This is different from the cases cited by AFS. The EEOC's class members endured an overarching policy that continued into the charging period. Therefore, any claimants that would otherwise be time-barred are timely because of the continuing violations doctrine.

---

[44] AFS cites *Salser v. Clarke Cty. Sch. Dist.*, No. 3:10-CV-17 CDL, 2011 WL 56064, at *3 (M.D. Ga. Jan. 5, 2011) (Denial of reasonable accommodations were considered discrete acts and the continuing violations doctrine did not apply); *Hernandez v. Palm Beach Cty. Bd. of Cty. Comm'rs*, No. 20-80075-CIV, 2021 WL 4459405, at *8–9 (S.D. Fla. Sept. 29, 2021) (The plaintiff could not rely on previous discrete acts of conduct to prove a continuing violation). (Doc. 153, p. 78).

2.    The EEOC Has Broader Authority Than a Private Litigant to Pursue Any Claim Arising Out of a Reasonable Investigation.

The case law dictates that the EEOC has broad authority to rectify instances of discrimination. The EEOC has broader authority than private litigants because the EEOC is charged with protecting the public from workplace discrimination. This Court should not preclude the EEOC from pursuing claims that were discovered during a reasonable investigation that AFS had fair notice of. AFS wants this Court to apply 42 U.S.C. §2000e—5(e) to the EEOC in a unique way. The plain language of 42 U.S.C. §2000e—5(e) applies a 180-day (or 300-day) time limitation to individuals who file a charge with the EEOC. AFS would like to extend this time limitation to every individual instance of discrimination that the EEOC uncovers during a reasonable investigation. This type of expansion of 42 U.S.C. §2000e—5(e) is not supported by the plain language of the statute, by the policy underlying the statutes the EEOC enforces, or by the case law.

3.    EEOC's Has Broad Enforcement Authority to Rectify Discrimination

Public policy in discrimination cases brought by individuals is always a consideration, but there is the broader public interest at work in suits brought by the EEOC. The EEOC acts, not only "for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 326 (1980). Therefore, the scope of the EEOC's interest, especially in cases involving class-wide discrimination, is broader than that of any individual plaintiff. *Id*. Congress and the United States Supreme Court have expanded the EEOC's ability to sue, as well as the types of relief available, and loosened procedural restrictions in EEOC suits several times. This expansion has allowed the EEOC to efficiently and effectively rectify instances of discrimination.

Courts have broadly defined the scope of the EEOC's power and distinguished the EEOC from private plaintiffs. For example, the EEOC may independently seek relief for a group of aggrieved individuals and is not required to comply with the class certification and other requirements of Federal Rule of Civil Procedure 23. *Waffle House*, 534 at 288; *Gen. Tel. Co.*, 446 U.S. 318, 330 (1980). The United States Supreme Court has also held the EEOC is not subject to the same statute of limitations as claims brought by private litigants. *Waffle House*, 534 U.S. at 287 (citing *Occidental Life*, 432 U.S. at 368). Finally, *Occidental* held the EEOC is not beholden to time limitations set forth in § 2000e—5(f)(1). The Court did, however, apply § 2000e—5(f)(1) to private litigants. *Occidental Life*, 432 U.S. at 366.

When the EEOC is the plaintiff, courts have recognized the EEOC's ability to bring any claims that grow out of a reasonable investigation. "Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable." *Gen. Tel. Co.*, 446 U.S. at 331. The original charge of discrimination provides EEOC with "a jurisdictional springboard to investigate whether the employer is engaged in any discriminatory practices," which investigation may well "disclose, as in this instance, illegal practices other than those listed in the charge." *EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453, 455 (5th Cir. 1975). "The charge incites the investigation, but if the investigation turns up additional violations the Commission can add them to its suit." *EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005). "Once the EEOC begins an investigation, it is not required to ignore facts that support additional claims of discrimination if it uncovers such evidence during the course of a reasonable investigation." *EEOC v. Kronos, Inc.*, 620 F.3d 287, 297 (3rd Cir. 2010).

In *U.S. EEOC v. O'Reilly Auto. Stores, Inc.*, the Defendant attempted to limit the scope of a class to just timely filed charges of discrimination that exhausted all administrative remedies. *U.S. EEOC v. O'Reilly Auto. Stores, Inc.*, U.S. Dist. LEXIS 266330, *17-18 (M.D. Fla. 2020). The Court determined that the scope of an action brought by the EEOC is not so limited. *Id*. When the EEOC serves as the representative for the discriminated class, the EEOC is not limited to the claims presented by the charging parties. *Id*. Instead, any violations the EEOC uncovers during a reasonable investigation of the charging party's complaint is actionable. *Id.* Consequently, "an enforcement suit can include any claims within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.*[45]

Here, although the EEOC's involvement was triggered by Paul Nolin's and Mervin Simmons' timely charges, the scope of the investigation uncovered various other issues on which the EEOC made reasonable cause determinations. *See Occidental Life*, 432 U.S. at 359-60; 42 U.S.C. § 2000e—5. The EEOC followed its own "multistep enforcement procedure" that led to this lawsuit. *Occidental Life*, 432 U.S. at 359; *Waffle House*, 534 U.S. at 287. All the EEOC's claimants and claims grew out of a reasonable investigation of AFS. The EEOC need not and must not ignore discrimination it uncovered while investigating AFS. Because of the statutory and judicially recognized breadth of the EEOC's enforcement authority, this Court should find that §

---

[45] (Citing *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1237, 1245 (M.D. Ala. 2001) (internal quotation marks omitted) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).

2000e—5(e)(1) does not apply to any occurrences of discrimination that the EEOC uncovers during a reasonable investigation.[46]

4.    AFS's Timeliness Argument is Based on a Non-Controlling Outlier Case

In a block quote, AFS adopts an argument from the Maryland District Court applying the 42 U.S.C. § 2000e—5(e)(1) time limitation to the EEOC. (Doc. 153 at 77). In *EEOC v. Freeman*, U.S. Dist. LEXIS 41336, *12 (D. Md. 2010), the court applied § 2000e—5(e)(1)'s time limitation to all EEOC class members. Much like AFS, the *Freeman* court determined that the plain language of § 2000e—5(e)(1) applies in the context of a class action brought by the EEOC with very little analysis. *Id*. The *Freeman* court's reasoning is simply that "section [2000e—5(e)(1)] clearly bars claims from individuals who failed to timely file charges." The *Freeman* Court then makes a quantum leap in its analysis and applies the § 2000e—5(e)(1) time limitation to the EEOC in the context of a class enforcement actions, where the EEOC is the plaintiff. The six sentences and conclusory language the *Freeman* court uses to analyze § 2000e—5(e)(1) is not well-reasoned. The lack of analysis is striking considering that no Circuit Court of Appeals has ruled on this issue and there is a split among the district courts. *EEOC v. Freeman*, 2010 U.S. Dist. LEXIS 41336, *6. (noting that no Circuit Court has considered this issue and there is a split among the district courts).

---

[46] *See also EEOC v. Sterling Jewelers, Inc*., 2010 U.S. Dist. LEXIS 649, 2010 WL 86376 (W.D.N.Y. Jan. 6, 2010) (finding the 300-day statute of limitations inapplicable to the EEOC); *EEOC v. LA Weight Loss*, 509 F. Supp. 2d 527 (D. Md. 2007) (same); *EEOC v. Scolari Warehouse Markets, Inc*., 488 F. Supp. 2d 1117 (D. Nev. 2007) (same); *EEOC v. Mitsubishi Motor Mfg. of Am., Inc*., 990 F. Supp. 1059 (C.D. Ill. 1998) (same).

The EEOC does not agree that a court can apply limitations from §2000e—5(e)(1) that are not based on the statutory language. The language of § 2000e—5(e)(1) requires **a charge** to be filed with the EEOC 180 days after the alleged unlawful employment practice occurred. The statute goes no further. Logically, concluding that § 2000e—5(e)(1) bars every claim by the EEOC on behalf of class members who failed to timely file charges would require every member of a class to file a timely charge. Courts, including *Freeman*, have rejected this interpretation.[47] Yet the *Freeman* court conjures a rule allowing claims of discrimination that were *not* filed to proceed if the discrimination occurred within 180 days before the "initial filer."[48] This rule is nowhere to be found in Title VII. The *Freeman* court failed to apply the principle of *casus omissus pro omisso habendus est*-- that is, *"nothing should be added to what the text states or reasonably implies.*" Both AFS and the *Freeman* court claim that the text of § 2000e—5(e)(1) *clearly* applies to the

---

[47] See *EEOC v. 5042 Holdings Ltd.*, 2010 U.S. Dist. LEXIS 8242, 2010 WL 148085, at *1 (N.D. W.Va. Jan. 11, 2010) ("[I]t has long been the law of this Circuit that the EEOC possesses broad statutory authority to expand the scope of its litigation to encompass classes/groups of victims and claims not identified in the administrative charge precipitating the EEOC's lawsuit . . . ."); *EEOC v. Sidley Austin LLP*, 437 F.3d 695, 696 (7th Cir. 2006) (holding in an action under the Age Discrimination in Employment Act of 1967 that "the Commission is not bound by the failure of the Sidley ex-partners to exhaust their remedies; the *Commission* had no duty to exhaust"); *EEOC v. Scott Med. Health Ctr., P.C.*, 217 F. Supp. 3d 834, 837 (W.D. Pa. 2016) (rejecting defendant-employer's argument that administrative-exhaustion requirement applicable to private litigants applies equally to EEOC enforcement actions in case involving non-charge-filing aggrieved person); *EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 403-04 (E. D. N.Y. 2016) ("Courts have permitted the EEOC to add new claimants identified during discovery even when the EEOC is asserting claims under Section 706 of Title VII rather than exclusively under Section 707, which permits 'pattern or practice' actions.").

[48] The initial filer is the individual whose charge initiates the EEOC's investigation.

EEOC in this context, but both arrive at a conclusion that is not in the plain language of the statute.[49]

To borrow language from the *Freeman* Court, if Congress intended Title VII to include time limitations on class enforcement actions, it would have said so. Similarly, the United States Supreme Court has held that 42 U.S.C.S. § 2000e—5(f)(1) imposes no time limitation upon the power of the EEOC to sue in federal court. *Occidental Life*, 432 U.S. 355, 366 (1977). The Court interpreted § 2000e—5(f)(1) to apply only to private litigants and not the EEOC when the EEOC is a plaintiff. *Id*.

AFS and the *Freeman* court's interpretation of § 2000e—5(e)(1) is a policy argument concealed by a weak statutory analysis. The argument is actually concerned with fair notice of claims.[50] Although AFS did not expressly argue that it did not have notice of all class members— it actually did have such notice. AFS has always known that the EEOC was investigating a potential class action. (Ex. 97, Nolin Charge; Ex. 98 Simmons Ltr. of Determination; Ex. 99, Simmons Charge). The EEOC broadly informed AFS that a class action was being alleged based on AFS's policy related to prescription medications. Possible class members were identified prior to conciliation.[51] (Ex. 87, Proposed Settlement Agreement). An enforcement suit is permissible so

---

[49] A court's authority to interpret statutory language is constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction. The court does not look at one word or term in isolation but looks to the entire statute and its context. *Owens-Benniefield v. BSI Fin. Servs.*, 806 Fed. Appx. 853, 855, (11th Cir. 2020).

[50] "In addition, other *policy* and fairness considerations, including concerns of open-ended liability and the need for prompt notification of the asserted violations to the employer, militate in favor of applying the 300-day limitations period to the EEOC." *EEOC v. Freeman*, U.S. Dist. LEXIS 41336, *14 (D. Md. 2010) (emphasis added).

[51] Claimant Timothy Murray was not specifically named in any documents, but notice was given broadly when a class was alleged based on AFS's longstanding medication policy.

long as EEOC's reasonable cause letter provides the employer with fair notice of the possible violations and gives the employer a chance to conciliate the same. *Dinkins*, 133 F. Supp. 2d 1237, 1245. The EEOC went beyond a typical case to give AFS notice of possible class members during the investigation. Notice is therefore not a concern in this case. This Court need not ponder concerns of open-ended liability because this class is defined and does not extend past the Claimants. And, as stated above, the public interest in eliminating workplace discrimination outweighs concerns of *possible* open-ended liability.[52]

5. Notwithstanding the Continuing Violation Doctrine, AFS Miscalculated the Relevant Charge Period

AFS claims that eight of EEOC's class members should be dismissed because the foundation of those claims occurred more than 180 days before the filing of Paul Nolin's charge.[53] This is a miscalculation. Even if the continuing violation doctrine did not make all the EEOC's claims timely, the charge time period did not start when Simmons and Nolin filed their formal charges with the EEOC. The correct time period for the statute of limitations runs from the date of the EEOC intake questionnaires, not the charges of discrimination. The Supreme Court has held

---

[52] The Court in *Morgan* noted that § 2000e—5(g)(1) allows for recovery of backpay for up to two years before the filing of the charge and that "[i]f Congress intended to limit liability to conduct occurring in the period within which the party must file the charge, it seems unlikely that Congress would have allowed recovery for two years of backpay." *Nat'l R.R. Passenger Corporation v. Morgan,* 536 U.S. 101, 119, S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Congress must have therefore contemplated liability for acts extending outside the 180-day filing period.

[53] AFS alludes to a charge filed by Mervin Simmons on November 19th, 2016. (Doc. 153 at p. 29 n. 9 and Ex. 99, Simmons Charge). However, 180 days before November 19th, 2016 is May 23, 2016. If this Court applies *EEOC v. Freeman*, May 23, 2016 would be the limiting period. In *EEOC v. Freeman*, the term "triggering charge" refers to the charge that triggers the EEOC's investigations. *EEOC v. Freeman*, U.S. Dist. LEXIS 41336, *12. In this case, Simmons's charge triggered the investigation. Thus, applying AFS's case law and logic, Sabra Distasio Kelly's (asserted as May 23, 2016) claims are not time barred. (Doc. 153 p. 78).

that an EEOC intake questionnaire constitutes a charge for statute of limitations purposes if it sets forth certain basic information and indicates an intent to trigger the EEOC investigative process. *See Fed. Express Corp. v. Holowecki,* 552 U.S. 389 (2008); 29 C.F.R. § 1601.12(a). *Holowecki* adopted the Commission's regulations requiring that a charge include five pieces of information: (1) charging party's name and contact information; (2) respondent's name and contact information; (3) a concise statement of the circumstances of the alleged discrimination; (4) charging party's estimate of the number of employees working for respondent; and (5) whether charging party had previously filed a charge regarding these issues with the EEOC or any other agency. 552 U.S. at 395-396 (citing 29 C.F.R. § 1626.8(a).

Even if a charge does not contain the suggested information, the EEOC will deem a charge minimally sufficient when it receives from the charging party "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1318 (11th Cir. 2001) (quoting 29 C.F.R. § 1601.12(b) (2000). Furthermore, a charge may be amended to cure technical defects, to clarify or amplify allegations, or to allege additional unlawful acts. *See id.* The requirements for a charge are, indeed, "very minimal." *Id.* (quoting *EEOC v. Mississippi Coll.*, 626 F.2d 477, 483 (5th Cir. 1980)).

"[A] verified intake questionnaire that includes the basic information suggested by 29 C.F.R. § 1601.12(a) may constitute a charge for purposes of the Title VII statute of limitations when the circumstances of the case would convince a reasonable person that the charging party manifested her intent to activate the administrative process by filing the intake questionnaire with the EEOC." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1321 (11th Cir. 2001). To determine

whether an intake questionnaire functions as a charge, this Court should ask "[w]ould the circumstances of this case convince a reasonable person that [the charging party] manifested her intent to activate the machinery of Title VII by lodging her intake questionnaire with the EEOC?" *Wilkerson*, 270 F.3d at 1320.

Both Nolin and Simmons listed their name and contact information, Defendant's name and contact information, a concise statement of the discrimination, an estimate of the number of employees working for Defendant and whether they had filed a charge regarding these issues with the EEOC or another agency. Simmons also checked the box indicating he desired to file a charge of discrimination.[54] Thus, the Charging Parties' EEOC questionnaires readily meet the EEOC regulations (five informational requirements), and Simmons's also meets the *Holowecki* requirement (request for action) and therefore constitute charges for purposes of the statute of limitations. The intake questionnaires both identify the information necessary to satisfy EEOC's regulations concerning charge content, including: (1) each Charging Party's name and contact information, (2) Defendant's name and contact information, (3) a concise statement of the discrimination, (4) an estimate of the number of employees working for Defendant, and (5) whether the Charging Party had filed a charge regarding these issues with EEOC or any other agency. (Ex. 46, Intake Nolin; Ex. 47, Intake Simmons).

---

[54] The box states: "I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination."

Each Charging Party submitted an intake questionnaire to the EEOC on November 4, 2016. Even if the continuing violation doctrine did not apply, 180 days before November 4, 2016, is May 8, 2016. AFS is incorrect that the 180-day period started June 15, 2016. Therefore, Sabra Distasio Kelly's claims would fall within this charge period.

**H.    The Claimants Are Entitled to Compensatory Damages Due to Evidence of Intentional Discrimination and Foreseeable Further Injuries Caused by AFS**

AFS asserts that some unidentified legal principle bars the EEOC from seeking damages resulting from harms to Claimants outside the workplace or related to their medical condition.[55] But individuals covered by the ADA may pursue compensatory damages for foreseeable injuries flowing from the defendant's federal statutory violations. *See Adam C v. Scranton Sch. Dist.*, No. 3:07-CV-532, 2011 U.S. Dist. LEXIS 27423, at *33-34 (M.D. Pa. Mar. 17, 2011). *See also E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 834 (7th Cir. 2013) (affirming compensatory damages award in part for daily back pain causing problems outside of work like putting on clothes and taking a shower and recognizing "that cases that include even the slightest "physical element" are often associated with more substantial compensatory-damages awards"); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996) (affirming compensatory damages award in part for emotional distress, nightmares, weight loss, and excessive nervousness after discharge); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998) (finding medical evidence or corroborating testimony not required for mental anguish damages). The EEOC, however, is at a disadvantage in responding to AFS's arguments. AFS has provided no legal authority in support

---

[55] AFS also argues that compensatory and punitive damages are not available for disparate impact claims. (Doc.153 111) As discussed, the EEOC's claims are not limited to disparate impact. (§IV.E.1, *supra*).

of them. AFS has therefore waived its argument. *Taul ex rel. United States v. Nagel Enters.*, No. 2:14-CV-0061-VEH, 2019 U.S. Dist. LEXIS 26669, at *11-12 (N.D. Ala. Feb. 20, 2019) (holding that failure to cite to any legal authority constitutes an undeveloped argument and waives the issue); *Earl Patrick As Adm'r & Pers. Representative of the Estate of Patrick Clyde v. City of Birmingham*, No. 2:09-CV-1825-VEH, 2010 U.S. Dist. LEXIS 147326, at *6-7 (N.D. Ala. Oct. 28, 2010) (recognizing that an argument made without citation to authority is insufficient to raise an issue before the court).

## V.   CONCLUSION

Based on the foregoing, the EEOC respectfully requests the Court deny Defendant's Motion for Summary Judgment.

Dated this the 18th day of October 2022.

*/s/Carl Chang* __

**CARL M. CHANG**
Trial Attorney
(205) 382-3859
carl.chang@eeoc.gov

**GEORGE HAYEK**
Trial Attorney
(205) 651-7071
george.hayek@eeoc.gov

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
Phone: (205) 651-7034
Facsimile: (205) 212-2041

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system which will electronically send notification of the filing to all attorneys of record.

/s/*Carl Chang*__
CARL CHANG
Trial Attorney